# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

FRANKLIN CALIFORNIA TAX-FREE
TRUST, et al.,

         Plaintiffs,

  vs.

THE COMMONWEALTH OF PUERTO
RICO, et al.

         Defendants.

Case No. 14-1518

Hon. Francisco A. Besosa

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS SUBMITTED BY THE COMMONWEALTH OF PUERTO RICO, GOVERNOR ALEJANDRO J. GARCIA PADILLA, AND JOHN DOE, AGENT FOR THE GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

César R. Miranda Rodríguez
 *Secretary of Justice*
Marta Elisa González Y.
Jorge L. Flores-De Jesús
Janitza M. García-Marrero
Maraliz Vázquez Marrero
Joseph G. Feldstein-Del Valle
DEPARTMENT OF JUSTICE
GENERAL LITIGATION OFFICE
Federal Litigation and Bankruptcy Division
P.O. Box 9020192
San Juan, PR  00902-0192
Tel:  (787) 721-2900

Alejandro Febres-Jorge
GOVERNMENT DEVELOPMENT BANK
 FOR PUERTO RICO
Roberto Sánchez Vilella Government Center
De Diego Avenue No. 100
Santurce, Puerto Rico 00907-2345
Tel: (787) 729-6438

July 21, 2014

Susan M. Davies
Eugene F. Assaf, P.C.
Jeffrey S. Powell
Michael A. Glick
Liam P. Hardy
Claire M. Murray
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
Tel:  (202) 879-5000

Paul M. Basta, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel:  (212) 446-4800

James H.M. Sprayregen, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel:  (312) 862-2000

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

STANDARD FOR MOTION TO DISMISS...........................................................6

ARGUMENT .........................................................................................................8

I.      Unless PREPA Seeks Relief Under the Act, This Lawsuit Is Premature and
        Unripe. ......................................................................................................8

II.     The Act Is Not Preempted By the Federal Bankruptcy Code and Does Not Violate
        the U.S. Constitution's Bankruptcy Clause. ...............................................9

        A.      The Act Is a Valid Exercise of Puerto Rico's Police Power. ................9

        B.      Section 903's Limited Reach Does Not Actually Conflict With the Act.............12

III.    The Act Does Not Violate the Contract Clause.........................................15

IV.     The Act Does Not Violate the Takings Clause...........................................19

V.      The Act Properly Stays Litigation Seeking a Public Corporation's Limited Assets
        Pending Restructuring Proceedings...........................................................24

CONCLUSION ....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Andrus v. Allard*,
    444 U.S. 51 (1979) ....................................................................................................22, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................................6, 20

*Ashton v. Cameron Cnty. Water Improvement Dist.*,
    298 U.S. 513 (1936) ........................................................................................................10

*Aulson v. Blanchard*,
    83 F.3d 1 (1st Cir. 1996) ..................................................................................................7

*Blanchette v. Conn. Gen. Ins. Corps.*,
    419 U.S. 102 (1974) ........................................................................................................15

*Buckingham v. McLean*,
    54 U.S. 151 (1851) ..........................................................................................................21

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
    2014 WL 1758913 (6th Cir. May 5, 2014) ....................................................................13

*Commonwealth of Pa. State Emps.' Ret. Fund v. Roane*,
    14 B.R. 542 (Bankr. E.D. Pa. 1981) ..............................................................................24

*Connolly v. Pension Benefit Guar. Corp.*,
    475 U.S. 211 (1986) ..................................................................................................20, 22

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008) ..............................................................................................7

*Donovan v. City of Dallas*,
    377 U.S. 408 (1964) ...............................................................................................2, 24, 25

*Doty v. Love*,
    295 U.S. 64 (1935) ..........................................................................................................11

*Energy Reserves Grp. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ........................................................................................................16

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995) ..............................................................................................9

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
    426 U.S. 572 (1976) ..........................................................................................................9

*Faitoute Iron & Steel Co. v. City of Asbury Park,*
316 U.S. 502 (1942) .................................................................................2, 10

*FDIC v. Torrefación Café Cialitos, Inc.,*
62 F.3d 439 (1st Cir. 1995) ............................................................................10

*Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño,*
604 F.3d 7 (1st Cir. 2010) ..............................................................................20

*Grogan v. Garner,*
498 U.S. 279 (1991) ........................................................................................23

*Hanover Nat'l Bank v. Moyses,*
186 U.S. 181 (1902) ...................................................................................10, 15

*Highland Realty, Inc. v. Superior Court of P.R.,*
103 D.P.R. 306 (1975) ...................................................................................10

*Home Bldg. & Loan Ass'n v. Blaisdell,*
*290 U.S. 398 (1934)* ........................................................................12, 16, 17

*Hudson Cnty. News Co. v. Metro Assocs., Inc.,*
141 F.R.D. 386 (D. Mass. 1992) .....................................................................7

*In re Bankers Trust Co.,*
566 F.2d 1281 (5th Cir. 1978) ........................................................................11

*In re Cash Currency Exch., Inc.,*
762 F.2d 542 (7th Cir. 1985) .........................................................................11

*In re Equity Funding Corp. of Am.,*
396 F. Supp. 1266 (C.D. Cal. 1975) ..............................................................11

*Israel-British Bank (London) Ltd. v. FDIC,*
536 F.2d 509 (2d Cir. 1976) ..........................................................................11

*Local Div. 589, Amalgamated Transit Union v. Massachusetts,*
666 F.2d 618 (1st Cir. 1981) ..........................................................................16

*Local Loan Co. v. Hunt,*
292 U.S. 234 (1934) ........................................................................................23

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ..........................................................................................9

*McCullen v. Coakley,*
571 F.3d 167 (1st Cir. 2009) ............................................................................7

*McInnis-Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003) ...................................................................8

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
   312 U.S. 270 (1941) ...........................................................................7

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ..........................................................................12

*Mercado-Boneta v. Admin. del Fondo de Compensacion al Paciente*,
   125 F.3d 9 (1st Cir. 1997) ..................................................................17

*Neblett v. Carpenter*,
   305 U.S. 297 (1938) ..........................................................................11

*Ocasio-Hernandez v. Fortuno-Burset*,
   640 F.3d 1 (1st Cir. 2011) ....................................................................6

*Ogden v. Saunders*,
   25 U.S. 213 (1827) ...........................................................................20

*P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R.*,
   189 F.3d 1 (1st Cir. 1999) ..................................................................22

*Pa. Coal Co. v. Mahon*,
   260 U.S. 393 (1922) ..........................................................................23

*Penn Cent. Transp. Co. v. City of N.Y.*,
   438 U.S. 104 (1978) ...........................................................2, 20, 22, 24

*Perez v. Campbell*,
   402 U.S. 637 (1971) ..........................................................................23

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*,
   344 U.S. 237 (1952) .........................................................................7, 8

*Roman Catholic Bishop of Springfield v. City of Springfield*,
   724 F.3d 78 (1st Cir. 2013) ...................................................................8

*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*,
   628 F.3d 25 (1st Cir. 2010) ...................................................................6

*Soto-Torres v. Fraticell*,
   654 F.3d 153 (1st Cir. 2011) .................................................................6

