IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FRANKLIN CALIFORNIA TAX-FREE TRUST (for the FRANKLIN CALIFORNIA INTERMEDIATE-TERM TAX FREE INCOME FUND), et al., | CASE NO. 14-1518 (FAB) |
| Plaintiffs, | DECLARATORY JUDGMENT |
| v. | |
| THE COMMONWEALTH OF PUERTO RICO, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW
OPPOSING DEFENDANTS' MOTIONS TO DISMISS AND
SUPPORTING PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTS .............................................................................................................................. 2

PROCEDURAL HISTORY AND RELIEF REQUESTED ........................................... 6

STANDARD OF REVIEW ............................................................................................. 8

ARGUMENT ................................................................................................................... 9

I.      PLAINTIFFS' CAUSES OF ACTION ARE RIPE FOR DETERMINATION ................ 9

        A.      Plaintiffs' Facial Challenges to the Constitutionality of the Recovery Act
                are Ripe ......................................................................................................... 9

        B.      Plaintiffs Have Standing ........................................................................... 14

II.     THE RECOVERY ACT IS PREEMPTED BY THE BANKRUPTCY CODE
        AND THE BANKRUPTCY CLAUSE ............................................................................. 14

        A.      The Recovery Act is Preempted by Section 903(1) of the Bankruptcy
                Code ............................................................................................................ 15

        B.      The Recovery Act is Preempted By the Bankruptcy Clause ................. 21

III.    THE RECOVERY ACT VIOLATES THE TAKINGS CLAUSE ................................... 23

IV.     THE RECOVERY ACT VIOLATES THE CONTRACTS CLAUSE ............................. 27

V.      THE STAY PROVISIONS OF THE RECOVERY ACT IMPROPERLY
        AUTHORIZE STATE COURTS TO ENJOIN FEDERAL COURT LITIGANTS
        AND PROCEEDINGS .................................................................................................... 35

VI.     SUMMARY JUDGMENT SHOULD BE  GRANTED ON PLAINTIFFS'
        PREEMPTION AND  UNCONSTITUTIONAL-INJUNCTION CLAIMS ................... 37

CONCLUSION ............................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*,
    885 F.2d 621 (9th Cir. 1989) ................................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................9

*Armstrong v. United States*,
    364 U.S. 40 (1960)................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................8

*Asociación de Suscripción Conjunta del Seguro de Responsabilidad*
    *Obligatorio v. Juarbe-Jiménez*,
    659 F.3d 42 (1st Cir. 2011)....................................................................10

*Assoc. of Surrogates & U.S. Reporters v. State of New York*,
    940 F.2d 766 (2d Cir. 1991)............................................................. 30-31

*Baker by Thomas v. Gen. Motors Corp.*,
    522 U.S. 222 (1998)..............................................................................35

*Beacon Hill Farm Assocs. II Ltd. P'Ship v. Loudoun Cty. Bd. of Supervisors*,
    875 F.2d 1081 (4th Cir. 1989) ..............................................................10

*Beddall v. State St. Bank & Trust Co.*,
    137 F.3d 12 (1st Cir. 1998)....................................................................8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................................9

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
    751 F.3d 427 (6th Cir. 2014) (en banc) ...............................................17

*Cont'l Ill. Nat. Bank & Trust Co. v. State of Washington*,
    696 F.2d 692 (9th Cir. 1983) ................................................................28

*Daniels v. Area Plan Comm'n of Allen County*,
    306 F.3d 445 (7th Cir. 2002) ................................................................11

*Donovan v. City of Dallas*,
    377 U.S. 408 (1964)................................................................................35

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978)..................................................................................10

*Energy Reserves Grp. v. Kan. Power & Light Co*,
    459 U.S. 400 (1983).........................................................................27-29

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
    45 F.3d 530 (1st Cir. 1995)...................................................................12

*Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*,
    316 U.S. 502 (1942)........................................................................ *passim*

*First Nat. Bank of Herkimer v. Poland Union*,
    109 F.2d 54 (2d Cir. 1940)....................................................................23

*Fragoso v. López*,
    991 F.2d 878 (1st Cir. 1993).................................................................36

*Gen. Atomic Co. v. Felter*,
    434 U.S. 12 (1977)................................................................................35

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. *2000*).................................................................23

*Gutierrez v. Ada*,
    528 U.S. 250 (2000)..............................................................................17

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)..................................................................................21

*Hawthorne Savings FSB v. Reliance Ins. Co.*,
    No. 03-55548, 2006 U.S. App. LEXIS 829 (9th Cir. 2006) ...................37

*Home Bldg. & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)........................................................................25, 28

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)........................................................................23, 26

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935)..............................................................................25

*Merlonghi v. U.S.*,
    620 F.3d 50 (1st Cir. 2010)................................................................8, 9

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
  501 U.S. 252 (1991)..........................................................................................12

*Negrón-Gaztambide v. Hernández-Torres*,
  35 F.3d 25 (1st Cir. 1994).............................................................................8, 9

*Ocasio-Hernández v. Fortuño -Burset*,
  640 F.3d 1 (1st Cir. 2011)..................................................................................8

*Oklahoma Tax Com'n v. Jefferson Lines, Inc.*,
  514 U.S. 175 (1995)..........................................................................................22

*Opulent Life Church v. City of Holly Springs, Miss.*,
  697 F.3d 279 (5th Cir. 2012) ...........................................................................11

*P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R.*,
  665 F.3d 309 (1st Cir. 2011)............................................................................23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983)..........................................................................................10

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*,
  164 F.3d 677 (1st Cir. 1999)............................................................................26

*Penn Central Transp. Co. v. City of New York*,
  438 U.S. 104 (1978)....................................................................................24, 25

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923)..........................................................................................12

*Pharm. Care Mgmt. Ass'n v. Rowe*,
  429 F.3d 294 (1st Cir. 2005)............................................................................10

*Pharm. Research & Mfrs. of Am. v. Concannon*,
  249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Manufs. of Am. v. Walsh*, 538 U.S. 644 (2003)...................................................................14

*Phico Ins. Co. v. Pavia Health, Inc.*,
  413 F. Supp. 2d 76 (D.P.R. 2006)....................................................................36

*Riva v. Commissioner of Massachusetts*,
  61 F.3d 1003 (1st Cir. 1995)..............................................................................9

*Ry. Labor Execs. Ass'n v. Gibbons*,
  455 U.S. 457 (1997)..........................................................................................22

*Sherwood Partners, Inc. v. Lycos, Inc.*,
  394 F.3d 1198 (9th Cir. 2005) .........................................................................22

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ............................................................................... 14

*Stellwagen v. Clum,*
    245 U.S. 605 (1918) ................................................................................... 21, 22

*Stern v. United States Dist. Court,*
    214 F.3d 4 (1st Cir. 2000) ............................................................................... 13

*Sturges v. Crowninshield,*
    17 U.S. 122 (1819) ..................................................................................... 21, 22

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) ................................................................................... 24, 25

*Thomas v. Union Carbide Agr. Prods. Co.,*
    473 U.S. 568 (1985) ................................................................................... 12, 13

*Torres Maysonet v. Drillex, S.E.,*
    229 F. Supp. 2d 105 (D. P.R. 2002) ................................................................. 8

*TRW, Inc. v. Andrews,*
    534 U.S. 19 (2001) ......................................................................................... 16

*U.S. Trust Co. of N.Y. v. New Jersey,*
    431 U.S. 1 (1976) ................................................................................... *passim*

*United Auto., Aerospace, Agric. Implement Workers of Am. v. Fortuño,*
    633 F.3d 37 (1st Cir. 2011) .................................................................... *passim*

*United Parcel Service, Inc. v. Flores-Galarza,*
    318 F.3d 323 (1st Cir. 2003) ......................................................................... 17

*United States v. Bekins,*
    304 U.S. 27 (1938) ......................................................................................... 19

*United States v. Locke,*
    529 U.S. 89 (2000) ......................................................................................... 19

*United States v. Pewee Coal Co.,*
    341 U.S. 114 (1951) ....................................................................................... 26

*United States v. Sec. Indus. Bank,*
    459 U.S. 70 (1982) ..................................................................................... 23-25

*Universal Ins Co. v. Dept. of Justice,*
    866 F. Supp. 2d 49 (D.P.R. 2012) .............................................................. 28-29

*W.B. Worthen Co. v. Kavanaugh*,
  295 U.S. 56 (1935).........................................................................................23

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980).......................................................................................25

*Williamson Cty. Reg'l Planning Com'n v. Hamilton Bank of Johnson City*,
  473 U.S. 172 186 (1985).................................................................................11

**Statutes**

11 U.S.C. §§ 101 *et seq.*........................................................................ *passim*

11 U.S.C. § 103(k) ..........................................................................................17

11 U.S.C. § 109 ...............................................................................................14

11 U.S.C. § 361 ............................................................................................5, 24

11 U.S.C. § 364 ............................................................................................5, 24

11 U.S.C. § 525 ...............................................................................................17

11 U.S.C. § 528 ...............................................................................................17

11 U.S.C. § 903 .......................................................................................*passim*

11 U.S.C. § 1141 .............................................................................................22

48 U.S.C. § 734 ...............................................................................................20

48 U.S.C. § 745 ...............................................................................................20

Federal Relations Act, 48 U.S.C. §§ 731 *et seq.*...........................................19

Pub. L. No. 98-353, 98 Stat. 333 (1984)........................................................16

Pub. L. No. 95-598, 92 Stat. 2549 (1978)......................................................16

Pub. L. No. 447, 66 Stat. 327 (1952) .............................................................19

Pub. L. No. 481, § 83(i), 60 Stat. (1946) .......................................................17

Puerto Rico Electric Power Authority Act,
  22 L.P.R.A. §§ 191, *et seq.* .................................................................*passim*

Puerto Rico Public Corporation Debt Enforcement and Recovery Act,
  Act No. 71 of June 28, 2014 .................................................................*passim*

**Other Authorities**

6 Collier on Bankruptcy ¶ 903.01
(Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) ............................................17

17A *Moore's Federal Practice* 121.07(d)(ii) ................................................................35

Aaron Kuriloff, *Puerto Rico's Power Authority Taps Reserves To Pay Investors*,
Wall St. J. (July 10, 2014) ......................................................................................12