*St. Angelo v. Victoria Farms, Inc.*,
   38 F.3d 1525 (9th Cir. 1994) ...............................................................15

*Stellwagen v. Clum,*
  245 U.S. 605 (1918) ....................................................................................10, 12

*Tenn. Student Assistance Corp. v. Hood,*
  541 U.S. 440 (2004) .........................................................................................25

*Texas v. United States,*
  523 U.S. 296 (1998) ...........................................................................................8

*Tringali v. Hathaway Mach. Co.,*
  796 F.2d 553 (1st Cir. 1986) ...........................................................................21

*U.S. Trust Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977) ...............................................................................2, 16, 17

*United Auto., Aerospace, Agric. Implement Workers v. Fortuño,*
  633 F.3d 37 (1st Cir. 2011) ...............................................................17, 18, 19

*United States v. Bekins,*
  304 U.S. 27 (1938) ...........................................................................................10

*United States v. Salerno,*
  481 U.S. 739 (1987) ...........................................................................................7

*Usery v. Turner Elkhorn Mining Co.,*
  428 U.S. 1 (1976) .............................................................................................23

*Vanston Bondholders Protective Comm. v. Green,*
  329 U.S. 156 (1946) .........................................................................................15

*Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark,*
  310 U.S. 32 (1940) ...........................................................................................17

*Welch v. Brown,*
  935 F. Supp. 2d 875 (E.D. Mich. 2013) ...........................................................13

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .........................................................................................14

*Williams v. Puerto Rico,*
  910 F. Supp. 2d 386 (D.P.R. 2012) ..............................................................7, 16

## Statutes, Rules, and Constitutional Provisions

11 U.S.C. § 101 ...........................................................................................11, 12, 14

11 U.S.C. § 103 .......................................................................................................13

11 U.S.C. § 109 ...............................................................................................11, 12

11 U.S.C. § 903 .........................................................................................12, 13, 14, 15

48 U.S.C. § 821 ...................................................................................................9, 14

Fed. R. Civ. P. 12(b)(5) .............................................................................................2

Fed. R. Civ. P. 12(b)(6) .............................................................................................6

Fed. R. Civ. P. 4(m) ..................................................................................................2

*P. del S.* 1164 ...........................................................................................................1

P.R. CONST. art. II, § 19 .......................................................................................9, 14

Pub. L. 82-447, 66 Stat. 327 (July 3, 1952) .............................................................9

U.S. CONST. amend. V .............................................................................................20

U.S. CONST. art. I, § 8, cl. 4 ..................................................................................9, 15

## Other Authorities

17A Charles Alan Wright et al.,
   *Federal Practice and Procedure* § 4212 ...........................................................25

17A *Moore's Federal Practice* § 121.07..................................................................25

H.R. Rep. No. 686, 94th Cong., 2d Sess. 4 (1976)...................................................14

S. Rep. No. 95-989, 95th Cong., 2d Sess. 49 (1978)................................................24

COME NOW, the Commonwealth of Puerto Rico, Governor Alejandro Garcia Padilla, in his official capacity, without submitting to the Court's jurisdiction and without waiving their affirmative defense to Eleventh Amendment immunity or sovereign immunity, and John Doe, agent for the Government Development Bank for Puerto Rico (collectively, the "Commonwealth Defendants"), through the undersigned attorneys, and very respectfully STATE, AVER and PRAY:

## INTRODUCTION

Faced with the most severe fiscal crisis in its history, the Commonwealth of Puerto Rico has taken steps to improve the financial situation of its public corporations and its people. In a valid exercise of its inherent police power, the Commonwealth has enacted the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Act"), *P. del S.* 1164, which assures the restructuring of debt by public corporations where no federal law applies and ensures these public corporations have the ability to continue to provide vital public services like delivering dependable electricity and clean water. Puerto Rico's public corporations are not eligible to restructure their debts under Chapter 9 of the federal bankruptcy code. And because they are governmental entities, those public corporations are unable to seek relief under Chapter 11. The Act nonetheless parallels these provisions of federal law by creating straightforward restructuring procedures for public corporations to negotiate with creditors. Like federal law, the Act seeks to maximize the value available to all creditors and to ensure equal treatment of creditors holding similar claims while preventing a stampede of litigation that could threaten core public services.

Plaintiffs, financial funds that claim to hold bonds issued by the Puerto Rico Electrical Power Authority ("PREPA"), now seek a declaration that the Act violates the Bankruptcy Clause, Contract Clause, and Takings Clause of the U.S. Constitution. They also question the constitutionality of the Act's automatic stay provision. Plaintiffs' claims fail on multiple levels.

As an initial matter, Plaintiffs' facial challenge to the constitutionality of the Act is premature

and should be dismissed on ripeness grounds unless and until PREPA files for relief under the Act. As to the merits, Plaintiffs' challenge is squarely foreclosed by precedent and thus fails as a matter of law. *First*, the Supreme Court has long rejected the argument that Congress's authority to enact uniform bankruptcy legislation automatically precludes states or territories from passing their own restructuring laws where, as here, there is no conflict between the Act and federal bankruptcy law. *See, e.g.*, *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 508-09 (1942). Moreover, Plaintiffs' arguments would force this Court to confront serious constitutional issues, and disregard the strong presumption in favor of the constitutionality of a legislative act. *Second*, the Supreme Court has held that the Contract Clause permits the impairment of contractual obligations when reasonably necessary to achieve an important government purpose. *See, e.g.*, *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25-26 (1977). The Act plainly meets this test on its face, and Plaintiffs do not—and cannot—allege facts to the contrary. *Third*, Supreme Court precedent establishes that economic regulations will rarely result in the type and degree of deprivation necessary to work an unconstitutional taking. *See, e.g.*, *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978). And it is implausible that a restructuring law—the type of regulation expressly contemplated by the Bankruptcy Clause—would rise to this level. *Fourth*, it is well-established that courts may exercise exclusive jurisdiction over a debtor's assets through a stay of other litigation. *See Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964). For all these reasons, the Amended Complaint should be dismissed.[1]

## BACKGROUND

**The Current Fiscal Crisis**. The fiscal situation in Puerto Rico has reached the most critical point in the Commonwealth's history. In January 2013, the deficit for fiscal year 2012-13 was

---

[1] The GDB Agent moves to dismiss despite the fact that neither GDB nor its agent have been served with the Amended Complaint. The GDB Agent reserves its rights to object to the sufficiency of service of process pursuant to Fed. R. Civ. P. 12(b)(5) if service is not perfected within the time limit set forth in Fed. R. Civ. P. 4(m).

projected to exceed $2.2 billion.  Act, Stmt. of Motives, § A.  Even after significant budget cuts, the deficit for that fiscal year ultimately exceeded $1.2 billion.  *Id.*  And despite additional measures of fiscal discipline approved by the Legislative Assembly, the deficit for the current fiscal year reached $650 million.  *Id.*  Moreover, in recent years, Puerto Rico has faced a declining population and high unemployment, which have led to a declining tax base and decreases in revenue.  *Id.*