Commonwealth Quarterly Report (July 22, 2014) ......................................................12

Erwin Chemerinsky, *Federal Jurisdiction* (6th ed. 2012) ..........................................36

Fed. R. Civ. P. 15(a)(2) ..................................................................................................7

Fed. R. Civ. P. 56(a) .......................................................................................................8

*Hearing on H.R. 4307 Before the Special Subcomm. on Bankr. & Reorganization
of the H. Comm. on the Judiciary*, 79th Cong., 2d Sess. (1946) (statement of
Millard Parkhurst) ...................................................................................................18

H.R. Rep. No. 79-2246 (1946) .............................................................................. 19-20

John Marino, *Prepa's Weak Management, Business Controls Behind Poor
Financial Performance*, Caribbean Bus. (May 1, 2014) ........................................32

S. Rep. No. 95-989 (1978) .....................................................................................19, 24

U.S. CONST. amend. V ..................................................................................................23

U.S. CONST. amend. X ..................................................................................................19

U.S. CONST. amend. XIV .............................................................................................23

U.S. CONST. art. I, § 8, cl. 4 .........................................................................................14

U.S. CONST. art. I, § 10 ...............................................................................................27

Plaintiffs Franklin Funds and Oppenheimer Rochester Funds, by and through their attorneys, submit this memorandum of law (i) opposing the motions to dismiss (the "**Motions to Dismiss**") the Amended Complaint[1] filed by Defendants the Puerto Rico Electric Power Authority ("**PREPA**") and the Commonwealth of Puerto Rico, Governor Alejandro J. Garcia Padilla, and John Doe, Agent for the Government Development Bank for Puerto Rico (collectively, the "**Commonwealth**"), and (ii) supporting Plaintiffs' cross-motion for summary judgment on the basis of preemption and unconstitutional stay of federal proceedings.

## PRELIMINARY STATEMENT

On June 25, 2014, Puerto Rico's House and Senate passed the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, Act No. 71 of June 28, 2014 (the "**Recovery Act**") for use by PREPA and a limited number of other corporations.  The Recovery Act is at least as broad as the federal Bankruptcy Code, but it is materially worse for holders of PREPA secured bonds, including Plaintiffs.  The Recovery Act authorizes (among other things):

- A "composition" (*i.e.,* restructuring) of PREPA secured bonds by forcible reduction of principal amount and a discharge by permanent injunction against enforcement;

- A taking, without compensation, of the PREPA secured bonds' collateral and the bondholders' right to seek appointment of a receiver; and

- An automatic stay of all actions against PREPA and the Commonwealth, potentially including proceedings in this Court in this case.

Passage of the Recovery Act caused the market prices of PREPA's secured bonds to suffer a significant decrease in value.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Complaint.  Citations to "Am. Compl. ¶ ___" are to Plaintiffs' Amended Complaint; citations to "2d Am. Compl. ¶ ___" are to Plaintiffs' proposed second amended complaint filed contemporaneously herewith (the "**Second Amended Complaint**"); citations to "Commonwealth MTD, at ___" are to the Commonwealth's Motion to Dismiss; and citations to "PREPA MTD, at ___" are to the PREPA Motion to Dismiss.

The Commonwealth and PREPA can deny none of the facts set forth above. Accordingly, the Recovery Act:

- Is preempted by the express terms of Bankruptcy Code §§ 903(1) and 101(52), and by the Bankruptcy Clause of the United States Constitution;

- Takes Plaintiffs' property – *i.e.*, their collateral – without compensation in violation of Amendments V and XIV of the United States Constitution;

- Substantially impairs Plaintiffs' contractual rights under the bonds' trust agreement in violation of the Contracts Clause of the United States Constitution; and

- Violates Plaintiffs' right to litigate their federal claims in federal court.

Accordingly, Plaintiffs respectfully request that this Court (1) deny Defendants' Motions to Dismiss, and (2) grant Plaintiffs' cross-motion for summary judgment on the basis of preemption and unconstitutional stay of federal proceedings.[2]

## **FACTS**[3]

PREPA was established as a public corporation pursuant to the Puerto Rico Electric Power Authority Act, Act No. 83 of May 2, 1941, 22 L.P.R.A. §§ 191, *et seq.* (as amended, reenacted and supplemented, the "**PREPA Act**"). PREPA issued bonds (the "**PREPA Bonds**") under a Trust Agreement between PREPA and U.S. Bank National Association, as Successor Trustee (the "**Trustee**"), dated as of January 1, 1974, as amended and supplemented through August 1, 2011 (the "**Trust Agreement**"). Am. Compl. ¶ 3. The PREPA Bonds are secured by a pledge of all or substantially all of the present and future revenues of PREPA. *Id.*

---

[2] Plaintiffs do not seek summary judgment on their Takings Clause and Contracts Clause claims at this time, as those claims may involve facts that require further development through discovery.

[3] The facts are taken, as applicable, from the allegations of the Amended Complaint and the proposed Second Amended Complaint, and from the declarations of Thomas Moers Mayer (the "**Mayer Declaration**"), Sheila Amoroso (the "**Franklin Declaration**"), and Randy Legg (the "**Oppenheimer Declaration**"). Contemporaneously herewith, Plaintiffs are moving for leave to file their Second Amended Complaint, which supplements the Amended Complaint's allegations in several respects.

The Franklin Funds and the Oppenheimer Rochester Funds collectively hold approximately $1,559,020,000 in principal amount of PREPA Bonds.  *See* Franklin Decl.¶ 5; Oppenheimer Decl. ¶ 5.

In the PREPA Act, the Commonwealth pledges that it will not "limit or alter the rights or powers" vested in PREPA until the PREPA Bonds are fully paid.  PREPA Act § 25.  In the Trust Agreement, PREPA pledged that "no contract or contracts will be entered into or any action taken by which the rights of the Trustee or of the bondholders might be impaired or diminished."  Trust Agreement § 709.

The Trust Agreement requires PREPA to pay all principal, interest and other charges on the PREPA Bonds when due, and prohibits the extension of maturities, reduction in amounts owed, or the grant of any other liens on PREPA's revenue without the requisite bondholder consent.  Trust Agreement §§ 701, 712, 1102.

The Trust Agreement requires PREPA to fix, charge and collect rates sufficient to assure payment of principal and interest on the PREPA Bonds.  If PREPA fails to do so, the Trust Agreement authorizes the Trustee, upon direction from the holders of 10% of the bonds, to sue PREPA to compel it to raise rates.  *Id*. § 502.

The PREPA Act and the Trust Agreement also grant holders of PREPA Bonds remedies after an event of default, including the right to seek the appointment of a receiver to collect the revenues pledged to secure the PREPA Bonds.  PREPA Act §§ 17, 18; Trust Agreement § 804.

On June 25, 2014, the Commonwealth's Senate and House of Representatives passed the Recovery Act, and the Governor signed the Recovery Act into law on June 28, 2014.

Am. Compl. ¶ 11.  The Recovery Act impairs Plaintiffs' rights under the Trust Agreement and the PREPA Act in many ways.  For example:

- Recovery Act § 108(b) "supersedes and annuls" Plaintiffs' right to seek appointment of a receiver even before the commencement of proceedings by PREPA (Recovery Act § 108(b));

- Recovery Act §§ 115(b)(2) and (c)(3) permanently enjoin enforcement of any of  Plaintiffs' PREPA Bonds subject to a plan under Chapter 2 or Chapter 3 (*id.* §§ 115(b)(2), (c)(3));

- Chapter 2 of the Recovery Act forces Plaintiffs to accept less than payment in full on their claims so long as other PREPA bondholders have approved that treatment by requisite majorities (*id.* § 202);

- Chapter 3 of the Recovery Act allows PREPA to prime the PREPA Bonds with a senior lien on the bondholders' collateral, without requiring adequate protection or other compensation (*id.* §§ 322(c), 129(d)); and

- Chapter 3 of the Recovery Act forces Plaintiffs to accept less than payment in full even if all PREPA bondholders object – so long as creditors in another class have accepted the plan (*id.* §§ 312, 315).

The Recovery Act is expressly modeled on the federal Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), and the legislature stated "its intent that jurisprudence interpreting the provisions of chapter 9 of title 11 of the United States Code be used . . . for purposes of interpreting the provisions . . . of this Act."  Recovery Act, Stmt. of Motives § E.

However, the Recovery Act differs from the Bankruptcy Code in ways materially adverse to secured bondholders, including Plaintiffs.  For example, both statutes authorize municipal debtors to use cash collateral (such as revenues pledged to secure the PREPA Bonds), or to obtain financing secured by senior (i.e., "priming") or equal liens on existing creditors' collateral.  "Use" of cash collateral can diminish collateral.  If PREPA "uses" $1 million of the revenues pledged to PREPA bondholders, that $1 million is gone.

Likewise, senior liens on collateral can reduce or even eliminate a secured creditor's property interest in its collateral.  If PREPA borrows $1 million secured by a senior lien on pledged revenues, PREPA bondholders have $1 million less collateral.  Accordingly, the Bankruptcy Code requires "adequate protection" of secured creditors as a condition for use of their cash collateral or grant of a senior lien.  *See* 11 U.S.C. §§ 361, 364.

By contrast, the Recovery Act does not require adequate protection.  Instead, the Recovery Act authorizes PREPA to use the PREPA bondholders' collateral without providing adequate protection – or, indeed, compensation of any sort – "when and if the police power justifies and authorizes the temporary or permanent use or transfer of property without adequate protection."  Recovery Act § 129(d).  While the Trust Agreement does authorize PREPA to "use" pledged revenues to pay "current expenses," *see, e.g.*, Trust Agreement §§ 505, 506, 701, the Recovery Act allows PREPA to "use" pledged revenues for any purpose.

Similarly, PREPA can borrow money secured by a senior or equal lien on the PREPA bondholders' collateral without compensation or protection when "the proceeds are needed to perform public functions."  Recovery Act § 322(c).  The Trust Agreement specifically prohibits any priming lien on pledged revenues.  *See* Trust Agreement § 712.