The financial situation of the Commonwealth's three main public corporations, which provide essential utilities that are necessary for the general welfare of the people of Puerto Rico, is equally dire.  Their combined deficit in fiscal year 2012-13 was approximately $800 million, and their overall combined debt has reached $20 billion.  *Id.*  For the first time in the Commonwealth's history, the principal rating agencies have downgraded the Commonwealth's general obligation bonds (and the bonds of the majority of its public corporations) to below investment grade.  *Id.*  The attendant increases in interest rates, along with the reduction in access to capital markets, has further limited the liquidity and financial flexibility of the Government of the Commonwealth.  *Id.*  PREPA in particular—which employs over 8,000 Puerto Ricans and serves more than a million customers— has experienced severe reductions in its net revenues and has incurred net losses and cash flow shortfalls due to the prolonged weakness in the Commonwealth's macroeconomic conditions; high energy, labor, and maintenance costs; and investments in capital improvements.  *Id.*  PREPA's utility rates, which reached a high of $0.31 per kilowatt hour at the end of 2012, have crippled the Commonwealth's economic development and have made it difficult for PREPA to implement necessary capital improvements.  *Id.*

The Government Development Bank for Puerto Rico ("GDB")—which serves as financial adviser and fiscal agent to the Government—has also seen its liquidity affected as a result of financing the operational deficits of various public corporations.  In its financial statements for fiscal

year 2012-13, GDB reported that it had $6.9 billion in outstanding loans to the Commonwealth and its public corporations.   Its loans to municipalities totaled another $2.2 billion.   *Id.*   The Commonwealth has taken extraordinary steps to improve GDB's liquidity—including through a $3.5 billion bond issue and limits on the circumstances in which GDB may extend loans to public corporations.   *Id.*   GDB nonetheless continues to lack sufficient financial strength to satisfy the current financing needs of the Commonwealth and its public corporations.   *Id.*   These problems have been exacerbated by recurring budget deficits, prolonged recession, high unemployment, and high levels of pension obligations.   *Id.*   In light of these circumstances, the Legislative Assembly declared a state of fiscal emergency earlier this year.   *Id.*

**The Puerto Rico Public Corporation Debt Enforcement and Recovery Act.**   In order to address the fiscal emergency facing the Commonwealth and its public corporations, on June 26, 2014, the Legislative Assembly enacted the Puerto Rico Public Corporation Debt Enforcement and Recovery Act.   In doing so, it concluded that "the current fiscal emergency situation requires legislation that allows public corporations, among other things, (i) to adjust their debts in the interest of all creditors affected thereby, (ii) provides procedures for the orderly enforcement and, if necessary, the restructuring of debt in a manner consistent with the Commonwealth Constitution and the U.S. Constitution, and (iii) maximizes returns to all stakeholders by providing them going concern value based on each obligor's capacity to pay."   *Id.*, Stmt. of Motives, § D.   The Act is patterned after the federal bankruptcy code—under which Puerto Rico's public corporations are ineligible to seek relief—and creates a specialized court (the Public Sector Debt Enforcement and Recovery Act Courtroom of the Court of First Instance, San Juan Part) to exercise *in rem* jurisdiction over the property of any public corporation that seeks protection under the Act.   *See id.* §§ 109, 111.

The guiding principle of the Act is to provide all of a public corporation's creditors more

value than they could receive if all creditors sought to enforce their claims simultaneously while also ensuring that the corporation can maintain critical public functions.   To this end, the Act contemplates two types of procedures to address a public corporation's debt burden.   The first, set forth in Chapter 2 of the Act, is a market-based approach with limited court involvement.   The public corporation invoking this approach begins by choosing debts to renegotiate with creditors.   *See id.* § 202(a).   Creditors representing at least 50 percent of the debt in a given class must participate in the vote on whether to accept those changes, and at least 75 percent of participants must approve. *See id.* § 202(d)(b)(A)-(B).   GDB and the specialized court must approve any consensual debt relief transaction before any amendments, modifications, waivers, or exchanges become binding on any class of creditors.   *See id.* § 202(d)(b)(a).   Once the specialized court enters an approval order, creditors may not bring a separate action to enforce their original claims.   *See id.* § 115(b).

Public corporations may also seek relief under Chapter 3 of the Act, which involves enhanced judicial oversight.   *Id.*, Stmt. of Motives, § E.   The public corporation begins by filing a petition that includes a list of affected creditors and a schedule of claims, and the act of filing stays a broad range of actions against the petitioner.   *See id.* §§ 301, 302, 304.   Once the proceedings are underway, the specialized court may appoint committees to represent creditors.   *See id.* § 318. Either GDB or the petitioner must then file a proposed plan or proposed transfer of the petitioner's assets, which the court can confirm only if it "provides for every affected creditor in each class of affected debt to receive payments and/or property having a present value of at least the amount the affected debt in the class would have received if all creditors holding claims against the petitioner had been allowed to enforce them on the date the petition was filed."   *Id.* §§ 310, 315(d).   At least one class of affected debt must accept the plan with a majority of all votes cast and with the support of at least two-thirds of affected debt in the class.   *See id.* §§ 312, 315(e).   As under Chapter 2, all

creditors are bound by the plan after it is approved by the specialized court.  *See id.* § 115(c)(c).

In addition to providing all of a public corporation's creditors more value than they could receive if all creditors enforced their claims simultaneously, Chapter 3 of the Act does not discharge any creditor's claim.  Rather, creditors that are not paid in full are entitled to a portion of the corporation's free cash flow for up to "the first ten (10) full fiscal years after the first anniversary of the effective date of the plan" up until the time they are paid in full.  *Id.* § 315(k).  The contingent payment obligations are intended to allow all creditors to retain claims payable from the corporation's brighter future.  Such a system incentivizes the public corporation to create free cash flow while ensuring the corporation is not buried under an unmanageable debt load and preserving the opportunity for enhanced creditor recoveries.

## STANDARD FOR MOTION TO DISMISS

A complaint should be dismissed if it fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The First Circuit applies a two-pronged approach to determine the sufficiency of a complaint.  *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  The first prong is to "identify the factual allegation and to identify statements in the complaint that merely offer legal conclusions couched as facts or are threadbare or conclusory."  *Soto-Torres v. Fraticell*, 654 F.3d 153, 158 (1st Cir. 2011).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The second prong requires the Court to ask "whether the facts alleged would 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Soto-Torres*, 654 F.3d at 159 (quoting *Iqbal*, 556 U.S. at 678).  "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."  *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).  In doing so, the Court need not credit "bald assertions, unsupportable conclusions, periphrastic

circumlocutions, and the like." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996).