The Recovery Act's Statement of Motives indicates that it was designed for PREPA's use.  Recovery Act, Stmt. of Motives § A (PREPA is the "most dramatic example" of public corporations in need of the statute).  The mere introduction of the Recovery Act caused the Fitch Ratings Agency to downgrade the PREPA Bonds' rating from "BB" to "CC" on June 26, 2014.  Mayer Decl. Ex. 7; Am. Compl. ¶ 14.  The market prices of PREPA Bonds fell sharply following the introduction and passage of the Recovery Act.  For example, the prices of three series of PREPA Bonds of which Plaintiffs have substantial holdings dropped

approximately 35%, 24% and 23%, respectively, between the Recovery Act's June 25 introduction and the resumption of trading following its June 28 passage.  Mayer Decl. Ex. 5; Am. Compl. ¶ 15.[4]  Shortly thereafter, Standard & Poor's Rating Services downgraded the PREPA Bonds as well.  Mayer Decl. Ex 8; Am. Compl. ¶¶ 14-15.

These severe declines in the prices of PREPA Bonds have already caused specific and continuing harm to Plaintiffs.  For example, certain of the Plaintiff funds have already sold PREPA Bonds at reduced prices following the Recovery Act's enactment. 2d Am. Compl. ¶ 15. In addition, Plaintiffs are required to "mark to market" the holdings of their funds on a daily basis in order to calculate their funds' daily net asset values, *i.e.*, the daily price at which investors purchase or redeem shares from the funds.  Consequently, the diminished value of the PREPA Bonds has already reduced the daily net asset values of the Plaintiff funds, causing actual and continuing injury to Plaintiffs, as well as to shareholders of the Plaintiff funds that have sold or will sell fund shares since the Recovery Act's enactment.  *Id.*

## PROCEDURAL HISTORY AND RELIEF REQUESTED

Interest on the PREPA Bonds was payable on Tuesday, July 1, 2014.  Concerned that PREPA would commence a proceeding under the Recovery Act to forestall the payment of interest and stay Plaintiffs from vindicating their rights under the U.S. Constitution in federal court, Plaintiffs filed their initial complaint on Saturday, June 28, 2014 [Dkt. No. 1] and an amended complaint on Sunday, June 29, 2014 [Dkt. No. 2].  The Commonwealth filed a motion to dismiss on July 21, 2014 [Dkt. No. 10], as did PREPA [Dkt. No. 31].  On July 22, another

---

[4] The trading prices for PREPA Bonds held by Plaintiffs bearing CUSIP numbers 74526QA69, 74526QA28 and 74526QVX7 are attached as Exhibit 5 to the Mayer Declaration.  The percentage declines noted above are calculated using the last available trading data prior to June 25, 2014 and the first available trading data after June 28, 2014.

PREPA bondholder, BlueMountain Capital Management, LLC, on behalf of its managed funds, filed its own complaint (the "**BlueMountain Complaint**").

Subsequent to the filing of the Motions to Dismiss and the BlueMountain Complaint, Plaintiffs engaged in discussions with Defendants regarding a schedule under which Plaintiffs would first file a second amended complaint (primarily to supplement Plaintiffs' allegations concerning the Contracts Clause in ways that parallel allegations in the BlueMountain Complaint) and Defendants would then file a renewed motion to dismiss directed to the Second Amended Complaint. Ultimately, Defendants were not willing to agree to such a revised schedule. Accordingly, contemporaneously herewith, Plaintiffs are filing a motion for leave to file their Second Amended Complaint.

In addition, Plaintiffs cross-move for the entry of summary judgment on the basis of preemption and an unconstitutional stay of federal proceedings. As explained below, because Plaintiffs challenge the constitutionality of the Recovery Act on its face, rather than on an as-applied basis, the cross-motion rests on grounds that are purely legal and involve no disputed issues of material fact.

Plaintiffs respectfully submit that it would be most efficient for the Court to consider their motion for leave to amend their complaint prior to considering Defendants' Motions to Dismiss and Plaintiffs' Cross-Motion for Summary Judgment. Under Federal Rule 15(a)(2), leave of court to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). As discussed in Plaintiffs' motion for leave to amend, no reason exists not to permit the proposed amendment at this early stage of the case. Plaintiffs therefore request that the Court first grant the motion for leave to amend, and then consider the Motions to Dismiss and

the Cross-Motion for Summary Judgment in the context of the allegations of the Second Amended Complaint.

## **STANDARD OF REVIEW**

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure must be denied where the complaint "satisfies [Federal] Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11-12 (1st Cir. 2011) (citation omitted). Plaintiffs need only include "enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id*. In making such a determination, the Court must accept all non-conclusory factual allegations as true. *Id*. at 12. "If that factual content, so taken, 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' the claim has facial plausibility" and the motion to dismiss should be denied. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (complaint must contain factual material "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"). The court may consider documents outside the complaint where the complaint's factual allegations are "expressly linked to – and admittedly dependent on" such documents. *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

Motions brought under Rule 12(b)(1) are subject to a similar standard as Rule 12(b)(6) motions. *Negrón-Gaztambide v. Hernández-Torres*, 35 F.3d 25, 27 (1st Cir. 1994); *Torres Maysonet v. Drillex, S.E.*, 229 F. Supp. 2d 105, 107 (D.P.R. 2002). Therefore, in considering a Rule 12(b)(1) motion, "[the district court] must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v.*

*U.S.*, 620 F.3d 50, 54 (1st Cir. 2010) (citation omitted).  The court should not dismiss the action under 12(b)(1) "unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of [her] claim which would entitle [her] to relief."  *Negrón-Gaztambide*, 35 F.3d at 27.

A motion for summary judgment pursuant to Rule 56(a) may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The moving party generally bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Upon such a showing, however, the burden shifts to the non-moving party to establish a dispute that gives rise to a genuine triable issue.  *Id.*  If the opposing party cannot make such a showing, the court should award summary judgment in favor of the movant.  *See id.* at 322-23.

## ARGUMENT

## I.    PLAINTIFFS' CAUSES OF ACTION ARE RIPE FOR DETERMINATION

### A.    Plaintiffs' Facial Challenges to the Constitutionality of the Recovery Act are Ripe

Questions of ripeness are analyzed under a framework that considers "the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Comm'n of Mass.*, 61 F.3d 1003, 1009 (1st Cir. 1995) (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967).  Fitness factors include "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," the extent to which the claim is "bound up in the facts" instead "of an intrinsically legal nature," and "the presence

or absence of adverseness."  61 F.3d at 1009-10 (internal quotations and citation omitted).  The

hardship prong turns on the extent and immediacy of the harms the plaintiff has suffered or is

likely to suffer.  *Id.* at 1010.  "[E]ven when the direct application of such a statute is subject to

some degree of contingency, the statute may impose sufficiently serious collateral injuries that an

inquiring court will deem the hardship component satisfied."  *Id.* at 1012.

Here, both fitness and hardship considerations weigh heavily in favor of

immediate review of Plaintiffs' claims.  In the first place, the issues raised by the Amended

Complaint are particularly "fit" for immediate consideration for a simple reason that the Motions

to Dismiss largely ignore:  The Amended Complaint challenges the constitutionality of the

Recovery Act *on its face*, rather than challenging any particular application of that statute.  It is

well established that "a facial challenge [to a regulation or statute] is usually ripe 'the moment

the challenged regulation or ordinance is passed.'"  *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d

294, 307 (1st Cir. 2005) (citation omitted); *see also Asociación de Suscripción Conjunta del

Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 52 (1st Cir. 2011)

(facial takings challenge was ripe on day regulation passed).

Preemption issues, in particular, are often found to be particularly suitable for pre-

enforcement adjudication.  *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.

Comm'n*, 461 U.S. 190, 201 (1983) ("the question of preemption is predominantly legal" and

ripe for adjudication).  In the takings context, as well, courts have found that the existence and

threatened enforcement of a statute may itself be injurious and sufficient to confer ripeness.  *See,

e.g.*, *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978) (claim that

because statute "does not provide advance assurance of adequate compensation in the event of a

taking, it is unconstitutional," was ripe); *Beacon Hill Farm Assocs. II Ltd. P'Ship v. Loudoun*

*Cty. Bd. of Supervisors*, 875 F.2d 1081, 1083 (4th Cir. 1989) (facial challenge to zoning ordinance was ripe, where "the mere existence and threatened enforcement of the ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constituted a present and irreparable injury") (citation omitted).[5]

Considerations of hardship also weigh heavily in favor of immediate review.  As discussed in detail above, Plaintiffs have already suffered harm and will continue to suffer harm should review be postponed.  The Recovery Act has already eliminated Plaintiffs' right to seek the appointment of a receiver, even before the commencement of proceedings by PREPA – a substantial injury in itself.  The Recovery Act has further harmed Plaintiffs by authorizing PREPA to take their collateral without compensation or adequate protection after a filing.  As a result, market prices of PREPA Bonds have dropped substantially.  Certain Plaintiffs have sold significant amounts of PREPA Bonds at reduced prices, and the daily net asset values of all Plaintiff funds have been reduced.

PREPA's filing under the Recovery Act appears both probable and imminent under the Recovery Act's own Statement of Motives, which identifies PREPA as "most

---

[5] Thus there is no merit to PREPA's argument (PREPA MTD at 12) that Plaintiffs' claims will not be ripe until PREPA commences a proceeding under the Recovery Act and exercises its powers thereunder.  PREPA's reliance (PREPA MTD at 17-21) on the particular Takings Clause ripeness considerations set forth in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), is similarly misplaced.  These ripeness considerations apply only to as-applied challenges, as PREPA itself acknowledges.  *See* PREPA MTD at 17 (describing the *Williamson* factors as "steps that must be completed before [Plaintiffs'] *as-applied* Contracts Clause or Takings Clause claims can be ripe") (emphasis added); *see also Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 458 n.13 (7th Cir. 2002) ("Litigants are not required to meet the *Williamson County* ripeness requirements when solely mounting a pre-enforcement facial challenge . . . ."); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 287 (5th Cir. 2012) ("The Supreme Court has held *Williamson County* to be inapplicable to facial challenges.").

dramatic[ally]" in need of the statute.  Recovery Act, Stmt. of Motives § A.[6]  None of the Defendants has denied that PREPA will file.[7]

These actual and threatened harms are more than sufficient to warrant immediate review of Plaintiffs' facial challenges to the Recovery Act.  *See Pennsylvania v. West Virginia*, 262 U.S. 553, 591 (1923) (suit brought days after challenged legislation took effect was not premature, since enforcement of the statute was "presently threatened and likely to be productive of great injury."); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579, 581 (1985) (constitutional challenge to statute requiring arbitration was ripe even before arbitration commenced because plaintiffs were "aggrieved by the *threat* of an unconstitutional arbitration procedure") (emphasis in original); *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991) (facial challenge to administrative board's not-yet-exercised veto power was ripe:  "[t]he threat of the veto hangs over the [decisionmakers] like the sword over Damocles").[8]

---

[6] Market watchers have likewise predicted that PREPA will seek relief under the Recovery Act in the near future. *See, e.g.*, Aaron Kuriloff, *Puerto Rico's Power Authority Taps Reserves To Pay Investors*, Wall St. J. (July 10, 2014), http://online.wsj.com/articles/puerto-ricos-power-authority-taps-reserves-to-pay-investors-1405033187 ("The Puerto Rico Electric Power Authority tapped reserve funds to pay investors last week in the latest sign the cash-strapped utility may soon restructure its debt.").