Here, Plaintiffs bring a facial—as opposed to an as-applied—challenge seeking a declaration that the Act and "any prospective enforcement thereof" violates the Constitution.  Am. Compl. at 15-16.  The First Circuit "imposes a very heavy burden on a party who mounts a facial challenge to a state statute." *McCullen v. Coakley*, 571 F.3d 167, 174 (1st Cir. 2009).  Specifically, to succeed on such a challenge, Plaintiffs "must establish that no set of circumstances exists under which the act would be valid." *Williams v. Puerto Rico*, 910 F. Supp. 2d 386, 392-93 (D.P.R. 2012) (Besosa, J.); *cf. Cook v. Gates*, 528 F.3d 42, 56 n.8 (1st Cir. 2008) ("[P]laintiffs have pleaded classic as-applied challenges here because they claim that the Act is unconstitutional as applied to them, even though the Act may be constitutional as applied to others.").  Given that high standard, "[a] facial challenge to a legislative act . . . is considered 'the most difficult challenge to mount successfully.'" *Williams*, 910 F. Supp. 2d at 392-93 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Courts must also exercise particular caution in declaratory judgment actions.  As an initial matter, the "preemptive and contingent nature of declaratory judgment actions spawns heightened demand for careful judicial attention to the constitutional limitations to federal jurisdiction under Article III, as well as to derivative prudential doctrines, such as ripeness." *Hudson Cnty. News Co. v. Metro Assocs., Inc.*, 141 F.R.D. 386, 389 (D. Mass. 1992) (citing, for example, *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 241-43 (1952) and *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  "Guarding against the institutional dangers of treading too far into these troubled waters, Congress provided that courts need only issue declaratory judgments in their discretion." *Id.*

These jurisprudential concerns are even more pronounced when plaintiffs ask a federal court to interfere with state regulatory proceedings, especially where they have "rushed into federal court

to get a declaration which . . . is intended . . . to tie [a state agency]'s hands before it can act." *Wycoff*, 344 U.S. at 247.  Courts "have disapproved anticipatory declarations as to state regulatory statutes" and "anticipatory judgment by a federal court to frustrate action by a state agency is even less tolerable to our federalism." *Id.*  Plaintiffs seeking to avoid the prospect of proceedings under state or Commonwealth law thus cannot circumvent the restrictions on declaratory judgments by simply asserting a federal defense.  As the Supreme Court has explained, "[f]ederal courts will not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law."  *Id.* at 248.

## ARGUMENT

### I.      Unless PREPA Seeks Relief Under the Act, This Lawsuit Is Premature and Unripe.

Article III of the U.S. Constitution prohibits federal courts from rendering advisory opinions, limiting their jurisdiction to live cases and controversies.  *See Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013).  Plaintiffs lack standing to sue unless they show that they have "suffered some actual or threatened injury as a result of the putatively illegally conduct of the defendant, and that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision."  *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 67 (1st Cir. 2003).  As the Supreme Court has also made clear, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation omitted).

To date, no public corporation—including PREPA—has sought relief under the Act. Plaintiffs simply allege that proceedings under the Act would be preempted and would raise constitutional concerns *if* they were to occur.  *See, e.g.*, Am. Compl. ¶¶ 2, 18, 35-36, 42.  Because they have suffered no injury and can point to no imminent harm, Plaintiffs lack standing to sue.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  And because the lawsuit turns on the mere

possibility that PREPA will seek relief, Plaintiffs' claims are unripe for review.  *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537-38 (1st Cir. 1995).  Plaintiffs essentially ask this Court to render an advisory opinion about proceedings that may never occur, based on an alleged future injury that they may never suffer.  For this reason, the claims should be dismissed.

## II.     The Act Is Not Preempted By the Federal Bankruptcy Code and Does Not Violate the U.S. Constitution's Bankruptcy Clause.

### A.     The Act Is a Valid Exercise of Puerto Rico's Police Power.

The Act is a proper exercise of Puerto Rico's sovereign police power.  Puerto Rico's Constitution—established by the People of Puerto Rico and approved by Congress and the President, *see* Pub. L. 82-447, 66 Stat. 327 (July 3, 1952)—explicitly recognizes "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall . . . not be construed restrictively." P.R. CONST. art. II, § 19; *see also* 48 U.S.C. § 821; *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 594 (1976) ("The purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union.").  In their principal challenge to the Act, Plaintiffs nonetheless claim that laws relating to the restructuring of debts fall within Congress's exclusive province pursuant to the Bankruptcy Clause of the U.S. Constitution.

Plaintiffs' effort is badly misguided.  To be sure, the Bankruptcy Clause affords Congress the power "[t]o establish . . . uniform laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4.  But the Supreme Court has long made clear that the mere existence of this power does not occupy the field and extinguish local authority to regulate bankruptcies involving public entities.  Indeed, it was not until 1938 that the Supreme Court ruled that the federal bankruptcy power extends to laws governing municipalities and other state entities in the first place. *Compare United States v. Bekins*, 304 U.S. 27, 51-52 (1938) (upholding federal municipal

restructuring law), *with Ashton v. Cameron Cnty. Water Improvement Dist.*, 298 U.S. 513, 529-32 (1936) (striking down federal municipal restructuring law as impinging on state sovereignty).  Even then, the Supreme Court approved federal control over the bankruptcies of state entities only because the statute in question (a precursor to Chapter 9 of the Bankruptcy Code) was "carefully drawn so as not to impinge on the sovereignty of the State." *Bekins*, 304 U.S. at 50-51.  The Court credited the fact that the federal statute allowed "[t]he State [to] retain[] control of its fiscal affairs" and exercised the bankruptcy power "only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." *Id.*

Under clear Supreme Court precedent, state and local governments retain the power to pass their own restructuring statutes, so long as they do not conflict with federal law.[2]  Congress has not wholly occupied the field, and the Constitution does not vest it with exclusive power to enact such laws.  *See, e.g.*, *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502, 508-09 (1942) (upholding New Jersey's power to enact bankruptcy statute for its municipalities against constitutional challenge, concluding the state was not "powerless in this field" to devise "autonomous regulations" for the "fiscal management of its own household").  State laws on the subject are "suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress."  *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918); s*ee also FDIC v. Torrefación Café Cialitos, Inc.*, 62 F.3d 439, 443-44 (1st Cir. 1995); *Highland Realty, Inc. v. Superior Court of P.R.*, 103 D.P.R. 306, 309 (1975) ("[T]he existence of a federal bankruptcy act does not annul the power of the states or of Puerto Rico of having their own legislation in any aspect

---

[2] Here, Puerto Rico's Act does not deploy the unique aspect of the federal bankruptcy power recognized by the Supreme Court, namely the discharge of the petitioner of its obligation to use future earnings to pay preexisting debts beyond the value of the petitioner's assets.  *Stellwagen v. Clum*, 245 U.S. 605, 616 (1918) ("[A]ll the cases lay stress upon the fact that one of the principal requisites of a true bankruptcy law is for the benefit of the debtor in that it discharges his future acquired property from the obligation of existing debts."); *accord Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 187-88 (1902).

which is not in conflict with the federal statute.").