[7] Defendants' only response is to selectively quote, out of context, a statement on the Oppenheimer Rochester Funds' website that the Recovery Act would not affect Puerto Rican municipal issuers generally. There are at least 18 municipal Puerto Rican issuers of publicly traded bonds, many of which the Oppenheimer Rochester Funds hold in significant amounts; the PREPA Bonds represent only a portion of these total holdings. *See* Oppenheimer Decl. ¶6. The Recovery Act affects only a very limited number of such issuers, including PREPA. The statement that Puerto Rico bonds have more upside than downside is not at all inconsistent with Plaintiffs' position in this litigation:  that the Recovery Act is invalid and should be struck down, at which point the Plaintiffs reasonably expected the PREPA Bonds to recover the decline in prices that immediately resulted from the passage of the Recovery Act.

[8] PREPA's extensive reliance on *Ernst & Young v. Depositors Economics Protection Corp.*, 45 F.3d 530 (1st Cir. 1995), is misplaced.  There, the accounting firm Ernst & Young ("**E&Y**") brought a facial constitutional challenge to a statute that limited a nonsettling tort-feasor's right of contribution against joint tortfeasors. The First Circuit rejected the firm's challenge as "speculative" and unripe because it depended on the occurrence of *eight* "serendipitous events," including "most critically" a finding of E&Y negligence that E&Y "steadfastly denied." *Id.* at 538. Here, PREPA has not "steadfastly denied" that it will commence a Recovery Act proceeding.  To the contrary, the Commonwealth has acknowledged that PREPA is likely to seek relief under the Recovery Act, a

The need for immediate review is heightened by the provisions of the Recovery Act that purport to restrict, or even eliminate, Plaintiffs' right to challenge its constitutionality once PREPA has filed for relief under the Act.  The Act imposes an automatic stay that purports to enjoin all proceedings in other courts, including further proceedings in this Court, on pain of punitive damages.  Recovery Act §§ 304(a), 305.[9]  As set forth in Point V below, this injunction is unconstitutional.  The time to challenge the injunction in this Court is now, before Plaintiffs are forced to make the Hobson's choice between submitting to Commonwealth court jurisdiction under an unconstitutional statute and risking the imposition of punitive damages.  *See Stern v. U.S. Dist. Court*, 214 F.3d 4, 10-13 (1st Cir. 2000) (striking down District Court's local rule governing Department of Justice attorneys' service of subpoena before subpoena was issued because attorneys could not be forced to choose between an ethics violation and pursuing a criminal case).  Defendants cannot ask the Court to refrain from deciding the Recovery Act's constitutionality now, when Plaintiffs' opportunity to challenge it later will be severely constrained.

In sum,  Plaintiffs have already suffered concrete harm as a result of passage of the Recovery Act, and Plaintiffs' facial challenges to the Act were ripe the moment the Recovery Act was passed.  In addition, the two claims on which Plaintiffs seek summary judgment – namely, that the Act is preempted and that its automatic stay provisions are illegal – are "purely legal, and will not be clarified by further factual development."  *Union Carbide*, 473 U.S. at 581. The time to decide these claims is now.

---

specialized statute that confers rights on only a limited number of entities, including PREPA.  *See* Commonwealth Quarterly Report, 22 (July 17, 2014) (attached as Exhibit 8 to the Mayer Decl.).

[9] In addition, if PREPA obtains postpetition financing secured by a lien senior to Plaintiffs' lien without the provision of adequate protection (which would result in a Fifth Amendment taking), the grant of such a lien is purportedly not subject to reversal on appeal.  *Id.* § 322(e).

B.     **Plaintiffs Have Standing**

Since Plaintiffs' claims are ripe, Plaintiffs have standing to bring these facial challenges to the Recovery Act.  *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 9 n.5 (1st Cir. 2012) (once claim is deemed ripe, plaintiffs have standing).  Plaintiffs meet all three criteria for standing: (i) they have suffered actual injury, including devaluation of their PREPA Bonds and the elimination of their right to seek appointment of a receiver, and they face the prospect of more severe injuries upon PREPA's likely filing, (ii) their injuries can be fairly traced to the passage of the Recovery Act, and (iii) these injuries likely would be redressed by a decision from the Court that the Recovery Act is unconstitutional.  *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) (plaintiffs had standing to bring preemption challenge to statute), *aff'd sub nom. Pharm. Research & Manufs. of Am. v. Walsh*, 538 U.S. 644 (2003).

II.     **THE RECOVERY ACT IS PREEMPTED BY THE BANKRUPTCY CODE AND THE BANKRUPTCY CLAUSE**

Article I, Section 8, clause 4 of the United States Constitution (the "**Bankruptcy Clause**") grants Congress the power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4.  Congress has enacted a "uniform Law" on the subject of municipal bankruptcy – Chapter 9 of the Bankruptcy Code – and its provisions expressly preempt the Recovery Act.  Moreover, even absent this express preemption, the Recovery Act would be preempted by the Bankruptcy Clause, because the Act provides for a discharge of indebtedness, thereby intruding on an area in which the federal government alone may legislate.

**A.**   **The Recovery Act is Preempted by Section 903(1) of the Bankruptcy Code**

Section 903(1) of the Bankruptcy Code expressly preempts the Recovery Act. Section 903 provides in pertinent part:

> This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but --
>
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition . . . .

11 U.S.C. § 903(1).  Section 101(52), in turn, provides:  "The term 'State' includes . . . Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title."  11 U.S.C. § 101(52).

The meaning of these two provisions is unambiguous.  Section 101(52) defines Puerto Rico as a "State" for all purposes under the Bankruptcy Code except eligibility under Chapter 9.  Puerto Rico is therefore a "State" for purposes of Section 903(1) and is covered by that section's prohibition on the enactment of State laws authorizing non-consensual "compositions," or restructurings, of municipal debt.  PREPA, which the Recovery Act describes as a "public corporation," *see, e.g.*, Recovery Act, Stmt. of Motives, § A, is a "municipality" for purposes of the Bankruptcy Code.  *See* 11 U.S.C. §101(40) ("'municipality' means political subdivision or public agency or instrumentality of a State").  The Recovery Act explicitly implements non-consensual "compositions" of PREPA's debt – by authorizing PREPA to compel its creditors to accept cents-on-the-dollar treatment under a Chapter 2 plan accepted by other creditors in their class or a Chapter 3 plan accepted by creditors in any class – and thus runs afoul of section 903(1) of the Bankruptcy Code.

Despite the plain meaning of Sections 903(1) and 101(52), the Commonwealth argues that the Recovery Act is not preempted for a number of reasons.  *First*, the Commonwealth points to the absence of any reference to Puerto Rico in Section 903(1), arguing that it would be "absurd" to deem Puerto Rico's police powers to be displaced by a statutory provision that makes no mention of the Commonwealth.  Commonwealth MTD at 13-14 (such a construction would amount to "hid[ing] elephants in mouseholes") (citation omitted).  This argument simply overlooks Section 101(52), which specifically delineates which provisions of the Bankruptcy Code apply to Puerto Rico and which do not.  By expressly defining Puerto Rico as a "'State' . . . except for the purpose of defining who may be a debtor under chapter 9 of this title," Congress made clear its intent to make Puerto Rico a State for all other purposes, including Section 903(1).  *See, e.g.*, *TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (under canon of "*expressio unius est exclusio alterius*," where statute contains a single express exception, additional exceptions are not to be implied).[10]  A contrary reading of Section 101(52) – deeming Congress to have enacted a definition expressly applicable to Puerto Rico, to have applied that definition widely with but a single enumerated exception, yet to have intended the courts to infer a further *unwritten* exception (that "State" excludes Puerto Rico for section 903(1), as well as eligibility, purposes) – would violate this basic canon of statutory construction.

*Second*, the Commonwealth argues that Section 903(1) applies only in a Chapter 9 proceeding.  *See* Commonwealth MTD at 13.  This argument, too, flies in the face of the plain language of the Bankruptcy Code.  Section 903(1), by its terms, is not limited to Chapter 9 cases

---

[10] Congress enacted Section 101(52) as part of the 1984 amendments to the Bankruptcy Code.  Prior to those amendments, the Code contained no definition of the term "State."  *Compare* Pub. L. No. 95-598, 92 Stat. 2549, 2549-54 (Nov. 6, 1978) (no definition of "State") *with* Pub. L. No. 98-353, 98 Stat. 333, 368-69 (July 10, 1984) (adding definition of "State").

but applies whether or not a Chapter 9 case (or a bankruptcy case of any sort) is pending.  In this regard, it is similar to other Bankruptcy Code provisions that also apply whether or not a bankruptcy case is pending.  *See, e.g.*, 11 U.S.C. § 528 (imposing regulations on debt relief agencies); *id.* § 525 (prohibiting discriminatory treatment of former debtors).  Not surprisingly, the one court of appeals that has addressed this issue has held that "the plain language of this section is not limited to bankruptcy proceedings."  *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 431 (6th Cir. 2014) (en banc).[11]  The leading bankruptcy treatise has likewise stated broadly that Sections 903(1) and 903(2) "indicate congressional preemption of the law of municipal debt adjustment," without mention of any exception to this rule.  *See 6 Collier on Bankruptcy* ¶ 903.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.).[12]

Moreover, to restrict Section 903(1)'s application to Chapter 9 cases would contravene the clear legislative history of that statute and its predecessor, Section 83(i) of the Bankruptcy Act of 1898 (the "**Bankruptcy Act**"), which leaves no doubt that Congress intended to forbid the enactment of any State laws authorizing non-consensual municipal debt restructurings, regardless of the pendency of a Chapter 9 case.