For this reason, courts have upheld state restructuring or liquidation proceedings that apply to entities—such as banks and insurance companies—that are specifically excluded from the protection of federal bankruptcy law under 11 U.S.C. § 109(b)(2).  *See, e.g.*, *Neblett v. Carpenter*, 305 U.S. 297 (1938) (rehabilitation of an insurance company under the Insurance Code of California); *Doty v. Love*, 295 U.S. 64 (1935) (reorganization of a bank under a Mississippi statute).  Indeed, Congress passed the predecessor to Section 109(b)(2) provision to preserve the jurisdiction of the states over the liquidation of insurance companies.  *See In re Equity Funding Corp. of Am.*, 396 F. Supp. 1266, 1275 (C.D. Cal. 1975); *see also In re Cash Currency Exch., Inc.*, 762 F.2d 542, 552 (7th Cir. 1985) ("Title 11 suspends the operation of state insolvency laws except as to those classes of persons specifically excluded from being debtors under the Code."); *In re Bankers Trust Co.*, 566 F.2d 1281, 1288 (5th Cir. 1978) ("[T]o permit the blocking of a state reorganization herein would be tantamount to imposing a federal reorganization which is clearly forbidden by the Act's exemption of savings and loan associations and inconsistent with the congressional scheme of the Bankruptcy Act."); *Israel-British Bank (London) Ltd. v. FDIC*, 536 F.2d 509, 514 (2d Cir. 1976) ("Even if no statutory scheme for liquidation existed in a particular state, state courts of equity could fill the statutory gap" created when "Congress chose to exempt banks from the benefits of the Act.").

The Commonwealth may authorize proceedings for the restructuring of its public entities for precisely the same reasons.  Puerto Rico's public entities are not currently governed by any federal bankruptcy law.  Rather—much like banks and insurance companies—they fall into a gap in the Bankruptcy Code.  On the one hand, because Puerto Rico is not a "state" for "the purpose of defining who may be a debtor under chapter 9," 11 U.S.C. § 101(52), its political subdivisions, public agencies, and instrumentalities are not "municipalit[ies]" eligible to reorganize under

Chapter 9.  *See* 11 U.S.C. §§ 101(40), 109(c)(1), 109(c)(2).  At the same time, because those entities are classified as "governmental unit[s]" for purposes of 11 U.S.C. § 101(41), they are not "person[s]" for purposes of the Bankruptcy Code and thus cannot seek the Chapter 11 relief available to their counterparts in the 50 states.  *See* 11 U.S.C. § 109(b), (d).  As a result, there is *no* federal restructuring scheme that conflicts with or displaces the public-entity restructuring law enacted by Puerto Rico pursuant to its inherent police power.  *See, e.g.*, *Stellwagen*, 245 U.S. at 613.

The Supreme Court has long emphasized the importance of protecting state police power. *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444 (1934) (recognizing "reserved power of the state to protect the vital interests of the community" in time of emergency).  Given the clear precedent permitting state and territorial regulation of bankruptcy, and the absence of any federal scheme whatsoever that public corporations in Puerto Rico might invoke, Plaintiffs cannot demonstrate that the mere existence of federal bankruptcy power displaces the Commonwealth's sovereign authority.

### B.   Section 903's Limited Reach Does Not Actually Conflict With the Act.

Plaintiffs next allege that Section 903 of the Bankruptcy Code (a provision of Chapter 9) prohibits the Commonwealth from adopting the Act.  *See* Am. Compl. ¶¶ 2, 19-20.  This argument fails as well—especially because courts must "start with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

As a starting point, the principal purpose of Section 903 is to *protect* state sovereignty by making clear that Chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or government powers of such municipality."  11 U.S.C. § 903.  Indeed, the section's title is "Reservation of state power to control municipalities."  Plaintiffs' argument turns instead on Section 903's caveat that "a State law

prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition." *Id.* § 903(1).

Nothing about this provision prevents the Commonwealth from enacting this legislation.  To the contrary, Section 903 strikes a balance between state and federal concerns within the confines of Chapter 9.  On the one hand, it ensures that chapter will not hinder the states' ability to govern their public entities.  On the other, it prevents states subject to Chapter 9 from passing any law that would conflict with the federal bankruptcy code.  The law does not, however, purport to preempt restructuring laws of sovereign territories (like Puerto Rico) whose public entities are not subject to Chapter 9.  *See Welch v. Brown*, 935 F. Supp. 2d 875, 886 (E.D. Mich. 2013), *aff'd*, 551 F. App'x 804 (6th Cir. 2014) ("Defendants are correct in arguing that the [public entity] is not in bankruptcy and is not restrained by the Bankruptcy Clause or 11 U.S.C. § 903(1)."); *see also City of Pontiac Retired Emps. Ass'n v. Schimmel*, 2014 WL 1758913, at *5 (6th Cir. May 5, 2014) (McKeague, J., concurring) ("[T]he plain language of § 903(1) may be construed to mean . . . that § 903(1) represents a specific limitation on State power only where Chapter 9 has been invoked.").  Where Congress intended for provisions of the Bankruptcy Code to apply outside of the chapter in which they are located, it has spoken clearly.  *See*, *e.g.*, 11 U.S.C. 103(k)(2) ("Chapter 15 applies only in a case under such chapter, except that section 1509 applies whether or not a case under this title is pending.").  Congress did no such thing here.  Accordingly, because Puerto Rico's public corporations may not avail themselves of Chapter 9, Section 903—which, by its own terms, applies only when Chapter 9 is invoked—is wholly inapplicable to the Commonwealth.

As a result, Plaintiffs' reading of Section 903 is absurd:  Under their view, Congress displaced Puerto Rico's traditional police power—and only Puerto Rico's police power—in a caveat to a section of a chapter that does not apply to Puerto Rico at all and that is designed to protect the

power of the States.   There is no basis for reaching such an implausible and extraordinary conclusion.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").  Indeed, catastrophic practical consequences would flow from Plaintiffs' reading of Section 903.  As the Act explains in detail, Puerto Rico is in a state of fiscal crisis which threatens its ability to provide "services necessary and indispensable for the populace."  Act, Stmt. of Motives, § A.  At the same time, Congress recognized in passing Chapter 9 that, without access to a restructuring mechanism, distressed public entities are left without recourse.  *See* H.R. Rep. No. 686, 94th Cong., 2d Sess. 4 (1976) ("For an embarrassed debtor without the remedy afforded by this bill, the only effective recourse is the repeal of its charter by the State legislature, in which event creditors are generally left without any remedy.").  That Congress would have denied Puerto Rico and its public corporations similar ability to escape financial ruin in a brief statutory provision unrelated to Puerto Rico strains credulity.

In approving Puerto Rico's Constitution, Congress explicitly recognized that "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall . . . not be construed restrictively."  P.R. CONST. art. II, § 19; *see also* 48 U.S.C. § 821.  To read Section 903(1)—in conjunction with 11 U.S.C. § 101(52)—to preclude Puerto Rico from using its police power to enact a law that enables it to provide protections similar to that which the 50 states can provide their corporations would risk a serious intrusion on Puerto Rico's autonomy and do violence to Congress's intent in approving Puerto Rico's Constitution.

In any event, even if Section 903 could plausibly be read to pre-empt the Act—and it cannot—Plaintiffs' construction of Section 903—under which Puerto Rico would not only be excluded from Chapter 9, but also barred from enacting a nearly identical restructuring mechanism

of its own—would force this Court to confront constitutional concerns about whether Congress properly exercised its power to establish "*uniform* laws on the subject of bankruptcies through the United States."   U.S. CONST. art. I, § 8, cl. 4 (emphasis added).   Courts have made clear that bankruptcy laws established by Congress must be "geographically" uniform, except to the extent they attempt to "resolve geographically isolated problems."   *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 159 (1974); *see also Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946); *Hanover Nat'l Bank*, 186 U.S. at 188.  And, in the absence of such a justification, they have struck down as unconstitutional federal statutes purporting to exclude specific states from the general federal bankruptcy scheme.  *See St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1530-32 (9th Cir. 1994).