---

[11] Inexplicably, the Commonwealth quotes the two-judge *concurring* opinion in *Pontiac* for the opposite proposition, without mentioning the actual holding to the contrary from the en banc panel of 15 judges. Commonwealth MTD at 13.

[12] The Commonwealth observes (MTD at 13) that Section 103(k)(2) of the Bankruptcy Code provides that Section 1509 of the Code applies whether or not a bankruptcy case is pending, whereas there is no similar provision in section 103 for Section 903(1).  But Section 103(k)(2) has no relevance whatsoever to Section 903(1).  In the first place, Section 103(k)(2) is an exception to Section 103(k)'s statement that the provisions of Chapter 15 (which governs cross-border insolvencies) apply "only in a case under such chapter."  *See* 11 U.S.C. § 103(k).  Nothing in Section 103 similarly limits the application of Chapter 9 to "a case under such chapter."  Consequently, there is no need in section 103 for any exception applicable to Section 903.  In addition, Section 103(k)(2) was not enacted until 2005, more than 25 years after Congress enacted Section 903.  It therefore has no bearing on Congress's intent when it enacted that earlier statute.  *See Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000) ("[L]ater laws that 'do not seek to clarify an earlier enacted general term' and 'do not depend for their effectiveness upon clarification, or  a change in the meaning of an earlier statute,' are 'beside the point' in reading the first enactment.") (citation omitted).

Section 83(i) of the Bankruptcy Act was amended in 1946 for the specific purpose of overruling the Supreme Court's decision, four years earlier, in *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502 (1942).  In *Faitoute*, the Supreme Court upheld a municipal insolvency law enacted by the state of New Jersey, holding that the law was neither preempted (because there was no federal municipal bankruptcy statute in effect) nor barred by the Contracts Clause of the U.S. Constitution.  Four years later, Congress amended Section 83(i) of the Bankruptcy Act to include language almost identical to the current Section 903(1) of the Bankruptcy Code:

> (i) Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any municipality or any political subdivision of or in such state in the exercise of its political or governmental powers, including expenditures therefore: *Provided, however,* That *no State law prescribing a method of composition of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition*, and no judgment shall be entered under such State law which would bind a creditor to such composition without his consent.

Pub. L. No. 481, § 83(i), 60 Stat. 409, 415 (1946) (emphasis added).

The legislative history to this amendment clearly states that it was intended to overrule *Faitoute* by forbidding the enactment of any State laws authorizing non-consensual municipal debt restructurings:

> An amendment to section 83(i) provides that State legislation dealing with compositions of municipal indebtedness shall not be binding on nonconsenting creditors.  State adjustment acts have been held to be valid, but a bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States, as the bonds of almost every municipality are widely held.  *Only under a Federal law should a creditor be forced to accept such an adjustment without his consent.*

H.R. Rep. No. 79-2246, at 4 (1946) (emphasis added)[13]; *see also Hearing on H.R. 4307 Before the Special Subcomm. on Bankr. & Reorganization of the H. Comm. on the Judiciary*, 79th Cong., at 15-16 (1946) (statement of Millard Parkhurst) (describing amendment as overruling *Faitoute*).   Congress reaffirmed this intent when it enacted Section 903(1) of the Bankruptcy Code, the terms of which are substantively identical to those of Section 83(i).[14]

        *Third*, the Commonwealth argues that the "historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  Commonwealth MTD at 12 (citation omitted).  As discussed above, both the plain language and the legislative history of Section 903(1) and its predecessor make clear that Congress's purpose *was* to supersede the "historic police powers of the States" in the field of municipal debt restructuring.[15]   Moreover, while States have "inherent" powers (U.S. CONST. amend. X), Puerto Rico does not.  Puerto Rico has only those powers delegated by Congress under the Puerto Rican Federal Relations Act, 48 U.S.C. §§ 731 *et seq*.  By passage of Public Law No. 447, 66 Stat. 327 – approving Puerto Rico's constitution – Congress did not in 1952 provide Puerto Rico a power to enact municipal bankruptcy laws that Congress had explicitly

---

[13] Relevant excerpts of the legislative histories, bills, and public laws cited herein are attached as exhibits to the Mayer Declaration.

[14] With the enactment of the Bankruptcy Code in 1978, former Section 83(i) became current Section 903.  *See* S. Rep. No. 95-989, at 110 (1978) ("Section 903 is derived, with stylistic changes, from section 83 of current Chapter IX. . . . The proviso in section 83, prohibiting State composition procedures for municipalities, is retained.  *Deletion of the provision would 'permit all States to enact their own versions of Chapter IX,' which would frustrate the constitutional mandate of uniform bankruptcy laws*.") (citation omitted) (emphasis added).

[15] Any presumption against preemption arises only when "Congress legislates in a field traditionally occupied by the states."  *United Parcel Service, Inc. v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003); *see also United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").  Federal law, rather than state law, has dominated the field of bankruptcy since the enactment of the Bankruptcy Act of 1898, and has dominated the field of municipal bankruptcy since 1938, when the Supreme Court upheld Chapter IX of the Bankruptcy Act, *see United States v. Bekins*, 304 U.S. 27, 51-52 (1938).  While Congress has chosen to exclude banks and insurance companies from the federal bankruptcy statute and to leave regulation of bank and insurance company insolvencies to the states, it has done the opposite with respect to municipal insolvencies.

denied to the states under Section 83(i) only six years earlier, in 1946.  To the contrary, any powers delegated to Puerto Rico in 1952 were made subject to Section 83(i).  *See* 48 U.S.C. § 734 ("The statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States.").

*Fourth,* the Commonwealth contends that it "strains credulity" to think Congress would have intended Sections 903(1) and 101(52) to apply as written, so as to bar Puerto Rico from either utilizing Chapter 9 of the Bankruptcy Code or enacting a municipal debt restructuring law of its own.  In fact, such a reading makes perfect sense.  As noted above, Congress's stated reason for enacting Section 903(1)'s predecessor, Section 83(i) of the Bankruptcy Act, was that municipal bonds are "widely held" throughout the states and thus only a federal law should apply.  *See* H.R. Rep. No. 79-2246, at 4 (1946).  This reason applies with particular force to Puerto Rico.  By act of Congress, *only Puerto Rico bonds are exempt from federal and state tax in every one of the 50 states.  See* 48 U.S.C. § 745.  This privileged tax status has enabled Puerto Rico to become the third largest issuer of municipal debt in the country after California and New York.[16]  Congress' grant to Puerto Rico of the unique right to issue "triple tax exempt" bonds to investors throughout the nation, and the increasing amount of Puerto Rican debt held nationwide, may explain Congress' exclusion of Puerto Rico from

---

[16] Interest on municipal bonds is typically exempt from federal income tax and from state and local taxes levied by the issuing municipality's own state.  Thus municipal bonds issued by New York or New York municipalities would be "triple tax exempt" (*i.e.*, exempt from federal, state and local taxes) only for a New York investor, municipal bonds issued by California or California municipalities would be triple tax exempt only for a California investor, and so on.  However, investors in New York, California or other states can buy triple tax exempt bonds issued by Puerto Rico or Puerto Rican municipalities and enjoy the same triple tax exemption as a Puerto Rico investor would enjoy.

Chapter 9 through the 1984 enactment of Section 101(52):  Congress did not want Puerto Rico to restructure its municipal debt through either its own laws or Chapter 9.[17]

*Finally*, the Commonwealth argues that preemption of the Recovery Act would lead to "catastrophic practical consequences."  Commonwealth MTD at 14.  Policy-based arguments are irrelevant where the language of the statute is explicit.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (where Bankruptcy Code's "language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms") (citations and quotations omitted).  Puerto Rico's remedy lies, therefore, with Congress.[18]

### B.      The Recovery Act is Preempted By the Bankruptcy Clause

Wholly apart from the express preemption effected by Section 903(1) of the Bankruptcy Code, the Recovery Act is also preempted by the Bankruptcy Clause of the United States Constitution, because the Act's provisions operate to grant a discharge of indebtedness.  The Supreme Court has long held that the power to grant a discharge belongs to the federal government alone.  Thus, even when no federal bankruptcy law is in effect, states are without power to enact bankruptcy laws providing for a discharge.  *See, e.g.*, *Sturges v. Crowninshield*, 17 U.S. 122, 199 (1819) ("[T]he states may, until that power shall be exercised by congress, pass laws concerning bankrupts; yet they cannot constitutionally introduce into such laws a clause which discharges the obligations the bankrupt has entered into."); *Stellwagen v. Clum*, 245 U.S.

---

[17] The Commonwealth's real complaint is not that Congress has made it subject to the same prohibition as the States – namely, Section 903(1)'s ban on the enactment of State municipal restructuring laws – but rather that Congress has excluded it from Chapter 9.  *See* Commonwealth MTD at 14-15 (complaining of exacerbation of "constitutional concerns regarding Puerto Rico's exclusion from Chapter 9").  But whatever "concerns" may be posed by that exclusion, they are not the subject of this litigation, which deals with the constitutionality of the Recovery Act, not Chapter 9.

[18] Indeed, on July 31, 2014, Representative Pedro R. Pierluisi proposed H.R. 5305 to amend the Bankruptcy Code to make Puerto Rican municipalities eligible for relief under Chapter 9.