Here, no "geographically isolated problem" is at issue.  Like the states, Puerto Rico's public corporations can take on debt and fall into difficult financial straits, and have creditors who could benefit from an orderly debt relief program.  Accordingly, Section 903 can and should be read to permit Puerto Rico to enact restructuring legislation that complements—and in no way conflicts with—its federal counterpart.  Plaintiffs would instead have this Court read the provision to *exacerbate* the constitutional concerns regarding Puerto Rico's exclusion from Chapter 9 in the first place by denying it the opportunity to use its police power to enact legislation of its own. As explained above, it is implausible that Congress intended to wholly pre-empt Puerto Rico from enacting straightforward and complementary restructuring legislation through a caveat to a provision of a chapter of federal bankruptcy law (Chapter 9) that does not even apply to the Commonwealth.

### III.   The Act Does Not Violate the Contract Clause.

In an equally futile effort, Plaintiffs allege that the Act "deprive[s] creditors of their contractual rights to payment in full of their claims, thus impairing contractual obligations in violation of the Contract Clause."  Am. Compl. ¶ 35.  As an initial matter, as no debtor has yet

availed itself of the Act, Plaintiffs appear to raise a facial, rather than an as-applied, challenge.  In other words, they seek a declaration that the Act—no matter how it is eventually applied—will violate the Contract Clause.  As set forth above, however, "[a] facial challenge to a legislative act . . . is considered the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the act would be valid."  *Williams*, 910 F. Supp. 2d at 392-93 (internal quotation and citation omitted).  Plaintiffs fail to meet that heavy burden here.

The Contract Clause's prohibition on the enactment of laws impairing contractual obligations "is not an absolute one" and "does not make unlawful every state law that conflicts with any contract."  *Blaisdell*, 290 U.S. at 428; *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 638 (1st Cir. 1981).  "The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."  *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983).  Here, Plaintiffs have not alleged—much less averred facts demonstrating—that the Act "substantially" impairs their contracts.[3]  For this reason alone, their Contract Clause claim can be dismissed.

Moreover, even assuming the Act substantially impaired certain contractual obligations, such impairment would be simply one threshold element of a Contract Clause challenge—necessary, but far from sufficient.  As the Supreme Court has made clear, "a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether the [contractual] impairment is permitted under the Constitution."  *U.S. Trust Co.*, 431 U.S. at 21.  Instead, the necessary second step in any Contract Clause analysis focuses on the reasonableness and necessity of the law in question: laws modifying a state's financial obligations are constitutional if they are "reasonable and necessary to serve an important public purpose," and no "more moderate

---

[3] Nor could they.  As set forth above, the Act provides all creditors the value of what they would receive if they enforced their claims simultaneously.  Act, Summ. of Ch. 3.  Therefore, there can be no impairment.

16

course [that] would serve its purposes equally well" is in evidence.  *Id.* at 25-26, 30-31; *see also United Auto., Aerospace, Agric. Implement Workers v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011); *Mercado-Boneta v. Admin. del Fondo de Compensacion al Paciente*, 125 F.3d 9, 15 (1st Cir. 1997). The Supreme Court has repeatedly upheld laws impairing contractual obligations where those laws were reasonable and necessary to the achievement of a sufficiently important government interest so as to render them constitutional exercises of the state's police power.  *See, e.g.*, *Blaisdell*, 290 U.S. at 444-47 (upholding state law suspending creditors' rights during the Great Depression because "the legislation was addressed to a legitimate end" and was "justified by the emergency"); *Veix v. Sixth Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 37 (1940) (upholding law that diminished contractual rights to shares of building and loan association because it "was passed in the public interest to protect the activities of the associations for the economic welfare of the State").

Plaintiffs—who allege only that the Act impairs contracts to which they are a party—have failed to allege facts that would "allow a court to draw a reasonable inference that [the Act] was unreasonable or unnecessary to effectuate an important government purpose."  *United Automobile*, 633 F.3d at 45.  Instead, Plaintiffs' Amended Complaint, which includes only a brief one-page "Background" section containing factual allegations, alleges no facts whatsoever that plausibly speak either to the Act's unreasonableness or to its purported lack of moderation.  *See* Am. Compl. ¶¶ 11-17.  Plaintiffs' allegations thus fail as a matter of law under well-established First Circuit precedent:  "[W]here plaintiffs sue a state—or in this case the Commonwealth of Puerto Rico— challenging the state's impairment of a contract to which it is a party, the plaintiffs bear the burden on the reasonable/necessary prong of the Contract Clause analysis."  *United Automobile*, 633 F.3d at 42.  Plaintiffs here have failed even to satisfy the threshold pleading requirements.

Recent First Circuit precedent dispels any doubt as to whether the Contract Clause claim

17

must be dismissed for failure to allege that the impairment was unreasonable and unnecessary.  In

*United Automobile*, a collection of unions and public employees challenged Puerto Rico's Act No. 7,

which abridged benefits for which the employees had contracted.  *Id.* at 39-40, 47.  The complaint

contained far more extensive allegations than the Amended Complaint here—but the First Circuit

still found it insufficient to maintain a Contract Clause claim.  For example, as to "reasonableness,"

the plaintiffs alleged that Act 7's ends were "neither significant nor legitimate." *Id*. at 46-47.  But

the First Circuit held that such a "conclusory statement" did not comprise "factual content [capable

of] undermin[ing] the credibility of Act No. 7's statement that it was enacted to remedy a $3.2

billion deficit." *Id.* at 46.  Similarly, as to "necessity," the plaintiffs "averred that there were other

available alternatives with lesser impact to the paramount constitutional rights affected," and alleged

that Puerto Rico should have used federal aid to help offset the deficit. *Id*. at 47.  Nonetheless,

because they "failed to specify any such alternatives or plead any factual content suggesting such

alternatives might exist," the First Circuit held that the complaint failed to "aver facts demonstrating

that Act. No. 7 was an excessively drastic means of tackling the deficit." *Id*.

The allegations here are even more deficient.  Plaintiffs do not cast even conclusory

aspersions on the Act's reasonableness or necessity, and thus do not call into question the Act's

detailed description of the current "fiscal emergency," which it describes as "the most critical the

country has undergone in its history."  Act, Stmt. of Motives, § A; *see also, e.g.*, *id*. ("The public

debt's loss of its investment grade rating places the economic and fiscal health of the people of

Puerto Rico at risk, and improperly compromises the credit of the Central Government and its public

corporations."); *id*. ("If the public corporations were to default on their obligations in a manner that

permits creditors to exercise their remedies in a piecemeal way, the lack of an effective and orderly

process to manage the interests of creditors and consumers would threaten the ability of the

18

Commonwealth's government to safeguard the interests of the public to continue receiving essential public services and promote the general welfare of the people of Puerto Rico."). Nor does the Amended Complaint allege facts contrary to the comprehensive legislative findings that the extensive alternative measures already taken have been insufficient to address the Commonwealth's fiscal problems. *See id.* ("[T]he measures taken with the General Fund, as well as with the public corporation, have not been enough to address the economic and fiscal problems of Puerto Rico."). Indeed, Plaintiffs do not even make the conclusory allegations about "other available alternatives with lesser impact" that the First Circuit deemed insufficient in *United Automobile*. 633 F.3d at 47.