605, 615 (1918) ("It is settled that a state may not pass an insolvency law which provides for a discharge of the debtor from his obligations . . . and this although no general federal bankruptcy act is in effect."); *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005) ("We know, because the Supreme Court has repeatedly told us, that state statutes that purport to . . . giv[e] debtors a discharge of their debts, are preempted."); *cf. Ry. Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 472 n.14 (1997) ("Apart from and independently of the Supremacy Clause, the Contract Clause prohibits the States from enacting debtor relief laws which discharge the debtor from his obligations, unless the law operates prospectively.") (citations omitted).[19]

      The Commonwealth itself admits that discharge is a "unique aspect of the federal bankruptcy power."  Commonwealth MTD at 10 n.2.  But the Recovery Act ignores this limitation.  The Recovery Act forces creditors to accept partial payment of their claims under a Chapter 2 or Chapter 3 plan, and then purports to permanently enjoin them from collecting the balance.  *See* Recovery Act §§ 115(b)(2) & (c)(3).  These provisions achieve the same outcome as a discharge under Section 1141(d)(1)(A) of the Bankruptcy Code. 11 U.S.C. § 1141(d)(1)(A) ("[T]he confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . .").  A permanent injunction, for these purposes, is indistinguishable

---

[19] The principle articulated in *Sturges* and *Stellwagen* – that certain aspects of the bankruptcy power are reserved to the federal government notwithstanding the absence of any federal law on the subject – is analogous to the "dormant Commerce Clause."  *See Sturges*, 17 U.S. at 193 ("Whenever the terms in which a power is granted to congress, or the nature of the power, require that it should be exercised exclusively by congress, the subject is as completely taken from the state legislatures, as if they had been expressly forbidden to act on it."); *cf. Oklahoma Tax Com'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995) ("Despite the express grant to Congress of the power to 'regulate Commerce . . . among the several States,' [] we have consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject.").

*Faitoute*, which the Commonwealth cites only for the proposition that Congress has not fully occupied the field of municipal insolvency (MTD at 10), is fully consistent with *Sturges* and *Stellwagen*.  The state municipal insolvency statute at issue in *Faitoute* did not effect a discharge; to the contrary, it specifically prohibited any reduction of the principal amount of any outstanding obligation.  *See Faitoute*, 316 U.S. at 504 (under provisions of state statute at issue, a "plan cannot be authorized . . . if it involves any reduction of the principal amount of any outstanding obligation").

from a discharge. *See, e.g.*, *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 626 (9th Cir. 1989) ("We find American's semantic distinction between a permanent injunction and a discharge unpersuasive. . . . A discharge is in effect a special type of permanent injunction."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000) (proposed release and injunction for benefit of non-debtors under plan of reorganization "amounted to nothing more than a lockstep discharge of non-debtor liability"); *First Nat. Bank of Herkimer v. Poland Union*, 109 F.2d 54, 56 (2d Cir. 1940) (injunction restraining suits against non-debtors "would be tantamount to a discharge in bankruptcy").  Thus, the Recovery Act violates the established principle that a state insolvency statute may not provide for a discharge.

## III.    THE RECOVERY ACT VIOLATES THE TAKINGS CLAUSE[20]

The Takings Clause of the Fifth Amendment provides that property shall not "be taken for public use, without just compensation."  U.S. CONST. amends. V, XIV.  This prohibition – which applies to Puerto Rico[21] – extends both to the "direct government appropriation or physical invasion of property" and to government regulations so onerous that they are "tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

Plaintiffs' PREPA Bonds are secured by a lien on PREPA's net revenues.  Trust Agreement § 701.  A lien is "property" protected by the Fifth Amendment.  *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75-76 (1982).  Recognizing this, the Bankruptcy Code allows a

---

[20] The Commonwealth argues in passing that Plaintiffs have not adequately pled their claim under the Takings Clause.  Commonwealth MTD at 20.  Plaintiffs have pled that they have a property interest and that the Recovery Act effects a taking of that property interest, having already resulted in a loss of value of their PREPA Bonds.  *See* Am. Compl. ¶¶ 3, 4, 14, 15, 28-32.  For a facial takings claim, nothing more is required.

[21] *See P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R.*, 665 F.3d 309, 323 n.18 (1st Cir. 2011).

debtor to "prime" a secured creditor – i.e., subject its collateral to a senior or equal lien – only if compensation in the form of "adequate protection" is provided.  *See* 11 U.S.C. § 364(d); *see also* S. Rep. No. 95-989, at 49 (1978) ("[A]dequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court . . . .").[22]  This adequate protection compensation may take various forms, including cash payments, replacement liens on other property, or other relief that will result in the realization by the primed creditor of "the indubitable equivalent" of its property interest.  11 U.S.C. § 361.

In contrast to the Bankruptcy Code, Sections 129(d) and 322(c) of the Recovery Act authorize PREPA to borrow money secured by a senior or equal lien on Plaintiffs' collateral *without* "adequate protection" whenever Puerto Rico's "police power" would permit or whenever the proceeds of the new loan are used "for a public purpose."  *See* Am. Compl. ¶¶ 28, 30.  In other words, the Recovery Act authorizes PREPA to take Plaintiffs' collateral whenever PREPA decides that it really needs it, without compensation.  This is a taking in violation of the Fifth and Fourteenth Amendments.

The Commonwealth argues that Sections 322(c) and 129(d) of the Recovery Act are not sufficient to constitute "regulatory takings" within the meaning of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  Commonwealth MTD at 20-23.  But that is beside the point.  The Recovery Act is not a *regulatory taking*, it is a *direct taking*: the Commonwealth is expropriating Plaintiffs' property for its own benefit.  In the case of an expropriation, the government has "a categorical duty to compensate the former owner."  *Tahoe-*

---

[22] The Commonwealth concedes that the "'purpose of 'adequate protection' is to protect the property interests of secured creditors pursuant to the Fifth Amendment prohibition against takings without just compensation.'" Commonwealth MTD at 24-25 (citation omitted).

*Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).[23]  There is no broad "police power" exception to this requirement.  *See Sec. Indus. Bank*, 459 U.S. at 77 ("[H]owever great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation.") (quoting *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935)).[24]

The grant of a priming lien without adequate protection is no different than the unconstitutional taking at issue in *Armstrong v. United States*, 364 U.S. 40, 46-48 (1960).  There, the government's acquisition of ship hulls rendered materialmens' liens unenforceable because of the government's sovereign immunity.  The Supreme Court held this was a taking.  *Id.* at 48.  "The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking.'"  *Id.*  The same is true here.  For every dollar of Plaintiffs' collateral pledged to a new lender under a priming lien without adequate protection, Plaintiffs suffer a corresponding reduction in the value of their lien.

In any event, the grant of senior or equal liens on Plaintiffs' collateral without adequate protection *would* constitute a regulatory taking under *Penn Central*.  Under the *Penn*

---

[23] A classic taking need not involve the appropriation of land.  *See, e.g.*, *Webb's Fabulous Pharm., Inc. v. Beckwith*, 449 U.S. 155, 163-64 (1980).

[24] The takings and contractual impairments contemplated by the Recovery Act are far more extreme than those at issue in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), on which the Commonwealth relies.  The Supreme Court has written of *Blaisdell*:

> Statutes for the relief of mortgagors . . . were sustained by this court when, as in [*Blaisdell*], they were found to preserve substantially the right of the mortgagee to obtain, through application of the security, payment of the indebtedness.  They were stricken down, as in [*W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935)], when it appeared that this substantive right was substantially abridged.

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 581 (1935).  The Recovery Act, in permitting priming without adequate protection and taking away Plaintiffs' right to seek the appointment of a receiver, does not preserve Plaintiffs' right to "obtain, through application of the security, payment of the indebtedness," and is thus much closer to the statutes struck down in *Kavanaugh* and *Radford* than the one approved in *Blaisdell*.

*Central* analysis, courts consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action." *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 685 (1st Cir. 1999); *see Lingle*, 544 U.S. at 538-39. The economic impact on Plaintiffs is the loss of their collateral, which in turn destroys their reasonable investment-backed expectations – expectations that were underscored by explicit commitments in the Trust Agreement and PREPA Act. *See* Trust Agreement § 709 (pledged revenues to be used only as permitted in agreement); PREPA Act § 10 (PREPA "shall not take any action which shall have the effect of impairing the obligation of any contractual duties imposed upon or assumed by the People of Puerto Rico under authority of existing law").[25]

The elimination of the PREPA bondholders' right to seek the appointment of a receiver – which occurred immediately upon passage of the Recovery Act – also constitutes a taking. It is well settled that contract rights, including those memorialized in a statutory covenant, may constitute "property" for purposes of the Takings Clause. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1976) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). *U.S. Trust* is closely on point; it involved a statutory covenant assuring bondholders that bridge and tunnel tolls allotted to their repayment would not be used to fund mass transit. New Jersey repealed the covenant and the Supreme Court held the repeal unconstitutional because it "totally eliminated

---

[25] The fact that PREPA operates in a regulated industry does not vitiate Plaintiffs' expectation that their security interests would be preserved. *See* Commonwealth MTD at 21-22. The taking here is not related to the regulation of energy production and transmission. Moreover, the coal industry falls within the category of a highly regulated industry, yet this did not stop the Supreme Court from holding – in wartime, no less – that a government action constituted a taking. *See United States v. Pewee Coal Co.*, 341 U.S. 114, 115-16 (1951). Indeed, if the Commonwealth's position were correct, and government instrumentalities operating in highly regulated industries could take property at their whim, such entities would never be able to obtain financing.

an important security provision and thus impaired the obligation of the States' contract." *Id.* at 19.[26]   There is a similar expropriation here.   Under Section 804 of the Trust Agreement and Section 17 of the PREPA Act, the bondholders had the right to seek appointment of a receiver upon PREPA's default.   *See* Trust Agreement § 804; PREPA Act § 17.   This right was taken away by Section 108(b) of the Recovery Act, which provides: "This Act supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including Section 17 of Act No. 83 . . . ."   Recovery Act § 108(b).

The elimination of the right to a receiver is, in the context of the PREPA Bonds, more than just the elimination of one of several remedies.   Plaintiffs' lien on PREPA's revenues is their principal source of recovery.   Plaintiffs cannot obtain a judgment and "execute" on the revenues or "sell" the revenues.   Plaintiffs' principal remedy is to have a receiver collect those revenues for them (and, indeed, raise rates to increase the pledged revenues if necessary).   The Commonwealth's immediate elimination of that remedy is thus a taking of a material element of Plaintiffs' property.