Here, as in *United Automobile*, the "plaintiffs failed to plead sufficient facts from which a court could reasonably infer that [an Act] was unnecessary or unreasonable." *Id.* at 46. There has been no suggestion that the Act "was enacted to benefit a special interest at the expense of" the general public—or that it was motivated by any other improper considerations. *Id.* at 47. Instead, every indication is that the Act is designed "to protect and promote the general welfare of the people of Puerto Rico," Act, Stmt. of Motives, § A, while "treat[ing] debt holders fairly and balanc[ing] the best interest of creditors with the interest of the Commonwealth to protect its citizens and to grow and thrive for the benefit of its residents," *id.*, § D. In short, the Act makes clear that it is necessary to advance "a significant and legitimate public purpose . . . such as the remedying of a broad and general social or economic problem." *Energy Reserves Group*, 459 U.S. at 411-12. Plaintiffs—who bear the burden on this issue—have failed to allege that the Act is unreasonable or unnecessary, much less to aver any facts raising a triable issue as to its reasonableness or necessity. This alone ends their Contract Clause claim.

## IV. The Act Does Not Violate the Takings Clause.

Without explanation, Plaintiffs further allege that the Act violates the Takings Clause of the

U.S. Constitution by depriving them of the benefits of their security interests.[4]   Am. Compl. ¶ 36. As stated above, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Iqbal*, 556 U.S. at 678 (quotation omitted).   "[T]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements," are not sufficient, *id.* at 663, especially when, as here, Plaintiffs are making a facial challenge to the constitutionality of a legislative act, *see* Part III, *supra*.   Because Plaintiffs have failed to satisfy this basic pleading requirement, their takings claim must be dismissed.

The Supreme Court has long recognized a sovereign's authority to enact legislation that affects creditors' property interests.   *See Ogden v. Saunders*, 25 U.S. 213, 295 (1827) (New York's Insolvent Act of 1788 was a "due and rightful exercise of its powers as an independent government").   Although that authority is subject to the requirements of the Takings Clause, the Supreme Court has provided guidelines for identifying those unusual cases where "justice and fairness" require just compensation be paid for private economic injuries resulting from regulation in the public interest:   "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'"   *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986) (quoting *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).   Examination of these three factors demonstrates that the Act does not constitute an unconstitutional taking.

First, it is beyond dispute that the Legislative Assembly carefully drafted the Act to minimize any adverse economic impact on potential claimants.   As explicitly stated in the Act's Preamble, the Legislative Assembly's goal was to "maximize[] returns of all stakeholders by providing them going concern value based on each obligor's capacity to pay."   Act, Stmt. of Motives, § D.   In Chapter 2,

---

[4] The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.   That provision applies to Puerto Rico, by way of the Fourteenth Amendment's Due Process Clause.   *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 12 (1st Cir. 2010).

creditors are protected from economic harm by the fact that the amendments adjusting the terms of their debt cannot be adopted without the consent of a supermajority of debt holders.  *Id.*, § E.  And any recovery program adopted under Chapter 2 must "allocate equitably among all stakeholders the burdens of the recovery program" and "provide the same treatment to all creditors unless a creditor agrees to a less favorable treatment."  *Id.*

Similarly, Chapter 3 reflects the Commonwealth's desire for its public corporations to satisfy their contractual obligations to the greatest extent possible by, wherever practicable, maximizing distributions to creditors consistent with the execution of vital public functions.  *Id.*, Summ. of Ch. 3. Chapter 3 codifies these goals "by requiring that each creditor receive (i) at least the value it would receive if all creditors were allowed simultaneously to enforce their respective claims against the public corporation . . . plus (ii) a note providing additional value based on the amount by which the public corporation's future financial results yield positive cash flow." *Id*.  Although the Act prevents creditors from engaging in a "race to the courthouse" to satisfy their claims, deterrence of such behavior has long been recognized as a beneficial and legitimate goal of restructuring legislation. *See, e.g.*, *Buckingham v. McLean*, 54 U.S. 151, 166 (1851) (one of the "great objectives" of bankruptcy is "to distribute [the debtor's] property ratably among all their creditors'); *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 560 (1st Cir. 1986) (a creditor race to the courthouse could result in "unfair results as between potential plaintiffs" and prevent court's ability to satisfy claims).

Second, even if the Act has some adverse economic impact on Plaintiffs, they have not claimed that it interfered with any reasonable investment-backed expectations—nor could they make out such a claim.  Plaintiffs should have expected that monopolies operating in highly regulated industries may be affected by government action. *See, e.g.*, *P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R.*, 189 F.3d 1, 17 (1st Cir. 1999) (citing *Connolly*, 475 U.S. at 227).  Moreover, the

financial obligations at issue here have always been subject to the possibility that the Legislative Assembly would enact restructuring legislation and create an orderly process for the adjustment of the debts owed by Puerto Rico's public corporations.  It cannot possibly be a surprise to Plaintiffs that the Commonwealth would respond to a financial crisis by exercising its authority as a sovereign to ensure the continued supply of vital public services to the citizens of Puerto Rico.

Finally, and most importantly, the Act is simply not the type of government action that triggers the Fifth Amendment's requirement of just compensation.  Government action is vulnerable to constitutional attack as a taking if it "can be characterized as a physical invasion by government" or as an acquisition of property by the government for its own use.  *Penn Central*, 438 U.S. at 124, 135.  Conversely, when the interference "arises from some public program adjusting the benefits and burdens of economic life to promote the common good," the risk of a taking is diminished.  *See id.* at 124.  Government regulation, by definition, involves the adjustment of rights for the public good.  To require the government to compensate private parties for each regulatory interference would require it to "regulate by *purchase*."  *Andrus v. Allard*, 444 U.S. 51, 65 (1979) (emphasis in original); *see also id.* ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.").  The fact that the Bankruptcy Clause itself contemplates restructuring laws simply confirms that the nature of such legislation generally does not violate the Takings Clause.

Accordingly, the Act—under which the government would not condemn property for its own use but would merely allow for the adjustment of the benefits and burdens of economic life to promote the common good—raises no serious constitutional takings question.  *See Connolly*, 475 U.S. at 225 (citing *Penn Central*, 438 U.S. at 124; *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 14 (1976); *Andrus*, 444 U.S. at 65; and *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).  The

Legislative Assembly has authorized a rational and reasonable solution to the potential public harms caused by financial emergencies involving corporations that perform critical public functions. The Act preserves the public good by guaranteeing the short-term delivery of essential public services including the delivery of electricity, gas, and clean water, and by ensuring the long-term survival of the institutions that provide those services. Furthermore, the Act seeks to secure a sustainable future for Puerto Rico and its public corporations by restoring their credit and stabilizing their financial condition. *See* Act § 101(e). This objective is entirely consistent with the Supreme Court's longstanding bankruptcy jurisprudence. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("a central purpose of [bankruptcy] is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)); *Perez v. Campbell*, 402 U.S. 637, 648 (1971).