## IV.    THE RECOVERY ACT VIOLATES THE CONTRACTS CLAUSE

Article I, Section 10 of the United States Constitution, provides that "No State shall . . . pass any . . . Law impairing the Obligations of Contracts"   (the "**Contracts Clause**"). U.S. CONST. art. I § 10.

Contracts Clause claims are analyzed under a two-pronged test.   *United Auto., Aero., Agric. Impl. Workers of Am. v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011).   "The first question is whether the State law has operated as a substantial impairment of a contractual relationship."   *Id.* (citing *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411

---

[26] While primarily a Contracts Clause case, the Court, as noted above, made reference to the Takings Clause as well.

(1983)).  That is unquestionably true in this case.  The Plaintiffs' PREPA Bonds, the Trust

Agreement, and the PREPA Act governing them constitute a "contractual relationship."  *See*

*Cont'l Ill. Nat. Bank & Trust Co. v. State of Washington*, 696 F.2d 692, 697-98 (9th Cir. 1983)

(government bonds are contracts subject to the Contracts Clause).[27]

        The Recovery Act effects a "substantial impairment" of PREPA bondholders'

rights under the Trust Agreement and the PREPA Act: (i) to full payment of principal and

interest in accordance with the maturities set forth in the Trust Agreement (*compare* Trust

Agreement §§ 701, 1102, *with* Recovery Act §§ 202, 315), (ii) not to have PREPA sell, lease or

otherwise dispose of the electric power system or grant senior or equal liens impairing

bondholders' lien on pledged revenues (*compare* Trust Agreement § 712, *with* Recovery Act §§

307, 322), (iii) to declare an event of default when, among other things, an order, decree, or

proceeding is instituted or entered "for the purpose of effecting a composition between [PREPA]

and its creditors or for the purpose of adjusting the claims or such creditors" (*compare* Trust

Agreement §§ 802(f), (g), *with* Recovery Act § 325), and (iv) to certain remedies upon an event

of default, including accelerating payments, suing at law or equity to enforce the Trust

Agreement, and seeking the appointment of a receiver to collect their pledged revenues (*compare*

Trust Agreement §§ 803, 804, *and* PREPA Act §§ 17, 18, *with* Recovery Act §§ 108(b), 115,

205, 304).

        These impairments are clearly substantial, as they disrupt the PREPA

bondholders' expectations in entering into the Trust Agreement, and, indeed, eviscerate the

primary inducement for an investor to purchase bonds. *See Universal Ins. Co. v. Dept. of*

---

[27] *See Blaisdell*, 290 U.S. at 431 ("The laws which existed at the time the contract was entered into and which affect its validity, construction, discharge and enforcement, in effect, are incorporated within the contract.").

*Justice*, 866 F. Supp. 2d 49, 67 (D.P.R. 2012) (Besosa J.) ("Whether an impairment is substantial requires a court to consider the parties' reasonable expectations to the alleged contract.").

The second question is whether the impairment was "reasonable and necessary to serve an important government purpose." *Fortuño*, 633 F.3d at 41 (citing *U.S. Trust*, 431 U.S. at 25 and *Energy Res. Grp.*, 459 U.S. at 411). Where the state impairs one of its *own* contracts, courts are exacting in their scrutiny of the challenged legislation and "in almost every case, [have] held a governmental unit to its contractual obligations when it enters financial and other markets." *Energy Reserves Group*, 459 U.S. at 412 n.14 (citing *U.S. Trust*, 431 U.S. at 25-38).

*U.S. Trust* is the last and definitive Supreme Court precedent dealing with impairment of municipal bonds. It is on all fours with the case at hand. It involved bonds secured by bridge and tunnel tolls and a statutory covenant barring the use of pledged revenues and reserves for passenger rail. 431 U.S. at 9-10. In 1974, seeking to discourage auto traffic over the bridges and tunnels and promote public use of mass transit, New Jersey repealed the statutory covenant retroactively. *Id.* at 13-14. The Supreme Court held that "outright repeal" of the covenant "totally eliminated an important security provision and thus impaired the obligation of the States' contract." *Id.* at 19.

As to whether the impairment was permissible, the Court held that the state's "self-interest" was at stake and thus the Court would not accord "complete deference to a legislative assessment of reasonableness and necessity." *Id.* at 26. Nor was the State's assertion of its "police power" determinative, because "the power to enter into effective financial contracts cannot be questioned." *Id.* at 24. "If a State could reduce its financial obligations whenever it wanted to spend the money for what is regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 26.

> [A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives.  Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.

*Id.* at 30.  Because New Jersey had alternatives, such as a prospective surcharge on tolls to fund mass transit, *id.* at 30 n.28, 12 n.10, or direct taxes on automobile use, gasoline or parking, *id.* at 30 n.29, total repeal of the covenant violated the Contracts Clause.  *Id.* at 48.

Just as New Jersey had alternatives to the repeal of the covenant in *U.S. Trust*, the Commonwealth and PREPA have alternatives to the Recovery Act in this case.[28]

*First*, PREPA can simply raise rates.[29]  This would be PREPA's first increase in basic electric charges for almost 25 years.  2d Am. Compl. ¶ 50(i).  Indeed, Section 502 of the Trust Agreement requires PREPA to raise rates if necessary to assure the payment of "Current Expenses" and fund the next year's debt service.  A reasonable rate increase would constitute a far more moderate step to stabilizing PREPA's finances than abrogating its obligations to its bondholders under the Recovery Act.  *Assoc. of Surrogates & U.S. Reporters v. State of New York*, 940 F.2d 766, 773 (2d Cir. 1991).

*Second*, the Commonwealth could pay PREPA what the Commonwealth currently owes – more than $640.83 million (not accounting for $420.57 million the Commonwealth

---

[28] The Commonwealth argues that, under the First Circuit's pleading rules as reflected in *Fortuño*, 633 F.3d at 42, Plaintiffs must plead specific facts to support their allegations that the challenged statute is not reasonable and necessary.  Recognizing this, Plaintiffs are contemporaneously filing a motion for leave to amend their complaint to include more specific allegations of that nature, including those discussed on pages 30-32 of this memorandum.

[29] On May 27, 2014, the Governor signed into law Act 57, known as the Puerto Rico Energy Transformation and Relief Act ("**Act 57**").  Act 57 purports to replace PREPA's ability to unilaterally set rates with the establishment of the Puerto Rico Energy Commission (the "**Commission**").  While any adjustments to energy rates are now subject to review by the Commission, Act 57 provides that "[t]he Commission shall guarantee that the approved rate will be sufficient to: (i) guarantee payment of principal of and interest on bonds and other financial obligations of PREPA; and (ii) comply with the terms and provisions of the agreements entered into with or in benefit of buyers or holders of any bonds or other financial obligations of PREPA."  Act 57 § 2.8(b); PREPA Act § 6B(b).  The Plaintiffs reserve all rights to contest the constitutionality of Act 57.

claims it is owed from previously accrued contributions in lieu of taxes).  2d Am. Compl. ¶ 50(ii).

Third, the Commonwealth could reduce PREPA's taxes and subsidies.  The PREPA Act requires PREPA to set aside *11% of its gross revenues each year* to pay "contributions in lieu of taxes" (so-called "CILT payments") to various municipalities as well as various subsidies to hotels, residential consumers and others.  PREPA Act § 22.  These taxes and subsidies are expected to total over $1 billion from 2014 through 2018.  2d Am. Compl. ¶ 50(iii). The Commonwealth's failure to reduce PREPA's taxes and subsidies "smacks of the political expediency that *United States Trust Co.* warned of."  *Assoc. of Surrogates*, 940 F.2d at 773.

Fourth, PREPA could alter its internal practice for collecting accounts receivable to assure payment of its bonds.  Until recently, the PREPA Act expressly provided that payments due on the PREPA Bonds have priority over subsidy and CILT payments. *See* PREPA Act § 22.[30]  Rather than bill and collect its full rates from subsidy and CILT payment recipients, however, PREPA adopted a practice of allowing the recipients to simply reduce their electric payments by the amount of the subsidy or CILT payment.  2d Am. Compl. ¶ 50(iv).  This practice effectively reverses the order of priorities contemplated by the PREPA Act to the detriment of bondholders.

Fifth, PREPA could make efforts to cut costs and correct potentially significant inefficiencies in the management of PREPA's business. Among other things, PREPA has been reported to have (i) a highly overstaffed human resources and labor department compared to peer

---

[30] The recently enacted Act 57 also made certain modifications to the CILT mechanism contained in the PREPA Act.  Previously, Section 22(b)(3) of the PREPA Act stated that "[t]he obligations assumed by the Authority in the Trust Agreement in effect and any other that may be assumed in the future, which secures the bonds of the Authority shall have priority over any contribution granted in this section."  It appears that this provision was eliminated from Section 22 of the PREPA Act pursuant to the amendments contained in Act 57.

corporations, (ii) high costs for customer service, especially when compared to its low service levels, (iii) under-competitive bidding procedures for its equipment, (iv) surplus equipment and other inventory above that needed for storm preparedness, (v) high overtime charges from PREPA employees and lenient timekeeping standards, and (vi) weak accounting controls and decentralized accounting information. *See* John Marino, *Prepa's Weak Management, Business Controls Behind Poor Financial Performance*, Caribbean Bus. (May 1, 2014), *available at* http://www.cb.pr/prnt_ed/prepas-weak-management-business-controls-behind-poor-financial-performance-9832.html.  Correcting each of these inefficiencies or cutting excess costs could be implemented, improving PREPA's financial stability in both the short and long term.  2d Am. Compl. ¶ 50(v).

> *Finally*, PREPA could make efforts to strengthen its reputation in the global capital markets and develop better relationships with customers, including (i) hiring a capital markets investment banker, something it has not done since the issuance of its 2013A PREPA Bonds, or (ii) presenting publicly to investors, another action it has not taken in over a year, since May 2013.  In the eight months since the issuance of the $8 billion "Advanced Fossil Energy Projects" solicitation in December 2013, PREPA has also not addressed whether it will apply for a federal guarantee through this program, but could, thereby strengthening creditor relationships and stabilizing its finances without prejudicing its contractual rights.  *Id.* ¶ 50(vi).