In short, the provisions of Chapters 2 and 3 of the Act provide protections for claimants' security interests that are similar to those provided by the federal Bankruptcy Code. *See* Act, Stmt. of Motives, § E (Legislative Assembly designed the Act to "mirror" key portions of the Code). In fact, given the Act's provisions ensuring that creditors not paid in full receive a share of future cash flows until they are paid in full, the Act arguably treats creditors better than the Bankruptcy Code. Thus the Act—like the Bankruptcy Code—satisfies the Fifth Amendment requirements of the U.S. Constitution by providing adequate protection for security interests. *See* Act §§ 129 ("Adequate Protection and Police Power"), 207 ("Adequate Protection for Use of Property Subject to Lien or Pledge"), 324 (same); *see also Commonwealth of Pa. State Emps.' Ret. Fund v. Roane*, 14 B.R. 542, 544 (Bankr. E.D. Pa. 1981) ("[T]he purpose of 'adequate protection' is to protect the

property interests of secured creditors pursuant to the Fifth Amendment prohibition against takings without just compensation."); S. Rep. No. 95-989, 95th Cong., 2d Sess. 49 (1978) (noting that "[t]he concept of adequate protection is derived from the Fifth Amendment protection of property interests as enunciated by the Supreme Court").  As the *Penn Central* analysis demonstrates, the Act creates a lawful scheme for restructuring the debts of Puerto Rico's public corporations.  When such a scheme merely adjusts economic benefits while providing adequate protection for security interests, there is no violation of the Takings Clause.

## V.   The Act Properly Stays Litigation Seeking a Public Corporation's Limited Assets Pending Restructuring Proceedings.

In addition to their constitutional arguments, Plaintiffs contend that Section 304 of the Act impermissibly purports to stay all proceedings against a public corporation that has filed for relief under Chapter 3.  *See* Am. Compl. ¶¶ 37-39.  Specifically, they argue that "state courts lack any power . . . to enjoin proceedings in federal court," such that "the Commonwealth cannot pass a law that . . . enjoins, stays, suspends or precludes" litigation over the debts owed by a public corporation. *Id.* ¶¶ 38, 39 (citing *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964)).  But this argument— which, in any event, pertains to hypothetical debt collection proceedings—is squarely foreclosed by the very Supreme Court precedent on which Plaintiffs rely.

The Supreme Court recognized in *Donovan* that although state and federal courts generally will not "interfere with or try to restrain each other's proceedings . . . [a]n exception has been made in cases where a court has custody of property, that is, proceedings *in rem* or *quasi in rem*."  377 U.S. at 412.  In such cases, the Court held, "the state or federal court having custody of such property has exclusive jurisdiction to proceed."  *Id.*[5]  An action for relief under Chapter 3 of the

---

[5] This well-established principle is literally hornbook law: "When state court jurisdiction attaches first, the federal court is precluded from exercising jurisdiction over the same *res*. . . .  Pursuant to principles of intersystem comity and federalism, state and federal courts must respect each system's prior *in rem* jurisdiction.  Thus, a federal court must

Act—which, modeled on the federal bankruptcy code, centers on a determination of how a public corporation's assets will be distributed—is just such a case.  *See, e.g.*, 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4212 & n.24 (citing cases); 17A *Moore's Federal Practice* § 121.07[d] & nn.32-46 (same); *see also Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447-48 (2004) ("Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate.").  Even if Plaintiffs had sought relief from the automatic stay—and they have not—their argument about its facial invalidity fails as a matter of law.

## CONCLUSION

WHEREFORE, it is respectfully requested from this Honorable Court that it GRANT the instant motion and DISMISS the Amended Complaint.

---

respect and not interfere with a state court's prior *in rem* jurisdiction.  A federal court must obey a state court injunction forbidding further federal proceedings with reference to the *res*.  After finding that a state court has prior *in rem* jurisdiction, a federal court should ordinarily abstain."  17A *Moore's Federal Practice* § 121.07[d][ii].

Respectfully Submitted,

César R. Miranda Rodríguez
  *Secretary of Justice*

Marta Elisa González Y.
  *Deputy Secretary of Justice*
  *in Charge of Litigation*

DEPARTMENT OF JUSTICE
GENERAL LITIGATION OFFICE
Federal Litigation and Bankruptcy Division
P.O. Box 9020192
San Juan, PR  00902-0192
Tel:  (787) 721-2900

*s/ Jorge L. Flores De Jesús*
Jorge L. Flores De Jesús
  *Special Assistant to the Secretary of Justice*
(USDC-PR No. 231407)
jlflores@justicia.pr.gov

*s/ Janitza M. García-Marrero*
Janitza M. García-Marrero
(USDC-PR No. 222603)
jgarcia@justicia.pr.gov

*s/ Maraliz Vázquez Marrero*
Maraliz Vázquez Marrero
(USDC-PR No. 225504)
marvazquez@justicia.pr.gov

*s/ Joseph G. Feldstein-Del Valle*
Joseph G. Feldstein-Del Valle
(USDC-PR No. 230808)
jfeldstein@justicia.pr.gov

*Attorneys for the Commonwealth of Puerto*
  *Rico and Governor Alejandro J. García*
  *Padilla, in his official capacity*

Dated: July 21, 2014

Susan M. Davies (*pro hac vice pending*)
Eugene F. Assaf, P.C. (*pro hac vice pending*)
Jeffrey S. Powell (*pro hac vice pending*)
Michael A. Glick (*pro hac vice pending*)
Liam P. Hardy (*pro hac vice pending*)
Claire M. Murray (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
Tel:  (202) 879-5000

Paul M. Basta, P.C. (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel:  (212) 446-4800

James H.M. Sprayregen, P.C.
  (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel:  (312) 862-2000

*Attorneys for the Commonwealth of Puerto*
  *Rico, Governor Alejandro J. García*
  *Padilla, in his official capacity, and John*
  *Doe, agent for the Government*
  *Development Bank for Puerto Rico*

*s/ Alejandro Febres-Jorge*
Alejandro Febres-Jorge
(USDC-PR No. 228403)
GOVERNMENT DEVELOPMENT BANK
  FOR PUERTO RICO
Roberto Sánchez Vilella Government Center
De Diego Avenue No. 100
Santurce, Puerto Rico 00907-2345
Tel: (787) 729-6438

*Attorney for John Doe, agent for the*
  *Government Development Bank for*
  *Puerto Rico*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

In San Juan, Puerto Rico, this 21st day of July 2014.


*s/ Janitza M. García-Marrero*_____
Janitza M. García-Marrero
USDC Bar No. 222603
DEPARTMENT OF JUSTICE
Federal Litigation and Bankruptcy Division
P.O. Box 9020192
San Juan, PR  00902-0192
jgarcia@justicia.pr.gov
Tel (787) 721-2900 Fax (787) 723-9188

27