> In short, the Recovery Act constitutes a drastic impairment to the PREPA Bonds "when an evident and more moderate course would serve equally well."  *U.S. Trust*, 431 U.S. at 31.  But instead of making any efforts to minimize disruption to contractual rights through alternative solutions, Puerto Rico passed an act that, as recognized by Puerto Rico's Resident Commissioner Pierluisi, is "characterized by haste, a lack of transparency, and no public debate

about the suitability of alternative ways to address the problem."  Pierluisi Statement on Puerto

Rico and Chapter 9 of the U.S. Bankruptcy Code (July 10, 2014), *available at*

http://pierluisi.house.gov/media-center/pressreleases/pierluisi-statement-on-puerto-rico-and-

chapter-9-of-the-us-bankruptcy.

　　　　　The Commonwealth argues that *Faitoute Iron & Steel Co. v. City of Asbury Park*,

316 U.S. 502 (1942), upholds the Recovery Act against a Contracts Clause claim.  *See* Recovery

Act, Stmt. of Motives, § C; *see also* PREPA MTD at 19 n.4.  *Faitoute* may no longer be good

law, *see U.S. Trust*, 431 U.S. at 27 ("The only time this century that alteration of a municipal

bond contract has been sustained by this Court was in *Faitoute*."), and it does not support the

Recovery Act.  The New Jersey statute upheld in *Faitoute* was severely limited, providing only

for an extension of maturity and adjustment of interest rates[31] on *unsecured* bonds which had no

meaningful remedy.  *Faitoute* at 514-15.  The Court was careful to state:

> We do not go beyond the case before us.  Different considerations may
> come into play in different situations.  The New Jersey courts have held
> that under this very statute tax anticipations and revenue notes stand on an
> entirely different footing from other municipal obligations and in relation
> to them no claim is affected [by the Statute].

*Id*. at 516.

　　　　　Unlike the *Faitoute* unsecured bonds, the PREPA Bonds are secured by pledged

revenues and have a remedy – the ability to seek the appointment of a receiver to collect the

revenues pledged to them.[32]  Unlike the plan at issue in *Faitoute*, which actually *raised* the

---

[31] The statute explicitly barred any reduction of principal.  *Id.* at 505-06.

[32] The Supreme Court's holding in *Faitoute* was carefully limited to state legislation addressing *unsecured* claims. *See* 316 U.S. at 516 ("[W]e are not here concerned with legislative changes touching secured claims.")).  Here, the most objectionable provisions of the Recovery Act are those dealing with *secured* claims, such as those held by the Plaintiffs.

market value of the plaintiffs' holdings, *id.* at 513, the Recovery Act has diminished the market value of Plaintiffs' PREPA Bonds.  *U.S. Trust* distinguished *Faitoute* on precisely this basis:

> It is clear that the instant case involves a much more serious impairment than occurred in *Faitoute*.  No one has suggested here that the States acted for the purpose of benefitting the bondholders, and there is no serious contention that the value of the bonds was enhanced by the repeal of the 1962 covenant.

431 U.S. at 28.  The Commonwealth has not alleged that the Recovery Act benefits PREPA bondholders; it has alleged that the Recovery Act benefits unspecified "creditors" which is disingenuous since the Recovery Act expropriates PREPA bondholders' collateral for the benefit of other untouched creditors such as pension funds.

Finally, recent circuit court decisions upholding changes to labor and pension agreements provide no support for the Recovery Act. *See, e.g.*, *Fortuño*, 633 F.3d at 49. These decisions dismissed challenges to changes to labor and pension agreements, finding that those who work for the Commonwealth or its agencies know that their employment agreements are infused with a "public interest" and therefore take the risk that the locality where they live and which employs them has the inherent power to change the terms of their employment.  *See, e.g.*, *id.* at 46 (noting that public employees whose expectations are defined by the public interest have a diminished expectation that their contracts will not be impaired by the government).  These characteristics of public employees are inapplicable to PREPA bondholders.  As noted above, PREPA Bonds are held throughout the United States.  They are widely traded securities.  A municipal bondholder in New York, California or any other state buys bonds on a national market without any warning or assumption of risk that its issuer may expropriate its rights for the benefit of a community in which it does not reside.

V.     THE STAY PROVISIONS OF THE RECOVERY ACT
       IMPROPERLY AUTHORIZE STATE COURTS TO ENJOIN
       FEDERAL COURT LITIGANTS AND PROCEEDINGS

           Section 304 of the Recovery Act mandates that a public corporation's filing for

relief triggers an automatic stay of *all* proceedings of any kind against any filing entity and any

related proceedings against the Commonwealth and any elected official or employee of the filing

entity – which would include proceedings in federal court such as this proceeding in this Court.

*See* Recovery Act § 304.

           The Supreme Court has long held that "state courts are completely without power

to restrain federal-court proceedings in *in personam* actions."  *Donovan v. City of Dallas*, 377

U.S. 408, 413 (1964); *accord Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 236 n.9

(1998).  *See also Gen. Atomic Co. v. Felter*, 434 U.S. 12, 16 (1977).

           The Commonwealth raises two defenses of Section 304 of the Recovery Act.

*First*, it asserts that Section 304 merely "stays litigation seeking a public corporation's limited

assets   pending   restructuring   proceedings."     Commonwealth   MTD   at   24-25.     That

mischaracterizes Section 304, which extends to all proceedings against a filing entity, whether *in

rem* or *in personam*, and all suits against any elected official or employee of the entity.  That

would include even this action, as well as any *in personam* breach of contract action Plaintiffs

may bring in the event of a PREPA default.

           *Second*, the Commonwealth fastens mistakenly on a narrow exception to

*Donovan*, "where a court has custody of property, that is, proceedings *in rem* or *quasi in rem*."

Commonwealth MTD at 24 (citing *Donovan*, 377 U.S. at 412).  But as the authorities cited by

the Commonwealth note, this exception applies only to *in rem* actions "[w]hen state court

jurisdiction attaches first" and "[p]ursuant to principles of intersystem comity and federalism,"

mandating that "state and federal courts must respect each system's prior *in rem* jurisdiction." Commonwealth MTD at 24 n.5, citing 17A *Moore's Federal Practice* 121.07(d)(ii).  *See also* Erwin Chemerinsky, *Federal Jurisdiction* § 11.2.1 at 767 n.10 (6th ed. 2012) ("The only time that state courts can enjoin federal proceedings is when the state courts first acquire in rem or quasi in rem jurisdiction before the federal courts.").  Section 304 of the Recovery Act on its face is not limited only to those actions in which the Commonwealth is the first to acquire *in rem* jurisdiction, but rather purports to stay federal actions of any kind as soon as a public corporation files for relief under the Recovery Act.

In fact, the automatic stay in Section 304 applies to claims against the *petitioner*, and is not limited to claims against the petitioner's assets.  In light of the *in personam* features of any proceeding under the Recovery Act, the *in rem* exception has no application here, particularly since any federal suit(s) brought by plaintiffs challenging the constitutionality of the Recovery Act or brought outside the Recovery Act for nonpayment of their bonds would be *in personam*.

*Fragoso v. López*, 991 F.2d 878 (1st Cir. 1993) is on point.  There, the Puerto Rico Insurance Code purported to stay federal court proceedings against an insolvent insurer for six months from the date of insolvency, and required that all claims against the insurer be remitted to the liquidator's claims process.  The Court of Appeals refused to enforce the statute. "We start with bedrock: a state court cannot enjoin federal proceedings.  Thus, the prohibitions contained in the Liquidation Order do not bind this court."  *Id.* at 881 (citing *Donovan* and *Felter*).  *See also Phico Ins. Co. v. Pavia Health, Inc.*, 413 F. Supp. 2d 76 (D.P.R. 2006) (Pennsylvania rehabilitation order could not bar federal action).  Likewise, other Circuit Courts have refused to allow state insurance rehabilitation proceedings to enjoin federal court

proceedings, even though insurance companies are excluded from federal bankruptcy laws.  *See*, *e.g.*, *Hawthorne Savings FSB v. Reliance Ins. Co.*, No. 03-55548, 2006 U.S. App. LEXIS 829, at *40-41 (9th Cir. 2006) (refusing to respect rehabilitation and liquidation anti-suit injunction because "state courts may never enjoin in personam proceedings in the federal courts").

In short, Section 304 of the Recovery Act runs squarely afoul of the elemental principles of federalism set out in *Donovan* and on that basis alone should be struck down.

## VI.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' PREEMPTION AND UNCONSTITUTIONAL-INJUNCTION CLAIMS

For the reasons set forth above, in addition to denying the Motions to Dismiss, the Court should grant Plaintiffs' cross-motion for summary judgment on the basis of their preemption and unconstitutional-stay-of-federal-proceedings claims.   Because Plaintiffs challenge the constitutionality of the Recovery Act on its face, rather than on an as-applied basis, these claims rest on grounds that are purely legal and involve no disputed issues of material fact.

## CONCLUSION

WHEREFORE, the Plaintiffs respectfully request that the Court (i) deny the Defendants' Motions to Dismiss and (ii) grant Plaintiffs' motion for summary judgment inasmuch as the Recovery Act is, on its face, invalid on preemption grounds and a violation of principles of federalism that preserve the jurisdiction of this Court from interference by a Commonwealth court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico today August 11, 2014.

s/ **MANUEL FERNÁNDEZ-BARED**
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204

E-mail: mfb@tcmrslaw.com

**s/ LINETTE FIGUEROA-TORRES**
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

**TORO, COLÓN, MULLET, RIVERA
& SIFRE, P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

– and –

**s/ LAURA R. DOMINGUEZ-LLERANDI**
LAURA R. DOMINGUEZ-LLERANDI
USDC-PR 219,114
30 Reparto Piñero
Guaynabo, PR 00969-5650
Tel.: (787) 528-7583
Fax.: (787) 963-0677
E-mail: ldominguezlaw@gmail.com

– and –

**KRAMER LEVIN NAFTALIS & FRANKEL
LLP**

**s/ THOMAS MOERS MAYER**
THOMAS MOERS MAYER
AMY CATON
P. BRADLEY O'NEILL
JONATHAN WAGNER
DAVID E BLABEY JR.
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
        acaton@kramerlevin.com

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this same day, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel of record.

**<u>s/LINETTE FIGUEROA-TORRES</u>**
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com