IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FRANKLIN CALIFORNIA TAX-FREE TRUST (for the FRANKLIN CALIFORNIA INTERMEDIATE-TERM TAX FREE INCOME FUND), et al., | CASE NO. 14-1518 (FAB) |
| Plaintiffs,<br>v. | DECLARATORY JUDGMENT |
| THE COMMONWEALTH OF PUERTO RICO, et al., | |
| Defendants. | Consolidated with: |
| BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, for and on behalf of investment funds for which it acts as investment manager, | CASE NO. 14-1569 (FAB) |
| Plaintiffs,<br>v. | |
| ALEJANDRO J. GARCÍA PADILLA, in his official capacity as Governor of Puerto Rico, et al., | DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF |
| Defendants. | |

**MEMORANDUM OF LAW OF PLAINTIFFS FRANKLIN
FUNDS AND OPPENHEIMER ROCHESTER FUNDS
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE SECOND AMENDED COMPLAINT AND IN FURTHER
SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTS ...................................................................................................................................... 2

PROCEDURAL HISTORY....................................................................................................... 3

ARGUMENT ............................................................................................................................ 4

I.      PLAINTIFFS' CLAIMS ARE RIPE .......................................................................... 4

     A.      Plaintiffs' Legal Challenges are Fit for Immediate Review ................................... 4

     B.      The Recovery Act Has Harmed and Will Continue to Harm Plaintiffs.................. 7

II.      PLAINTIFFS HAVE STANDING........................................................................... 11

III.      THE RECOVERY ACT IS PREEMPTED BY THE BANKRUPTCY CODE
     AND THE BANKRUPTCY CLAUSE ..................................................................... 11

     A.      The Recovery Act is Preempted by Section 903(1) of the Bankruptcy
     Code ..................................................................................................................... 12

     B.      The Recovery Act is Preempted By the Bankruptcy Clause ............................... 17

IV.      THE RECOVERY ACT VIOLATES THE TAKINGS CLAUSE.................................. 19

     A.      The Recovery Act Effects a Direct Taking......................................................... 20

     B.      The Recovery Act is Facially Unconstitutional .................................................. 23

V.      THE RECOVERY ACT VIOLATES THE CONTRACTS CLAUSE............................ 24

VI.      THE STAY PROVISIONS OF THE RECOVERY ACT IMPERMISSIBLY
     DENY ACCESS TO THE FEDERAL COURTS ......................................................... 30

CONCLUSION...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner*,
   387 U.S. 136 (1967) ................................................................................4

*Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*,
   885 F.2d 621 (9th Cir. 1989) ................................................................18

*Armstrong v. United States*,
   364 U.S. 40 (1960)................................................................................21

*Armstrong World Indus., Inc. v. Adams*,
   961 F.2d 405 (3d Cir. 1992)..............................................................9, 10

*Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio*
   *v. Juarbe-Jiménez*,
   659 F.3d 42 (1st Cir. 2011)....................................................................5

*Assoc. of Surrogates & U.S. Reporters v. State of New York*,
   940 F.2d 766 (2d Cir. 1991)................................................................27

*Baker by Thomas v. Gen. Motors Corp.*,
   522 U.S. 222 (1998)..............................................................................30

*Beacon Hill Farm Assocs. II Ltd. P'Ship v. Loudoun Cty. Bd. of Supervisors*,
   875 F.2d 1081 (4th Cir. 1989) ............................................................8-9

*Chamber of Commerce v. Reich*,
   57 F.3d 1099 (D.C. Cir. 1995)..............................................................10

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)................................................................................23

*City of Pontiac Retired Emps. Ass'n v. Schimmel*,
   751 F.3d 427 (6th Cir. 2014) (en banc) ...............................................14

*Cont'l Ill. Nat. Bank & Trust Co. v. State of Washington*,
   696 F.2d 692 (9th Cir. 1983) ................................................................25

*Donovan v. City of Dallas*,
   377 U.S. 408 (1964)....................................................................30, 31, 32

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
   438 U.S. 59 (1978)..................................................................................5

*Energy Reserves Grp. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983)..................................................................................24, 26

*Ernst & Young v. Depositors Economics Protection Corp.*,
    45 F.3d 530 (1st Cir. 1995).................................................................................6

*Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*,
    316 U.S. 502 (1942)..................................................................12, 17, 28, 29

*Felzen v. Andreas*,
    134 F.3d 873 (7th Cir. 1998) .............................................................................9

*First Nat. Bank of Herkimer v. Poland Union*,
    109 F.2d 54 (2d Cir. 1940)...............................................................................18

*Fragoso v. López*,
    991 F.2d 878 (1st Cir. 1993)............................................................................32

*Gen. Atomic Co. v. Felter*,
    434 U.S. 12 (1977)............................................................................................30

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
    203 F.3d 203 (3d Cir. 2000).............................................................................18

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)..............................................................................................16

*Hawthorne Sav. FSB v. Reliance Ins. Co.*,
    No. 03-55548, 2006 U.S. App. LEXIS 829 (9th Cir. 2006) ....................32

*Home Building & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934) .........................................................................................25

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)....................................................................................19, 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................................9

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991)..........................................................................................10

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)..............................................................................9

*Nixon v. United States*,
    978 F.2d 1269 (D.C. Cir. 1992) ......................................................................21

*Oneida Indian Nation of New York v. Madison County,*
    401 F. Supp. 2d 219 (N.D.N.Y. 2005) ................................................................31

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) ...........................................................................................5

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein),*
    164 F.3d 677 (1st Cir. 1999) ...........................................................................22

*Penn Central Transp. v. City of New York,*
    438 U.S. 104 (1978) .........................................................................................22

*Penn General Cas. Co. v. Pennsylvania,*
    294 U.S. 189 (1935) ....................................................................................31, 33

*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005) .............................................................................5

*Pharm. Research & Mfrs. of Am. v. Concannon,*
    249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am.*
    *v. Walsh,* 538 U.S. 644 (2003) .........................................................................11

*Phico Ins. Co. v. Pavia Health, Inc.,*
    413 F. Supp. 2d 76 (D.P.R. 2006) ...................................................................32

*Philip Morris, Inc. v. Reilly,*
    267 F.3d 45 (1st Cir. 2001) ...............................................................................5

*Philip Morris, Inc. v. Reilly,*
    312 F.3d 24 (1st Cir. 2002) ...................................................................22, 23, 24

*Princess Lida of Thurn & Taxis v. Thompson,*
    305 U.S. 456 (1939) .........................................................................................31

*Reuss v. Balles,*
    584 F.2d 461 (D.C. Cir. 1978) ...........................................................................9

*Rhode Island v. Narragansett Indian Tribe,*
    19 F.3d 685 (1st Cir. 1994) ...............................................................................4

*Riva v. Comm'n of Mass.,*
    61 F.3d 1003 (1st Cir. 1995) .............................................................................4

*Sherwood Partners, Inc. v. Lycos, Inc.,*
    394 F.3d 1198 (9th Cir. 2005) .........................................................................17

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ...............................................................................11

*Stellwagen v. Clum*,
　　245 U.S. 605 (1918) .......................................................................................17

*Stern v. U.S. Dist. Court*,
　　214 F.3d 4 (1st Cir. 2000) .............................................................................10

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*,
　　560 U.S. 702 (2010) .......................................................................................20

*Sturges v. Crowninshield*,
　　17 U.S. 122 (1819) ...................................................................................17, 18

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
　　535 U.S. 302 (2002) .......................................................................................21

*Thomas v. Union Carbide Agric. Prods. Co.*,
　　473 U.S. 568 (1985) .......................................................................................10

*U.S. Trust Co. of N.Y. v. New Jersey*,
　　431 U.S. 1 (1976) ................................................................................... *passim*

*U.S. Trust. Co. of N.Y. v. State*,
　　338 A.2d 833 (N.J. Super. Ct. 1975) .............................................................7

*United Auto., Aero., Agric. Impl. Workers of Am. v. Fortuño*,
　　633 F.3d 37 (1st Cir. 2011) ................................................................24, 26, 29

*United Parcel Service, Inc. v. Flores-Galarza*,
　　318 F.3d 323 (1st Cir. 2003) .........................................................................15

*United States v. Bekins*,
　　304 U.S. 27 (1938) .........................................................................................15

*United States v. Locke*,
　　529 U.S. 89 (2000) .........................................................................................15

*United States v. One 1986 Chevrolet Van*,
　　927 F.2d 39 (1st Cir. 1991) ...........................................................................31

*United States v. Salerno*,
　　481 U.S. 739 (1987) .....................................................................................4, 23

*United States v. Sec. Indus. Bank*,
　　459 U.S. 70 (1982) ....................................................................................19, 21

*United States v. Shields*,
　　522 F. Supp. 2d 317 (D. Mass. 2007) ......................................................23, 24

*Webb's Fabulous Pharm., Inc. v. Beckwith*,
  449 U.S. 155 (1980)...........................................................................................21

**Statutes**

11 U.S.C. § 101(40)..............................................................................................12

11 U.S.C. § 101(52)..............................................................................................12

11 U.S.C. § 103....................................................................................................14

11 U.S.C. § 109(c)(2)...........................................................................................15

11 U.S.C. § 364(d)................................................................................................19

11 U.S.C. § 525....................................................................................................14

11 U.S.C. § 528....................................................................................................14

11 U.S.C. § 903(1)........................................................................................ *passim*

11 U.S.C. § 1141..................................................................................................18

48 U.S.C. § 734....................................................................................................16

48 U.S.C. § 745....................................................................................................18

Federal Relations Act, 48 U.S.C. §§ 731, *et seq*.................................................15

Pub. L. No. 447, 66 Stat. 327 (1952) ..................................................................15

Pub. L. No. 481, 60 Stat. 409 (1946) ..............................................................12-13

**Other Authorities**

6 Collier on Bankruptcy ¶ 903.01
  (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) .....................................14

*Black's Law Dictionary* (10th ed. 2014)..............................................................14

Chapman & Cutler LLP, *Municipalities in Distress: How States and Investors
  Deal with Local Government Financial Emergencies* (2012) ..............................15

Erwin Chemerinsky, *Federal Jurisdiction* § 11.2.1 (6th ed. 2012) ....................32

Tonya Chin, *Puerto Rico's Possible Statehood Could Affect Triple Tax-Exempt
  Status*, The Bond Buyer (Nov. 2, 2012, 4:12 PM).........................................16-17

*Hearing on H.R. 4307 Before the Special Subcomm. on Bankr. & Reorganization of the H. Comm. on the Judiciary*, 79th Cong. (1946)............................................................13

H.R. Rep. No. 79-2246 (1946)...................................................................................................13, 16

Pierluisi Statement on Puerto Rico and Chapter 9 of the U.S. Bankruptcy Code (July 10, 2014), *available at* http://pierluisi.house.gov/media-center/pressreleases/pierluisi-statement-on-puerto-rico-and-chapter-9-of-the-us-bankruptcy.......................................................................................................................28

S. Rep. No. 95-989 (1978)...........................................................................................................13, 19

U.S. Const. amend. X...................................................................................................................15

U.S. Const. art. I, § 8, cl. 4.........................................................................................................11

U.S. Const. amend. V...................................................................................................................18

U.S. Const. amend. XIV...............................................................................................................18

Plaintiffs Franklin Funds and Oppenheimer Rochester Funds, by and through their undersigned attorneys, submit this memorandum of law (i) in opposition to the motions to dismiss (the "**Motions to Dismiss**") the Second Amended Complaint[1] filed by Defendants the Puerto Rico Electric Power Authority ("**PREPA**") and the Commonwealth of Puerto Rico, Governor Alejandro J. García-Padilla, and John Doe, Agent for the Government Development Bank for Puerto Rico (collectively, the "**Commonwealth**"), and (ii) in further support of Plaintiffs' cross-motion for summary judgment (the "**Summary Judgment Motion**") on their claims of preemption and denial of access to the federal courts.

## PRELIMINARY STATEMENT

On June 25, 2014, Puerto Rico's House and Senate passed the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, Act No. 71 of June 28, 2014 (the "**Recovery Act**" or "**Act**"), for use by PREPA and a limited number of other corporations.  The Recovery Act is at least as broad as the federal Bankruptcy Code, but it is materially worse for holders of PREPA secured bonds, including Plaintiffs.  Among other things, the Recovery Act:

- Authorizes a restructuring of PREPA secured bonds by forcible reduction of principal amount and a discharge by permanent injunction against enforcement, and is therefore preempted by the express terms of Bankruptcy Code § 903(1) and by the Bankruptcy Clause of the United States Constitution;

- Effects a taking, without compensation, of the PREPA secured bonds' collateral and the bondholders' right to seek appointment of a receiver in violation of Amendments V and XIV of the United States Constitution;

- Substantially impairs Plaintiffs' contractual rights under the PREPA Bonds' Trust Agreement in violation of the Contracts Clause of the United States Constitution; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Second Amended Complaint.  Citations to "2d Am. Compl. ¶ ___" are to Plaintiffs' Second Amended Complaint [Dkt. No. 85]; citations to "Commonwealth MTD at ___" are to the Commonwealth's Motion to Dismiss [Dkt. No. 95]; and citations to "PREPA MTD at ___" are to the PREPA Motion to Dismiss [Dkt. No. 97]; citations to "Initial Commonwealth MTD at ___" are to the Commonwealth's Initial Motion to Dismiss [Dkt. No. 10].

- Provides for an automatic stay of all actions against PREPA and the Commonwealth, potentially including proceedings in this Court in this case, thereby violating Plaintiffs' right to litigate their federal claims in federal court.

Passage of the Recovery Act has caused and will continue to cause harm to Plaintiffs. The Act immediately stripped Plaintiffs of their statutory right to a receiver. In addition, the Act's passage caused the market prices of the PREPA Bonds to suffer a significant decrease in value and led the two major ratings agencies to downgrade the ratings of the PREPA Bonds. The Act also forces Plaintiffs to negotiate with PREPA over their rights and remedies, including any restructuring of the PREPA Bonds, under threat of enforcement of an unconstitutional statute. Once the Act is invoked, it will purport to bar this suit or any federal court suit from proceeding, on pain of punitive damages.

Relief is needed now. Plaintiffs respectfully ask this Court to deny Defendants' motions to dismiss and to grant Plaintiffs' summary judgment motion on their preemption and access-to-federal-courts claims.[2]

## **FACTS**

The facts relevant to the pending cross-motions are set forth in Plaintiffs' Memorandum of Law Opposing Defendants' Motion to Dismiss and Supporting Plaintiffs' Cross-Motion for Summary Judgment [Dkt. No. 79] ("**Plaintiffs' Initial Brief**"), as well as in the Second Amended Complaint [Dkt. No. 85] and the declarations of Thomas Moers Mayer [Dkt. No. 81] (the "**Mayer Declaration**"), Randy Legg [Dkt. No. 82] (the "**Oppenheimer Declaration**"), and Sheila Amoroso [Dkt. No. 83] (the "**Franklin Declaration**").

---

[2] Plaintiffs have not moved for summary judgment on their Takings Clause and Contracts Clause claims, as those claims may involve facts that require further development through discovery.

## PROCEDURAL HISTORY

Interest on the PREPA Bonds was payable on Tuesday, July 1, 2014.  Concerned that PREPA would commence a proceeding under the Recovery Act to forestall the payment of interest and stay Plaintiffs from vindicating their rights under the United States Constitution in federal court, Plaintiffs filed their initial complaint on Saturday, June 28, 2014 [Dkt. No. 1] and an amended complaint on Sunday, June 29, 2014 [Dkt. No. 2].  The Commonwealth filed a motion to dismiss on July 21, 2014 [Dkt. No. 10], as did PREPA [Dkt. No. 31].  The Commonwealth filed a motion to join the motion to dismiss filed by PREPA on July 22, 2014 [Dkt. No. 44].  On July 22, another PREPA bondholder, BlueMountain Capital Management, LLC, on behalf of its managed funds, filed its own complaint (the "**BlueMountain Complaint**").

On August 11, 2014, Plaintiffs filed their opposition to the original motions to dismiss, together with a cross-motion for summary judgment and a motion for leave to amend their complaint.  *See* Plaintiffs' Initial Brief; Summary Judgment Motion [Dkt. No. 78]; *Plaintiffs' Motion for Leave to File Second Amended Complaint* [Dkt. No. 77].  The Court subsequently granted the Plaintiffs' motion for leave to amend their complaint.  *Order re Motion for Leave to File* [Dkt. No. 80].  On August 11, 2014, Plaintiffs filed a second amended complaint [Dkt. No. 85].

Thereafter, on August 19, 2014, the Defendants filed a motion to consolidate the Franklin and BlueMountain actions, and requested the opportunity to "supplement their motions to dismiss."  *Motion to Consolidate Cases*, at 5 [Dkt. No. 90].  The Court granted this motion and set a consolidated briefing schedule as proposed by the Defendants.  *Order re: Motion to Consolidate Cases* [Dkt. Nos. 92, 93].  Rather than "supplement" their initial motions to dismiss, however, Defendants filed what amounted to an entirely new set of motions to dismiss, revising or abandoning many of their prior arguments and raising new arguments unrelated to the modest

amendments reflected in the Second Amended Complaint.  This pleading is filed in response to these new motions to dismiss and in further support of Plaintiffs' Summary Judgment Motion.

## STANDARD OF REVIEW

The applicable standard of review for Plaintiffs' Summary Judgment Motion and Defendants' Motions to Dismiss is set forth in Plaintiffs' Initial Brief.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS ARE RIPE

Questions of ripeness are analyzed under a framework that considers "the fitness of the issue for immediate review and the hardship to the litigant should review be postponed." *Riva v. Comm'n of Mass.*, 61 F.3d 1003, 1009 (1st Cir. 1995) (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967)).  Both prongs of the ripeness inquiry are satisfied here.[3]

### A.    Plaintiffs' Legal Challenges are Fit for Immediate Review

The First Circuit has identified three "critical component[s]" to determine "fitness": (i) "the presence or absence of adverseness," (ii) the extent to which the claim is "intrinsically legal," rather than "bound up in the facts," and (iii) whether "the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  *Riva*, 61 F.3d at 1009-10 (citations omitted).  Plaintiffs' claims meet all three tests.

---

[3] Defendants' contention that "particular caution" is required in declaratory judgment actions (Commonwealth MTD at 7) is contrary to First Circuit precedent, which applies the same fitness/hardship test to declaratory judgment actions, albeit with certain "custom tailoring."  *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994).  The considerations particular to declaratory judgment actions – a heightened focus on "adverseness," *id.* at 692-93, and on "whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest," *id.* at 693 – support the case for immediate review of Plaintiffs' claims.

The Commonwealth's contention that Plaintiffs' claims are ripe only if the Recovery Act "cannot be applied to *anyone* under *any circumstance* in a constitutional manner," Commonwealth MTD at 10 (emphasis in original), is also off base.  This assertion conflates the ripeness inquiry with the merits of Plaintiffs' constitutional challenge.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (on facial challenge, plaintiff "must establish that no set of circumstances exists under which the Act would be valid").  As discussed in Sections IV and V below, Plaintiffs' claims satisfy the merits standard, whether under *Salerno* or otherwise.

The parties are clearly "adverse."  Defendants have not argued otherwise.

Plaintiffs' claims are "intrinsically legal" because they challenge the Recovery Act as unconstitutional *on its face*.[4]  As facial challenges, the claims do not require factual development and are presumptively ripe under Supreme Court and First Circuit precedent.  *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (facial preemption challenges are "predominantly legal"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005) (facial taking challenges are "usually ripe 'the moment the challenged regulation or ordinance is passed'") (citation omitted); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 71 n.15 (1978) (facial takings challenge to statute that did not "provide advance assurance of adequate compensation" was ripe); *Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 52 (1st Cir. 2011) (facial takings challenge was ripe on day regulation passed).

Finally, Plaintiffs' claims do not involve events so "uncertain and contingent" that ruling on the claims now would be premature.  In *Philip Morris, Inc. v. Reilly*, 267 F.3d 45 (1st Cir. 2001), *withdrawn*, 312 F.3d 24 (1st Cir. 2002),[5] the First Circuit found ripe a takings challenge to a statute requiring tobacco companies to turn over their ingredient lists to the state, even though public disclosure of the lists (the feared harm) would occur only if the state determined (i) disclosure was in the interest of public health, and (ii) disclosure would not constitute a taking.  267 F.3d at 50-54.  The state's future disclosure of the lists was sufficiently

---

[4] The Commonwealth acknowledges that Plaintiffs' preemption and access-to-federal-courts claims are purely legal. *See Commonwealth Defendants' Response to the Franklin Plaintiffs' Statement of Material Facts* [Dkt. No. 95-2] ("[T]he Franklin Plaintiffs' request for entry of summary judgment regarding the preemption claim and stay of federal proceedings claim can be resolved as a matter of law and there is no need to entertain factual statements to that end.").

[5] The First Circuit's initial opinion in *Philip Morris*, dealing with ripeness, was withdrawn upon rehearing *en banc*. However, the *en banc* panel did not revisit the ripeness holding; instead, the panel proceeded directly to the merits, noting that its *en banc* review did "not include revisiting the issues of whether the tobacco companies' claims are ripe."  312 F.3d at 30.

likely to justify ripeness.  *Id.* at 53.  Plaintiffs submit the same is true here based on Defendants'

own recitals, in the Recovery Act and in their papers, of PREPA's dire need for the statute.  *See*

Recovery Act, Stmt. of Motives § 1 (identifying PREPA as the public corporation "most

dramatic[ally]" in need of the statute); Commonwealth MTD at 3-4 (PREPA's situation is "dire";

Recovery Act is "key component" to Commonwealth's response to "overwhelming fiscal

emergency"); PREPA MTD at 1 (Recovery Act enacted in response to "severe financial crisis"

and "unprecedented fiscal challenge" to "preserve the viability of the Commonwealth's public

corporations").[6]

Defendants argue that PREPA's August 14, 2014 forbearance agreement with

Plaintiffs and other creditors (the "**Forbearance Agreement**") (Friedman Declaration, Dkt. Nos.

95-5, 95-6, Exh. 3), and the possibility of a consensual restructuring, shows that PREPA may

never use the Recovery Act.  But nothing in the Forbearance Agreement requires PREPA to

forbear from commencing  a Recovery Act proceeding; it can do so at any time.[7]  Were this

Court to hold Plaintiffs' claims unripe, PREPA could file under the Act the next day.  Only

Plaintiffs and other creditors are required to forbear.  Moreover, as discussed below, PREPA has

already used, and will continue to use, the Recovery Act to extract concessions from creditors.

---

[6] PREPA's extensive reliance on *Ernst & Young v. Depositors Economics Protection Corp.*, 45 F.3d 530 (1st Cir. 1995), is misplaced.  The statute in that case involved securities laws claims against joint tortfeasors, such as the issuer and its accounting firm.  Ernst & Young challenged the statute's limitation on its right to contribution from joint tortfeasors.  The First Circuit rejected the firm's challenge as "speculative" and unripe because it depended on the occurrence of *eight* "serendipitous events," including wrongful actions *by Ernst & Young itself* that Ernst & Young "steadfastly denied" having taken.  Here, Plaintiffs' claims do not depend on any "serendipitous events" or on any particular actions taken by the Plaintiffs themselves, much less action they have "steadfastly denied."

PREPA is disingenuous when it argues (MTD at 7-8) that a Recovery Act proceeding might not prejudice PREPA bondholders.  PREPA Bonds constitute approximately 80% of PREPA's liabilities, which guarantees that any Recovery Act proceeding would be used to prejudice PREPA bondholders.

[7] Commencement of a Recovery Act proceeding would automatically terminate the Forbearance Agreement but would not violate any provision of that agreement or give rise to any remedy other than termination.  *See* Forbearance Agreement § 5(b)(ii).

The threat of a Recovery Act filing hung over negotiations of the Forbearance Agreement and will hang over all future negotiations.

**B.      The Recovery Act Has Harmed and Will Continue to Harm Plaintiffs**

The passage and threatened enforcement of the Recovery Act have already harmed Plaintiffs and will continue to do so.

*First*, the Recovery Act has already eliminated Plaintiffs' right to seek the appointment of a receiver, even before the commencement of proceedings by PREPA.  *See* Recovery Act § 108(b) ("This Act supersedes and annuls any insolvency or custodian provisions included in the enabling or other act of any public corporation.").  The elimination of this statutory protection is a present harm.  *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1976) (repeal of statutory covenant protecting bondholders held unconstitutional because it "totally eliminated an important security provision").

Defendants argue that the Recovery Act has not harmed Plaintiffs because the conditions to appointment of a receiver (e.g., an event of default followed by a direction to the Trustee) have not yet been satisfied.  *See* PREPA MTD at 9; Commonwealth MTD at 12.[8] Defendants' argument is both disingenuous (they used the Recovery Act to extract a waiver of defaults in the Forbearance Agreement) and wrong: A default is not required for Plaintiffs to challenge the elimination of their right to a receiver.  In *U.S. Trust*, New Jersey repealed a statutory covenant that had assured bondholders their collateral would never be used to fund mass transit.  U.S. Trust sued to invalidate the repeal on the day it was signed into law.  *See U.S.*

---

[8] PREPA also contends that Plaintiffs retain their *contractual* right to a receiver.  PREPA MTD at 8-9.  But this supposed contractual right is nothing more than the Trust Agreement's incorporation of the rights created by statute. *See* Trust Agreement § 804 ("Upon the happening and continuance of an event of default specified in Section 802 of this Article, then and in every case the Trustee may proceed . . . for the appointment of a receiver *as authorized by the [PREPA] Act*.") (emphasis added).  Consequently, the Recovery Act's annulment of the statutory right to a receiver has eliminated the contractual right as well.

*Trust. Co. of N.Y. v. State*, 338 A.2d 833, 837 & 865 n.32 (N.J. Super. Ct. 1975), *aff'd*, 69 N.J. 253 (N.J. 1976), *rev'd*, 431 U.S. 1 (1977).  There was no indication that funds were used in a manner that would have violated the repealed covenant, and the indenture trustee never alleged the existence of an event of default.  The Supreme Court nevertheless held that the repeal of the covenant "totally eliminated an important security provision and thus impaired the obligation of the States' contract."  431 U.S. at 19.  Here too, the repeal of the right to a receiver is a present harm, warranting immediate review whether or not its protection could yet have been invoked.

*Second*, the market prices of PREPA Bonds fell sharply following the introduction and passage of the Recovery Act.  For example, the prices of three series of PREPA Bonds of which Plaintiffs have substantial holdings dropped approximately 35%, 24% and 23%, respectively, between the Recovery Act's June 25 introduction and the resumption of trading following its June 28 passage.  Mayer Decl. Ex. 5; 2d Am. Compl. ¶¶ 14, 15.  In addition, the Recovery Act's introduction and passage led the two major ratings agencies to downgrade the ratings of the PREPA Bonds.  *See* Mayer Decl. Ex. 6 (June 26, 2014 Fitch Ratings Report, downgrading PREPA Bonds from "BB," or slightly below investment grade, to "CC," the worst possible rating prior to a default); *id.* Ex. 7 (July 9, 2014 Standard & Poor's Rating Services Report).

These price declines and ratings downgrades have already harmed Plaintiffs.  Certain of the Plaintiffs' funds sold PREPA Bonds at reduced prices following the Recovery Act's enactment.  2d Am. Compl. ¶ 15.[9]  In addition, Plaintiffs are required to "mark to market" the holdings of their funds on a daily basis to calculate their funds' daily net asset values, *i.e.*, the daily price at which investors purchase or redeem shares from the funds.  Consequently, the

---

[9] PREPA appears to assume that certain Plaintiffs have sold all their PREPA Bonds.  PREPA MTD at 14 n.12.  To the contrary, all Plaintiffs hold PREPA Bonds; some have sold a portion of their holdings.  2d Am. Compl. ¶ 15.

diminished value of the PREPA Bonds has already reduced the daily net asset values of the Plaintiff funds.  These harms are real and warrant immediate review.  *Id.  See, e.g.*, *Beacon Hill Farm Assocs. II Ltd. P'Ship v. Loudoun Cty. Bd. of Supervisors*, 875 F.2d 1081, 1083 (4th Cir. 1989) ("mere existence and threatened enforcement of [zoning] ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constituted a present and irreparable injury," rendering dispute ripe); *Felzen v. Andreas*, 134 F.3d 873, 876 (7th Cir. 1998) ("[A] reduction in the market price of one's stock is injury."); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (sustaining allegations that ratings downgrades contributed to securities' decline in value).[10]

PREPA argues both that prices of certain PREPA Bonds have rebounded and that other factors may have influenced bond prices.  PREPA MTD at 11-13.  These arguments are inadequate to support a motion to dismiss.  Plaintiffs have adequately pleaded that the Recovery Act was the cause (or at least *a* cause) of the sharp price drop and that this price drop harmed Plaintiffs.  In *U.S. Trust,* the Supreme Court rejected a similar argument regarding the harm caused by repeal of a statutory covenant.  *See* 431 U.S. at 19 (bondholders' allegations of loss were sufficient even though bond prices rebounded and bonds retained an "A" rating); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleadings stage, general factual allegations of injury resulting from the defendant's conduct may suffice").[11]

---

[10] PREPA selectively quotes, out of context, a statement on the Oppenheimer Rochester Funds' website that the Recovery Act would not affect Puerto Rican municipal issuers generally.  PREPA MTD at 25 n.14.  There are at least 18 municipal Puerto Rican issuers of publicly traded bonds, many of which the Oppenheimer Rochester Funds hold in significant amounts; the PREPA Bonds represent only a portion of these total holdings.  *See* Oppenheimer Decl. ¶ 6.  The Recovery Act affects only a very limited number of such issuers, including PREPA.  The statement that Puerto Rico bonds have more upside than downside is not at all inconsistent with Plaintiffs' position in this litigation:  that the Recovery Act is invalid and should be struck down, at which point Plaintiffs reasonably expect the PREPA Bonds to rise in value.

[11] Defendants' reliance on *Reuss v. Balles*, 584 F.2d 461 (D.C. Cir. 1978), and *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405 (3d Cir. 1992), is misplaced.  In *Reuss*, unlike here, the plaintiff had not alleged an actual decline in the value of any specific securities he held.  Rather, he vaguely claimed that he owned "certain marketable

*Third*, PREPA has already used the threat of enforcement of the Recovery Act to coerce concessions from its bondholders.  2d Am. Compl. ¶ 17.  A prime example is the waiver of 11 potential defaults itemized in Annex D to the Forbearance Agreement, including default waivers that (together with associated amendments to the Trust Agreement) give PREPA undisputed access to certain cash.  *See* Friedman Decl., Ex. 3 at § 1(b) & Annex D.  The threat of the Act's enforcement will continue to hang over Plaintiffs, causing real harm, so long as the Recovery Act stands.  *See, e.g.*, *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 579, 581 (1985) ("threat of an unconstitutional arbitration procedure" harmed plaintiffs and made their challenge to statute requiring arbitration ripe before arbitration commenced); *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 n.13 (1991) (facial challenge to administrative board's not-yet-exercised veto power was ripe: "[t]he threat of the veto hangs over the [decisionmakers] like the sword over Damocles."); *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) ("mere existence" of Executive Order "alter[ed] the balance of bargaining power between employers and employees," causing injury for ripeness purposes).

*Finally*, if this action is dismissed and not re-filed until after PREPA has invoked the Act, Plaintiffs' ability to obtain relief from the Act will be severely impaired, if not eliminated altogether.  The Act imposes an automatic stay that purports to enjoin all proceedings in other courts, including further proceedings in this Court, on pain of punitive damages.  Recovery Act §§ 304(a), 305; *see also id.* § 205.  Plaintiffs should not be forced to make the

---

bonds," 584 F.2d at 465, and that the statute at issue "*could* reduce the value of his bonds," *id.* at 469 (emphasis added).  In addition, unlike the Recovery Act, the statute challenged in *Reuss* (dealing with appointment of members of a Federal Reserve committee) was one of general applicability that could in theory have affected almost any investor and any security.  *Armstrong* is inapposite for similar reasons.  Unlike the Recovery Act, which abrogates the contractual rights of a specific class of public bondholders and threatens to expropriate their collateral, the anti-takeover statute at issue in *Armstrong* did not abrogate any specific shareholders' contractual rights.  *See* 961 F.2d at 408-10.

Hobson's choice between submitting to the jurisdiction of the special court created by the Act or risking punitive damages from that court for challenging the Act in federal court.  *See Stern v. U.S. Dist. Court*, 214 F.3d 4, 10-13 (1st Cir. 2000) (striking down District Court's local rule governing Department of Justice attorneys' service of subpoena before subpoena was issued because attorneys could not be forced to choose between an ethics violation and pursuing a criminal case).

## II.      PLAINTIFFS HAVE STANDING

Because Plaintiffs' claims are ripe, Plaintiffs have standing to bring these facial challenges to the Recovery Act.  *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 9 n.5 (1st Cir. 2012) (once claim deemed ripe, plaintiffs have standing).  Plaintiffs meet all three criteria for standing: as detailed above, (i) they have already suffered actual injury, and they face the prospect of more severe injuries if the Recovery Act is not invalidated; (ii) their injuries can be fairly traced to the passage of the Recovery Act; and (iii) these injuries likely would be redressed or averted by a decision from the Court that the Recovery Act is unconstitutional.  *See Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) (upholding plaintiffs' standing to bring preemption challenge to statute), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003).

## III.     THE RECOVERY ACT IS PREEMPTED BY THE BANKRUPTCY CODE  AND THE BANKRUPTCY CLAUSE

Article I, Section 8, clause 4 of the United States Constitution (the "**Bankruptcy Clause**") grants Congress the power "[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. CONST. art. I, § 8, cl. 4.  Congress has enacted a "uniform Law" on the subject of municipal bankruptcy – Chapter 9 of the Bankruptcy Code – and its provisions expressly preempt the Recovery Act.  Moreover, even absent this express

preemption, the Recovery Act would be preempted by the Bankruptcy Clause because the Act provides for a discharge of indebtedness, thereby intruding on an area in which the Supreme Court has held that the federal government alone may legislate.

A.     **The Recovery Act is Preempted by Section 903(1) of the Bankruptcy Code**

Section 903(1) of the Bankruptcy Code expressly preempts the Recovery Act. Section 903 provides in pertinent part:

> This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but --

> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition . . . .

11 U.S.C. § 903(1).  "State" includes Puerto Rico (except for the purpose of defining who may be a debtor under chapter 9), 11 U.S.C. § 101(52), and "municipality" includes instrumentalities such as PREPA, 11 U.S.C. § 101(40).  Accordingly, the Recovery Act is a "State law" providing for composition of "municipal indebtedness" and is preempted by Section 903(1) of the Bankruptcy Code.

The legislative history of that statute and its predecessor, Section 83(i) of the Bankruptcy Act of 1898 (the "**Bankruptcy Act**"), leaves no doubt that Congress intended to preempt statutes such as the Recovery Act.  Congress amended Section 83(i) in 1946 for the express purpose of overruling the Supreme Court's decision, four years earlier, in *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502 (1942), which had sustained a New Jersey municipal debt-restructuring statute in the face of a preemption challenge.  To ensure that all such statutes are preempted, Congress amended Bankruptcy Act § 83(i) to add language almost identical to the prohibitory language now contained in Bankruptcy Code § 903(1):

- 12 -

> (i) . . . *[N]o State law prescribing a method of composition of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition*, and no judgment shall be entered under such State law which would bind a creditor to such composition without his consent.

Pub. L. No. 481, § 83(i), 60 Stat. 409, 415 (1946) (emphasis added).  As explained in the House Report:

> [A] bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations *should be uniform* throughout the 48 States, as the bonds of almost every municipality are widely held.  *Only under a Federal law should a creditor be forced to accept such an adjustment without his consent.*

H.R. Rep. No. 79-2246, at 4 (1946) (emphasis added).[12]  Congress reaffirmed this intent when it enacted Section 903(1) of the Bankruptcy Code, the terms of which are substantively identical to those of Section 83(i).  *See* S. Rep. No. 95-989, at 110 (1978) (retaining prohibitory language because "[d]eletion of the provision would 'permit all States to enact their own versions of Chapter IX,' which would frustrate the constitutional mandate of uniform bankruptcy laws.'").

The Commonwealth makes little attempt to dispute the plain meaning of Section 903(1) and does not even try to rebut that provision's clear legislative history.  *See* Commonwealth MTD at 19-20.[13]

The Commonwealth points first to the opening words of Section 903, which state that "[t]his chapter" (i.e., Chapter 9) does not limit the States' authority to control the political or governmental powers of municipalities.  MTD at 19-20.  According to the Commonwealth, it

---

[12] *See also Hearing on H.R. 4307 Before the Special Subcomm. on Bankr. & Reorganization of the H. Comm. on the Judiciary*, 79th Cong., at 15-16 (1946) (statement of Millard Parkhurst) (describing amendment as overruling *Faitoute*).  Relevant excerpts of the legislative histories, bills, and public laws cited herein are attached as exhibits to the Mayer Declaration.

[13] Most of the Commonwealth's preemption arguments respond not to Plaintiffs' claim of express preemption under Bankruptcy Code § 903(1), but instead to Plaintiffs' separate preemption claim under the Bankruptcy Clause of the U.S. Constitution (Commonwealth MTD at 13-16) and to Blue Mountain's "field preemption" claim (Commonwealth MTD at 16-19).  We reply to the Commonwealth's Bankruptcy Clause arguments in Point III.B below.

somehow follows that subsection (1)'s prohibition of State bankruptcy laws applies only when a Chapter 9 case has been filed.  But this is contrary to the plain language of subsection (1), which – unlike the opening clause of Section 903 – is *not* limited to Chapter 9 cases.[14]  Moreover, the Commonwealth's reading would deprive Section 903(1) of any practical effect:  A municipal debtor that has already invoked federal bankruptcy law has no need to employ state bankruptcy laws.

      Not surprisingly, the one court of appeals that has addressed this issue has held that "the plain language of [Section 903(1)] is not limited to bankruptcy proceedings."  *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 431 (6th Cir. 2014) (en banc).  The leading bankruptcy treatise likewise has stated broadly that Section 903(1) "indicate[s] congressional preemption of the law of municipal debt adjustment," without mentioning any exception to this rule.  *See* 6 Collier on Bankruptcy ¶ 903.01 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.).

      The Commonwealth argues next that Section 903(1) bars only state laws affecting "indebted[]" municipalities and their "creditors."  MTD at 20.  According to the Commonwealth, because Puerto Rico municipalities cannot be debtors under Chapter 9, PREPA's bondholders are not "creditors" within the meaning of the Bankruptcy Code.  This argument tortures the plain meaning of the word "creditor," which is not limited to creditors of entities that have filed or could file bankruptcy.  *See Black's Law Dictionary* 449, 490 (10th ed. 2014) (defining "creditor" as "[o]ne to whom a debt is owed").  In addition, this strained reading of Section 903(1) would

---

[14] In this regard, Section 903(1) is similar to other Bankruptcy Code provisions that also apply whether or not a bankruptcy case is pending.  *See, e.g.*, 11 U.S.C. § 528 (imposing regulations on debt relief agencies); *id.* § 525 (prohibiting discriminatory treatment of former debtors).  Section 103 of the Bankruptcy Code, cited by the Commonwealth (Commonwealth MTD at 20), confirms this reading of Section 903(1).  While many of Section 103's provisions limit specific chapters or subchapters of the Code to apply "only in a case under such chapter," *see, e.g.*, 11 U.S.C. §§ 103(b)-(e), (g)-(k), Congress did not so limit any portion of Chapter 9.  *See id.* § 103(f).

eviscerate the uniformity of municipal bankruptcy law that Congress sought to achieve by overruling *Faitoute*.   Chapter 9 is available to a municipality only if its state has specifically authorized a Chapter 9 filing.   *See* 11 U.S.C. § 109(c)(2).   Many states have not enacted such authorizing legislation.   *See* Chapman & Cutler LLP, *Municipalities in Distress: How States and Investors Deal with Local Government Financial Emergencies*, at 51 n.93 (2012) (identifying 21 states that have not specifically authorized filing, as required under Bankruptcy Code § 109(c)(2), or whose authorization is "unclear," and one state that has expressly prohibited filing).[15]   By the Commonwealth's reasoning, no municipality in a non-authorizing state could be a "debtor" or have "creditors."   Section 903(1) therefore would not apply, and each non-authorizing state could adopt its own municipal bankruptcy statute.

The Commonwealth urges the Court to "construe the Code in a way that preserves, not negates, the exercise of Puerto Rico's sovereign police power."   Commonwealth MTD at 21 (arguing that the "historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress") (citation omitted). But as discussed above, the plain language and the legislative history make clear that Congress's purpose *was* to supersede the "historic police powers of the States" in the field of municipal debt restructuring.[16]   Moreover, while States may have "sovereign" powers (*see* U.S. CONST. amend. X), Puerto Rico has only those powers delegated by Congress under the Puerto Rican Federal

---

[15] Pertinent excerpts from the Chapman & Cutler treatise are annexed as Appendix I to this memorandum.

[16] In addition, any presumption against preemption arises only when "Congress legislates in a field traditionally occupied by the states."   *United Parcel Service, Inc. v. Flores-Galarza,* 318 F.3d 323, 336 (1st Cir. 2003); *see also United States v. Locke,* 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of non-preemption is not triggered when the State regulates in an area where there has been a history of significant federal presence.").   Federal law, rather than state law, has dominated the field of bankruptcy since the enactment of the Bankruptcy Act of 1898, and has dominated the field of municipal bankruptcy since 1938, when the Supreme Court upheld Chapter IX of the Bankruptcy Act, *see United States v. Bekins,* 304 U.S. 27, 51-52 (1938).   While Congress has chosen to exclude banks and insurance companies from the federal bankruptcy statute and to leave regulation of bank and insurance company insolvencies to the states, it has done the opposite with respect to municipal insolvencies.

Relations Act, 48 U.S.C. §§ 731, *et seq*.  By passage of Public Law No. 447, 66 Stat. 327 (1952), approving Puerto Rico's constitution, in 1952 Congress did not provide Puerto Rico a power to enact municipal bankruptcy laws that Congress had explicitly denied to the states under Section 83(i) only six years earlier, in 1946.  To the contrary, any powers delegated to Puerto Rico in 1952 were made subject to Section 83(i).  *See* 48 U.S.C. § 734 ("The statutory laws of the United States not locally inapplicable, except as hereinbefore or hereinafter otherwise provided, shall have the same force and effect in Puerto Rico as in the United States. . . .").

The Commonwealth complains that it should not be "consign[ed] . . . to a twilight zone where it cannot restructure its debts."  MTD at 18.  But policy-based arguments are irrelevant where the language of the statute is explicit.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (where Bankruptcy Code's "language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms") (citations and quotations omitted).  In any event, Puerto Rico's municipalities are hardly alone in their inability to restructure their debts.  As noted above, many states have declined to allow their municipalities to file under Chapter 9.

Moreover, Congress may have had a particular reason to exclude Puerto Rico from Chapter 9.  As noted above, Congress's stated reason for enacting Section 903(1)'s predecessor was that municipal bonds are "widely held" throughout the states and thus only a federal law should apply.  *See* H.R. Rep. No. 79-2246, at 4 (1946).  This reason applies with particular force to Puerto Rico.  Bonds issued by Puerto Rico or its instrumentalities are exempt from federal, state and local tax – i.e., "triple tax-exempt" – in every one of the 50 states.  48 U.S.C. § 745.  Not one of the 50 states enjoys this same triple-tax-exempt status.  *See* Tonya Chin, *Puerto Rico's Possible Statehood Could Affect Triple Tax-Exempt Status*, The Bond Buyer

- 16 -

(Nov. 2, 2012, 4:12 PM).[17]   This privileged tax status may have contributed to Congress's decision to exclude Puerto Rico's municipalities from Chapter 9.  If Puerto Rico disagrees with that decision, its recourse is to seek redress from Congress, such as by pursuing the bill recently introduced by Resident Commissioner Pedro R. Pierluisi to amend the Bankruptcy Code to make Puerto Rican municipalities eligible for relief under Chapter 9.

### B.    The Recovery Act is Preempted By the Bankruptcy Clause

Wholly apart from the express preemption effected by Section 903(1) of the Bankruptcy Code, the Recovery Act is also preempted by the Bankruptcy Clause of the United States Constitution, because the Act's provisions operate to grant a discharge of indebtedness. The Supreme Court has long held that the power to grant a discharge belongs to the federal government alone.  Thus, even when no federal bankruptcy law is in effect, states are without power to enact bankruptcy laws providing for a discharge.  *See, e.g.*, *Sturges v. Crowninshield*, 17 U.S. 122, 199 (1819) ("[T]he states may, until that power shall be exercised by congress, pass laws concerning bankrupts; yet they cannot constitutionally introduce into such laws a clause which discharges the obligations the bankrupt has entered into."); *Stellwagen v. Clum*, 245 U.S. 605, 615 (1918) ("It is settled that a state may not pass an insolvency law which provides for a discharge of the debtor from his obligations . . . and this although no general federal bankruptcy act is in effect."); *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203 (9th Cir. 2005) ("We know, because the Supreme Court has repeatedly told us, that state statutes that purport to . . . giv[e] debtors a discharge of their debts, are preempted.").[18]

---

[17] A copy of this article is annexed as Appendix II to this memorandum.

[18] *Faitoute* is not to the contrary.  Far from granting a discharge, the state municipal insolvency statute at issue in that case specifically *prohibited* any reduction of the principal amount of any outstanding obligation.  *See* 316 U.S. at 504.

The Recovery Act ignores this limitation, forcing creditors to accept partial payment of their claims under a Chapter 2 or Chapter 3 plan, and then purporting to permanently enjoin them from collecting the balance.  *See* Recovery Act §§ 115(b)(2) & (c)(3); *see also id*. § 315(k).   These provisions achieve the same outcome as a discharge under Section 1141(d)(1)(A) of the Bankruptcy Code. 11 U.S.C. § 1141(d)(1)(A) ("[T]he confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . .").   A permanent injunction, for these purposes, is indistinguishable from a discharge. *See, e.g.*, *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 626 (9th Cir. 1989) ("We find American's semantic distinction between a permanent injunction and a discharge unpersuasive. . . . A discharge is in effect a special type of permanent injunction."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000) (proposed release and injunction for benefit of non-debtors under plan of reorganization "amounted to nothing more than a lockstep discharge of non-debtor liability"); *First Nat. Bank of Herkimer v. Poland Union*, 109 F.2d 54, 56 (2d Cir. 1940) (injunction restraining suits against non-debtors "would be tantamount to a discharge in bankruptcy").   Thus, the Recovery Act violates the established principle that a state insolvency statute may not provide for a discharge.

In its initial motion to dismiss, the Commonwealth conceded that discharge is a "unique aspect of the federal bankruptcy power."  Initial Commonwealth MTD at 10 n.2.  Now it asserts that the Bankruptcy Clause preempts only those State laws that conflict with the Bankruptcy Code.  *See* Commonwealth MTD at 15-16.  But as just noted, the two Supreme Court cases on which it relies for this proposition, *Sturges* and *Stellwagen*, both hold that state law discharge statutes are preempted even in the absence of a federal bankruptcy law.

## IV.    THE RECOVERY ACT VIOLATES THE TAKINGS CLAUSE

The Takings Clause of the Fifth and Fourteenth Amendments provides that property shall not "be taken for public use, without just compensation."  U.S. Const. amends. V, XIV.  This prohibition extends both to the "direct government appropriation or physical invasion of property" and to government regulations so onerous that they are "tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  The Recovery Act effects a categorical taking of the Plaintiffs' property in at least two ways: by eliminating Plaintiffs' contractual right to seek the appointment of a receiver, and by allowing for the priming of Plaintiffs' liens on collateral without adequate protection.

*First*, pursuant to Section 804 of the Trust Agreement, the bondholders had the right to seek appointment of a receiver, "as authorized by [Section 17 of the PREPA Act]" upon the occurrence of an event of default.  *See* Trust Agreement § 804; PREPA Act § 17.  Contractual rights, including those incorporated into a contract by then-existing laws, are property entitled to protection. *See U.S. Trust*, 431 U.S. 1, 19 n.16 (1976) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").  Nevertheless, Section 108(b) of the Recovery Act eliminates this right, providing that: "This Act supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including Section 17 of [the PREPA Act] . . . ."  Recovery Act § 108(b).[19]

*Second*, Plaintiffs' PREPA Bonds are secured by a lien on PREPA's net revenues. Trust Agreement § 701.  A lien is "property" protected by the Fifth Amendment.  *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75-76 (1982).  Recognizing this, the Bankruptcy Code

---

[19] While the Recovery Act does not reference Plaintiffs' contractual right to a receiver, it has the effect of eliminating that as well, as discussed above.

allows a debtor to "prime" a secured creditor – i.e., subject its collateral to a senior or equal lien – only if compensation in the form of "adequate protection" is provided.  11 U.S.C. § 364(d); *see also* S. Rep. No. 95-989, at 49 (1978) ("[A]dequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court. . .").  The Recovery Act does not require such protection, authorizing PREPA to borrow money secured by a senior or equal lien on Plaintiffs' collateral whenever Puerto Rico's "police power" would permit or whenever the proceeds of the new loan are used "for a public purpose."  *See* Recovery Act §§ 129(d), 322(c).

The Commonwealth does not dispute the foregoing.  Instead, it argues that (i) Plaintiffs' takings claim is unripe (Commonwealth MTD at 26), (ii) Plaintiffs will not be able to establish that there is "no set of circumstances" under which Sections 108(b), 129(d) or 322(c) of the Recovery Act could be constitutionally applied (*id.* at 27), and (iii) the Recovery Act could in any event amount only to a "regulatory taking," not a "per se" or "direct" taking (*id.*).  The Commonwealth's ripeness argument fails for reasons set forth in section I above.  Its remaining two arguments should be rejected as well.

## A.    The Recovery Act Effects a Direct Taking

As an initial matter, the Commonwealth's regulatory taking argument is devoid of any substance:  Having asserted that the taking at issue must be analyzed as a regulatory taking, the Commonwealth then fails to analyze it as such, or indeed to analyze it at all.  In any event, the Recovery Act is a *direct taking*: the Commonwealth is expropriating Plaintiffs' property for its own benefit.  As the Supreme Court has recognized, "States effect a taking if they recharacterize as public property what was previously private property."  *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010) (plurality).  This is precisely what is effectuated by the Recovery Act: the Commonwealth has recharacterized

Plaintiffs' private property (i.e., its right to a receiver and its liens on collateral) as public property that can used to secure a senior lien without adequate protection.   In the case of an expropriation, the government has "a categorical duty to compensate the former owner."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).[20]   There is no broad "police power" exception to this requirement.   *See Sec. Indus. Bank*, 459 U.S. at 77 ("[H]owever great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation.") (citation omitted).

The elimination of the PREPA bondholders' right to seek the appointment of a receiver constitutes a *direct* taking.  As in *U.S. Trust*, where the Court found unconstitutional a state's attempt to repeal a statutory covenant assuring bondholders that bridge and tunnel tolls allotted to their repayment would not be used to fund mass transit, the elimination of Plaintiffs' right to seek the appointment of a receiver "totally eliminated an important security provision and thus impaired the obligation of the States' contract."  431 U.S. at 19.[21]   Given that Plaintiffs' lien on PREPA's revenues is their principal source of recovery, and Plaintiffs' principal remedy is to have a receiver collect those revenues for them, the Recovery Act's immediate elimination of that remedy is thus a taking of a material element of Plaintiffs' property.

Likewise, the grant of a priming lien without adequate protection is no different from the unconstitutional taking at issue in *Armstrong v. United States*, 364 U.S. 40, 46-48 (1960).   There, the Supreme Court found that the government's acquisition of ship hulls that rendered materialmen's liens unenforceable because of the government's sovereign immunity

---

[20] That this case involves personal property, rather than real property, is inconsequential as to whether there has been a *per se* taking of the Plaintiffs' property.  *See, e.g., Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992) (noting that the government's argument that the *per se* analysis applies only to real property "fails for want of authority or logic"; finding that an act that materially restricted the former president's rights to his presidential papers constituted a taking in violation of the Fifth Amendment); *see also Webb's Fabulous Pharm., Inc. v. Beckwith*, 449 U.S. 155, 163-64 (1980).

[21] While primarily a Contracts Clause case, the Court, as noted above, made reference to the Takings Clause as well.

was a taking.  *Id.* at 48. "The total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking.'"  *Id.*  The same is true here.  For every dollar of Plaintiffs' collateral pledged to a new lender under a priming lien without adequate protection, Plaintiffs suffer a corresponding reduction in the value of their lien, thereby effecting a *per se* taking of Plaintiffs' property.

Because the Recovery Act effects a *direct* taking, it easily satisfies the standards for a regulatory taking as well.  *See Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 36 (1st Cir. 2002) (where provisions of regulation are so extraordinary as to properly subject it to the *per se* analysis, this should likewise lead to a takings finding under the *Penn Central* analysis).  Under the regulatory takings analysis set forth in *Penn Central Transp. v. City of New York*, 438 U.S. 104 (1978), courts consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action."  *Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 685 (1st Cir. 1999); *see Lingle*, 544 U.S. at 538-39.

Each of the *Penn Central* factors shows that the Recovery Act effects an unconstitutional taking.

The Recovery Act empowers PREPA to strip Plaintiffs of their collateral and deprives them of their right to a receiver, the primary remedy to collect revenues pledged to them – actions that "'impair[] the value'" of Plaintiffs' collateral, *Philip Morris*, 312 F.3d at 41 (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)), and violate "reasonable investment-backed expectations" guaranteed by the Trust Agreement and PREPA Act.[22]  *See Philip Morris*, 312 F.3d at 38-39 (finding that explicit governmental guarantee of confidentiality

---

[22] *See* Trust Agreement § 709  (pledged revenues to be used only as permitted in agreement); PREPA Act § 10 (PREPA "shall not take any action which shall have the effect of impairing the obligation of any contractual duties imposed upon or assumed by the People of Puerto Rico under authority of existing law").

created a reasonable investment-backed expectation that tobacco companies' trade secrets would remain confidential; elimination of confidentiality constituted a taking).

As for the "character" of the governmental action, the Recovery Act is expropriation:  It eliminates a remedy (receivership) and permits the taking of property (collateral) without compensation for the benefit of a government entity (PREPA).[23]

The Recovery Act thus effects an unconstitutional taking without just compensation in violation of the Fifth and Fourteenth Amendments.

### B.      The Recovery Act is Facially Unconstitutional

The Commonwealth's second argument – that Plaintiffs have failed to prove there is "no set of circumstances" where the Recovery Act is constitutional – also fails.  It is not the law.  *See City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22 (1999) (plurality) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision in this Court, including *Salerno* itself."); *id.* (finding it a "doubtful" proposition that it would ever "be appropriate for federal courts to apply the *Salerno* standard"); *United States v. Shields*, 522 F. Supp. 2d 317, 335 (D. Mass. 2007) ("[T]he continuing vitality of the *Salerno* standard is unclear.") (citing cases).

Even assuming that *Salerno* retains some vitality, the Recovery Act cannot survive Plaintiffs' challenge merely because the Commonwealth and PREPA have the discretion not to violate the Takings Clause and Contracts Clause.

The First Circuit's opinion in *Philip Morris* is on point:  the First Circuit struck down (on Takings Clause grounds) a statute authorizing the government to obtain (from tobacco companies) a list of cigarette ingredients and to publicize the list.  The First Circuit found the

---

[23] As noted in Plaintiffs initial brief (at 26, n.25), the fact that PREPA operates in a regulated industry does not vitiate Plaintiffs' expectation that their security interests would be preserved.  The taking here is not related to the regulation of energy production and transmission.

statute violated the Takings Clause on its face even though the statute contained a procedure for the tobacco companies to object to the disclosure on Takings Grounds.   The fact that the government could decide not to violate the Taking Clause (by not disclosing the ingredients) did not save the statute from invalidation.  *Philip Morris*, 312 F.3d at 28-29, 45.  *See also Shields*, 522 F. Supp. 2d at 336 (statute that provided no procedural safeguards for detention of sex offenders in advance of commitment hearings violated Fourth Amendment, notwithstanding argument that government *could* choose to hold probable cause hearing before detaining offender in any given case).

Accordingly, under *Philip Morris*, the fact that PREPA *could* decide to provide adequate protection to Plaintiffs is insufficient to insulate the Recovery Act from a facial challenge where PREPA retains complete discretion to decide not to provide such protection. The Recovery Act, on its face, violates the Fifth and Fourteenth Amendments.

## V.      THE RECOVERY ACT VIOLATES THE CONTRACTS CLAUSE

Article I, Section 10 of the United States Constitution provides that "No State shall . . . pass any . . . Law impairing the Obligations of Contracts"  (the "**Contracts Clause**"). U.S. CONST. art. I § 10.

Contracts Clause claims are analyzed under a two-pronged test.  *United Auto., Aero., Agric. Impl. Workers of Am. v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011).  "The first question is whether the State law has operated as a substantial impairment of a contractual relationship."  *Id.* (citing *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)).   That is unquestionably true in this case.  The Plaintiffs' PREPA Bonds, the Trust Agreement, and the PREPA Act governing them constitute a "contractual relationship."  *See*

*Cont'l Ill. Nat. Bank & Trust Co. v. State of Washington*, 696 F.2d 692, 697-98 (9th Cir. 1983) (government bonds are contracts subject to the Contracts Clause).[24]

The Recovery Act effects a present "impairment" of Plaintiffs' rights under the Trust Agreement and the PREPA Act by eliminating the right to a receiver.  The receiver is the bondholders' most important remedy.  PREPA bondholders have no mortgage on property, plants, or equipment – they have a pledge of revenues.  A receiver is the principal way to enforce that pledge.  The elimination of the receiver drastically reduces the remedies available to the bonds.  The right to a receiver is more important to the PREPA Bonds than the protective covenant was to bondholders in *U.S. Trust*.  There, the Supreme Court held that "outright repeal" of the covenant "totally eliminated an important security provision and thus impaired the obligation of the States' contract."  431 U.S. at 19.  So here, the outright repeal of the right to seek the appointment of a receiver totally eliminates an important security provision and impairs PREPA bondholders' rights under the PREPA Act and the Trust Agreement.[25]

The Recovery Act also authorizes PREPA, in a proceeding under the Act, to substantially impair other material contract rights of the bondholders, including:

- the right to full payment of principal and interest in accordance with the maturities set forth in the Trust Agreement (*compare* Trust Agreement §§ 701, 1102, *with* Recovery Act §§ 202, 315);

---

[24] *See also Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431 (1934) ("The laws which existed at the time the contract was entered into and which affect its validity, construction, discharge and enforcement, in effect, are incorporated within the contract.").

[25] The Commonwealth asserts that Plaintiffs must prove that the Recovery Act "cannot be constitutionally applied not only to their contracts but to any contracts."  MTD at 23.  This argument makes no sense insofar as the Act immediately impairs (by completely eliminating) the Plaintiffs' contractual and statutory right to seek the appointment of a receiver – and does so by specific reference to the PREPA Act.  *See* Recovery Act 108 ("This Act supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including Section 17 of Act No. 83 of May 2, 1941 . . . .").  This provision can apply only to the PREPA bondholders' contractual rights.  Moreover, it is disingenuous for the Commonwealth to pretend that the Recovery Act is targeted broadly at virtually any contract, when the Statement of Motives itself mentions PREPA as the prime candidate for the Act.  Finally, for the reasons discussed above, any reliance by the Commonwealth on *Salerno* in its attempt to foreclose Plaintiffs' facial challenge to the Act on Contracts Clause grounds should be given little weight.

- the right not to have PREPA sell, lease or otherwise dispose of the electric power system or grant senior or equal liens impairing the bondholders' lien on pledged revenues (*compare* Trust Agreement § 712, *with* Recovery Act §§ 307, 322); and

- the right to certain remedies upon an event of default, including accelerating payments and suing at law or equity to enforce the Trust Agreement (*compare* Trust Agreement §§ 803, 804, *and* PREPA Act § 18, *with* Recovery Act §§ 115, 205, 304).

The second question in a Contract Clause analysis is whether the impairment was "reasonable and necessary to serve an important government purpose." *Fortuño*, 633 F.3d at 41 (citations omitted). Where the state impairs one of its *own* contracts, courts are exacting in their scrutiny of the challenged legislation and "in almost every case, [have] held a governmental unit to its contractual obligations when it enters financial and other markets." *Energy Reserves Group*, 459 U.S. at 412 n.14 (citing *U.S. Trust*, 431 U.S. at 25-38).

As set forth above, *U.S. Trust* involved toll revenues which were dedicated to the payment of the bonds and which, by statutory covenant, could not be used to fund mass transit. New Jersey repealed the covenant and argued that funding mass transit was an important state purpose that justified impairing the bonds under New Jersey's inherent police powers. The Supreme Court disagreed. Because the state's "self-interest" was at stake, the Court would not accord "complete deference to a legislative assessment of reasonableness and necessity." 431 U.S. at 26. Nor was the State's assertion of its "police power" determinative, because "the power to enter into effective financial contracts cannot be questioned." *Id.* at 24. "If a State could reduce its financial obligations whenever it wanted to spend the money for what is regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 26.

> [A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is

> not free to impose a drastic impairment when an evident and more
> moderate course would serve its purposes equally well.

*Id.* at 30.  Because New Jersey had alternatives, such as a prospective surcharge on tolls to fund

mass transit, *id.* at 30 n.28, 12 n.10, or direct taxes on automobile use, gasoline or parking, *id.* at

30 n.29, total repeal of the covenant violated the Contracts Clause.  *Id.* at 48.

      Just as New Jersey had alternatives to the repeal of the covenant in *U.S. Trust*, the

Commonwealth and PREPA have alternatives to the Recovery Act.  As set forth in detail in the

Plaintiffs' Second Amended Complaint:

- PREPA can simply raise rates [26] – for the first time in nearly 25 years – as authorized by Section 502 of the Trust Agreement; a far more moderate step to stabilizing PREPA's finances than abrogating its obligations to its bondholders under the Recovery Act.  *Assoc. of Surrogates & U.S. Reporters v. State of New York*, 940 F.2d 766, 773 (2d Cir. 1991); *see also* 2d Am. Compl. ¶ 50(i).

- The Commonwealth could pay PREPA what the Commonwealth currently owes – more than $640.83 million (not accounting for $420.57 million the Commonwealth claims it is owed from previously accrued contributions in lieu of taxes).  2d Am. Compl. ¶ 50(ii).

- The Commonwealth could reduce PREPA's taxes and subsidies, including the current 11% set-aside of annual gross revenues for "contributions in lieu of taxes" (so-called "CILT payments") to various municipalities and other subsidies expected to total $1 billion through 2018.  *Id.* ¶ 50(iii).  The Commonwealth's failure to reduce PREPA's taxes and subsidies "smacks of the political expediency that United States Trust Co. warned of."  *Assoc. of Surrogates*, 940 F.2d at 773.

- PREPA could honor the priority of payments to PREPA Bonds over subsidy and CILT payments provided by the PREPA Act, rather than allowing CILT payment recipients to circumvent this priority by reducing their electric

---

[26] On May 27, 2014, the Governor signed into law Act 57, known as the Puerto Rico Energy Transformation and Relief Act ("**Act 57**").  Act 57 purports to replace PREPA's ability to unilaterally set rates with the establishment of the Puerto Rico Energy Commission (the "**Commission**").  While any adjustments to energy rates are now subject to review by the Commission, Act 57 provides that "[t]he Commission shall guarantee that the approved rate will be sufficient to: (i) guarantee payment of principal of and interest on bonds and other financial obligations of PREPA; and (ii) comply with the terms and provisions of the agreements entered into with or in benefit of buyers or holders of any bonds or other financial obligations of PREPA."  Act 57 § 2.8(b); PREPA Act § 6B(b).  The Plaintiffs reserve all rights to contest the constitutionality of Act 57.

payments by the amount of the subsidy or CILT payment.  2d Am. Compl. ¶ 50(iv).[27]

- PREPA could cut costs (including overstaffing, surplus equipment and high overtime charges and customer service costs) and correct potentially significant inefficiencies in the management of PREPA's business (including low customer service levels, lenient timekeeping standards and weak accounting controls). *Id.* ¶ 50(v).

In short, the Recovery Act constitutes a drastic impairment to the PREPA Bonds' contractual rights "when an evident and more moderate course would serve equally well." *U.S. Trust*, 431 U.S. at 31.  Instead of making any efforts to minimize disruption to contractual rights through alternative solutions, Puerto Rico passed an act that, as recognized by Puerto Rico's Resident Commissioner Pierluisi, is "characterized by haste, a lack of transparency, and no public debate about the suitability of alternative ways to address the problem."  Pierluisi Statement on Puerto Rico and Chapter 9 of the U.S. Bankruptcy Code (July 10, 2014), *available at*  http://pierluisi.house.gov/media-center/pressreleases/pierluisi-statement-on-puerto-rico-and-chapter-9-of-the-us-bankruptcy.

The Recovery Act's Statement of Motives cites *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502 (1942), as support for the Act.  *See* Recovery Act, Stmt. of Motives, § C.  *Faitoute* may no longer be good law.  *See U.S. Trust*, 431 U.S. at 27 ("The only time this century that alteration of a municipal bond contract has been sustained by this Court was in *Faitoute*.").  In any event, it provides no support for the Recovery Act.  The state statute upheld in *Faitoute* was severely limited:  It explicitly barred any reduction of principal, 316 U.S.

---

[27] The recently enacted Act 57 also made certain modifications to the CILT mechanism contained in the PREPA Act.  Previously, Section 22(b)(3) of the PREPA Act stated that "[t]he obligations assumed by the Authority in the Trust Agreement in effect and any other that may be assumed in the future, which secures the bonds of the Authority shall have priority over any contribution granted in this section."  It appears that this provision was eliminated from Section 22 of the PREPA Act pursuant to the amendments contained in Act 57.

at 505-06, and it provided only for an extension of maturity and adjustment of interest rates on *unsecured* bonds that had no meaningful remedy, *id.* at 514-15.  The Court was careful to state:

> We do not go beyond the case before us.  Different considerations may come into play in different situations.  The New Jersey courts have held that under this very statute tax anticipations and revenue notes stand on an entirely different footing from other municipal obligations and in relation to them no claim is affected [by the Statute].

*Id.* at 516.

Unlike the *Faitoute* unsecured bonds, the PREPA Bonds are secured by pledged revenues and have a remedy – the ability to seek the appointment of a receiver to collect the revenues pledged to them.[28]  In addition, the Recovery Act has diminished the market value of Plaintiffs' PREPA Bonds.  *See U.S. Trust*, 431 U.S. at 28 ("It is clear that the instant case involves a much more serious impairment than occurred in *Faitoute*.  No one has suggested here that the States acted for the purpose of benefitting the bondholders, and there is no serious contention that the value of the bonds was enhanced by the repeal of the 1962 covenant.").

Finally, recent circuit court decisions upholding changes to labor and pension agreements on which the Commonwealth relies (*e.g.*, *Fortuño*, 633 F.3d at 49) provide no support for the Recovery Act. These decisions dismissed challenges to changes to labor and pension agreements, finding that those who work for the Commonwealth or its agencies know that their employment agreements are infused with a "public interest" and therefore take the risk that the locality where they live and which employs them has the inherent power to change the terms of their employment.  *See, e.g.*, *id.* at 46 (noting that public employees whose expectations are defined by the public interest have a diminished expectation that their contracts will not be

---

[28] The Supreme Court's holding in *Faitoute* was carefully limited to state legislation addressing *unsecured* claims. *See* 316 U.S. at 516 ("[W]e are not here concerned with legislative changes touching secured claims.").  Here, the most objectionable provisions of the Recovery Act are those dealing with *secured* claims, such as those held by the Plaintiffs.

impaired by the government).  Almost all of the upheld "impairments" involved changes to current pay and benefits for current workers who could seek other employment.

None of these facts apply to PREPA Bonds.  As noted above, PREPA Bonds are held throughout the United States.  They are widely traded securities.  A municipal bondholder in New York, California or any other state buys bonds on a national market without any warning or assumption of risk that its issuer may expropriate its rights for the benefit of a community in which it does not reside.  Holders of "impaired" jobs can seek other jobs; holders of "impaired" bonds have an irremediable loss.

## VI.   THE STAY PROVISIONS OF THE RECOVERY ACT IMPERMISSIBLY DENY ACCESS TO THE FEDERAL COURTS

Upon a public corporation's filing for relief, Section 304 of the Recovery Act purports to impose an automatic stay of *all* proceedings of any kind against any filing entity and any related proceedings against the Commonwealth and any elected official or employee of the filing entity.  *See* Recovery Act § 304(a)(1)(A).  The section makes no exception for federal proceedings or proceedings *in personam*.  By its terms, it would enjoin the filing of this action – a proceeding in federal court seeking adjudication by an Article III judge of issues arising under the United States Constitution.  As such, Section 304 violates federal law and should be stricken.

The Supreme Court has long held that state courts cannot stay federal court *in personam* actions.  *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964); *accord Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 236 n.9 (1998); *Gen. Atomic Co. v. Felter*, 434 U.S. 12, 16 (1977).  The Commonwealth does not dispute that *Donovan* and its progeny remain binding precedent.  Instead, it relies on a limited exception, noted in *Donovan*, that it describes as allowing a state court to enjoin federal proceedings where the state court "'has custody of property, that is proceedings in rem or quasi in rem.'"  MTD at 28-29 (quoting *Donovan*, 377

- 30 -

U.S. at 412).   Because restructuring proceedings are *in rem*, the Commonwealth asserts that Section 304 of the Recovery Act may properly enjoin this federal case in federal court.

The Commonwealth's contention misconstrues the principles articulated in *Donovan*.   The exception described in *Donovan* allows a State Court to enjoin federal proceedings only where jurisdiction *in both cases* is *in rem* and based on the same *res*.   *Donovan* relied on *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939).   In *Princess Lida*, the Court upheld a state court injunction barring further proceedings in federal court where both actions were premised on *in rem* jurisdiction over the same trust.   *Id.* at 465-68.   The Court's rationale for the exception was straightforward and practical:

> if the two suits are in rem, or quasi in rem, so that the court or its officer has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one must yield to that of the other.

*Id.* at 466 (citing *Penn General Cas. Co. v. Pennsylvania*, 294 U.S. 189, 195 (1935)).   In these circumstances, the "court first assuming jurisdiction over the property" – whether state or federal – "may maintain and exercise that jurisdiction to the exclusion of the other." *Penn General*, 294 U.S. at 195.   "This is so because although a state and federal court may have concurrent jurisdiction, both courts cannot possess and control the same thing at the same time." *Oneida Indian Nation of New York v. Madison County*, 401 F. Supp. 2d 219, 226 (N.D.N.Y. 2005) (internal quotations and citations omitted).

Because the exception is premised upon the practical inability of two courts to exercise jurisdiction simultaneously over the same *res*, "[t]he corollary of this rule is that if only one of the actions is *in rem*, and the other is *in personam*, the cases may proceed simultaneously." *United States v. One 1986 Chevrolet Van*, 927 F.2d 39, 44 (1st Cir. 1991); *accord Oneida*, 401 F. Supp. 2d at 226 ("This *in personam* action in federal court is not

foreclosed by the state court *in rem* proceeding"). In fact, *Donovan* expressly holds that "State Courts are completely without power to restrain federal-court proceedings in *in personam* actions." 377 U.S. at 413.[29]

Thus, in *Fragoso v. López*, 991 F.2d 878 (1st Cir. 1993), a Puerto Rico commonwealth court supervising the liquidation of an insurer under the Puerto Rico Insurance Code – a bankruptcy-like proceeding that is *in rem* – issued an order purporting to stay federal *in personam* claims against the insurer. The First Circuit refused to enforce the order. "We start with bedrock: a state court cannot enjoin federal proceedings. Thus, the prohibitions contained in the Liquidation Order do not bind this court." *Id.* at 881 (citing *Donovan* and *Felter*); *accord Phico Ins. Co. v. Pavia Health, Inc.*, 413 F. Supp. 2d 76 (D.P.R. 2006) (order of Pennsylvania court supervising liquidation of insurer ineffective to stay *in personam* federal counterclaim). Similarly, the Ninth Circuit refused to enforce a Pennsylvania insurance liquidation order purporting to stay a federal court diversity action because "state courts may never enjoin in personam proceedings in the federal courts." *Hawthorne Sav. FSB v. Reliance Ins. Co.*, No. 03-55548, 2006 U.S. App. LEXIS 829, at *40-41 (9th Cir. 2006).

These principles doom Section 304. Section 304 purports to enjoin all claims against PREPA and would apply to this action even though jurisdiction here is solely *in personam*. Nowhere does the Second Amended Complaint request that this Court marshal, administer, dispose of or distribute assets of the Commonwealth, GDB or PREPA. Moreover, even if this action were *in rem* – and it plainly is not – this Court would have superior

---

[29] The authorities cited by the Commonwealth also recognize that this exception applies only to *in rem* actions "[w]hen state court jurisdiction attaches first" and "[p]ursuant to principles of intersystem comity and federalism," mandating that "state and federal courts must respect each system's prior *in rem* jurisdiction." Commonwealth MTD at 24 n.5 (citing 17A *Moore's Federal Practice* 121.07(d)(ii)). *See also* Erwin Chemerinsky, *Federal Jurisdiction* § 11.2.1 at 767 n.10 (6th ed. 2012) ("The only time that state courts can enjoin federal proceedings is when the state courts first acquire in rem or quasi in rem jurisdiction before the federal courts.").

jurisdiction and Section 304 could not enjoin it.  As the "court first assuming jurisdiction over the property," this Court "may maintain and exercise that jurisdiction to the exclusion of the other."  *Penn General*, 294 U.S. at 195.

[*Remainder of Page Intentionally Left Blank*.]

## <u>CONCLUSION</u>

WHEREFORE, the Plaintiffs respectfully request that the Court (i) deny Defendants' motions to dismiss and (ii) grant Plaintiffs' summary judgment motion on their claims of preemption and access to the federal courts.

**RESPECTFULLY SUBMITTED.**

San Juan, Puerto Rico, October 6, 2014

**s/ MANUEL FERNÁNDEZ-BARED**
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcmrslaw.com

**s/ LINETTE FIGUEROA-TORRES**
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

**TORO, COLÓN, MULLET, RIVERA
& SIFRE, P.S.C.**
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

– and –

**KRAMER LEVIN NAFTALIS & FRANKEL
LLP**

THOMAS MOERS MAYER
AMY CATON
PHILIP BENTLEY
P. BRADLEY O'NEILL
DAVID E BLABEY JR.
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
        acaton@kramerlevin.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this same day, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**s/ LINETTE FIGUEROA-TORRES**
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

**<u>Appendix I</u>**


Kramer Levin
0004 9435

# Municipalities in Distress?

## HOW STATES AND INVESTORS DEAL WITH LOCAL GOVERNMENT FINANCIAL EMERGENCIES

## Chapman and Cutler LLP

Attorneys at Law · Focused on Finance®

# MUNICIPALITIES IN DISTRESS?

## How States and Investors Deal with
## Local Government Financial Emergencies

*A 50 State Survey of:  (1) Rights and Remedies Provided by States
to Investors, (2) State Supervision and Oversight Mechanisms of Financially
Distressed Local Governments and
(3) State Authorization of Municipalities to File Chapter 9 Bankruptcy*

RECEIVED

JUL 1 8 2013

KRAMER LEVIN NAFTALIS & FRANKEL LLP
LIBRARY

Municipalities in Distress?

Since 1980, there have been 262 filings as of January 11, 2012. Of those who have filed since 1980, only five have been municipal debt issuers of any significance, namely: (1)-Orange County in 1994, in which the public debt was refinanced and paid, (2)-the City of Bridgeport, Connecticut, in 1991, which ultimately was dismissed, (3)-the City of Vallejo in 2008, which exited bankruptcy in August, 2011, (4) Harrisburg, Pennsylvania in September, 2011, which was promptly dismissed for not being authorized under state law and (5) Jefferson County, Alabama, which filed its petition in November, 2011. About a third of 262 Chapter 9 filings since 1980 have been dismissed, rather than being completed by confirming a Plan of Debt Adjustment (since 1937 about a quarter of all Chapter 9s filed have been dismissed and not resulted in a Plan of Debt Adjustment being confirmed), which evidences even after filing, other alternatives may be a more attractive resolution mechanism. While corporate issuers utilizing Chapter 11 have filed in recent years over 11,000 Chapter 11 filings per year, the Chapter 9 filings, even during the current economic downturn, have been small: 5 in 2007, 4 in 2008, 10 in 2009, 6 in 2010 and 13 in 2011. Chapter 9 has been viewed by major municipal issuers as clearly the last resort and an alternative to be avoided at virtually all costs. It is no accident that New York City in 1975, Cleveland in 1978, Philadelphia in 1991 and other significant issuers of municipal debt, when faced with a financial crisis, chose other viable alternatives rather than filing Chapter 9. Chapter 9 provides no additional revenues or tax sources to solve the problem, and it affects all creditor relationships and not just the few that are the problem. Chapter 9 tips over those desired creditor relationships that are not the problem and are working just fine. Further, the stigma and complexity and travail of Chapter 9 is more than what many local governments can tolerate.

The last resort for troubled municipalities in certain states is the filing of a petition under Chapter 9 of the Bankruptcy Code. Chapter 9 is a vehicle not for elimination of debt but rather for debt adjustment. Specifically, a Chapter 9 proceeding is a mechanism for a debtor municipality, through a court-supervised proceeding, to attempt to settle disputes with its creditors. Since a municipal unit cannot liquidate its assets to satisfy creditors and continue to function as a municipality, the primary purpose of Chapter 9 of the Bankruptcy Code is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims. Indeed, one of the stated purposes of the Bankruptcy Code was to provide a "workable procedure so that a municipality of any size that has encountered financial difficulties may work with its creditors to adjust its debts."[90]

A.  Initiation of Chapter 9 Proceeding and Effect on Bondholder Rights and Remedies

Only a municipality may initiate an action and be a debtor under Chapter 9 of the Bankruptcy Code.[91] Moreover, in order for a municipality to proceed under Chapter 9, state law must have specifically authorized the entity to be a debtor under Chapter 9.[92] Specifically, to be a debtor in a Chapter 9 proceeding, an entity must be:

---

90    H.R. Rep. No. 137, 93rd Cong. 1st Sess. 237248.

91    11 U.S.C. § 109(c).

92    11 U.S.C. § 109(c)(2).

- A municipality (political subdivision or public agency or instrumentality of the state) and not an entity created by a municipality;

- Specifically authorized under state law to be a debtor;[93]

- Insolvent (generally determined on a cash flow basis);

- Willing to effectuate a plan; and

- Either have obtained the agreement of creditors holding a majority amount of the claim of each class that the municipality intends to impair or have attempted to negotiate in good faith, but was unable to do so or it was impractical to negotiate with creditors or a creditor is attempting to obtain a preference.

In addition to the requirement that a municipality be a subdivision of an agency or a subdivision or instrumentality of the state, it must, since the 1994 Amendments to the Bankruptcy Code, be specifically authorized to file a Chapter 9 proceeding by the state. The states have adopted different approaches to this requirement. Twelve states have statutory provisions specifically authorizing the filing by an in-state municipality of a Chapter 9 petition.[94] Another 12 states authorize a filing conditioned on a further act of the state, an elected official, a state entity or some other issue.[95] Three states grant limited authorization[96] and two states prohibit filing, but one of them has an exception to the prohibition.[97] The remaining 21 states are either unclear or do not have

---

[93]   Twelve states have statutory provisions in which the state specifically authorizes filing (AL, AZ, AR, ID, MN, MO, MT, NE, OK, SC, TX, WA), another twelve states authorize a filing conditioned on a further act of the state, an elected official or state entity (CA, CT, FL, KY, LA, MI, NJ, NC, NY, OH, PA, RI). Three states (CO, OR and IL) grant limited authorization, and two states prohibit filing (GA, but one of them (IA) has a exception to the prohibition). The remaining 21 are either unclear or do not have specific authorization

[94]   *See* Section VII 50 State Survey charts for Alabama, Arizona, Arkansas, Idaho, Minnesota, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas and Washington.  The constitutionality of Alabama's Code with respect to that state's municipalities filing chapter 9 petitions is currently being considered by the Alabama Supreme Court as to whether it is limited to municipalities that have issued bonds as opposed to other debt obligations.  On March 4, 2012, the United States Bankruptcy Court in the *Jefferson County* Chapter 9 proceeding decided that warrants were historically included as bonds in § 11-81-3 of the Alabama Code and, therefore, the State has authorized counties to adjust their indebtedness under Chapter 9 of the Bankruptcy Code.  The Alabama Supreme Court's decision in the pending City of Prichard case, *In re City of Prichard, Alabama,* may provide additional guidance on this as well as any appeal of the *Jefferson County* Bankruptcy Court decision.

[95]   *See* Section VII 50 State Survey charts for California, Connecticut, Florida, Kentucky, Louisiana, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania and Rhode Island. California has adopted in 2011 the requirement that a municipality must first utilize in good faith a neutral evaluator before being authorized to file Chapter 9 except for certain financial emergency situations.

[96]   *See* Section VII 50 State Survey charts for Colorado, Illinois and Oregon.

[97]   *See* Section VII 50 State Survey charts for Georgia and Iowa.

Municipalities in Distress?

specific authorization with respect to filing. The District of Columbia and Puerto Rico are not permitted to file.[98]



☐ 12 States that specifically authorize municipal bankruptcies
▤ 12 States that *conditionally* authorize municipal bankruptcies
▥ 3 States with limited authorization
▨ 2 States prohibit filing, but one has an exception (Iowa)
■ Remaining 21 States are either unclear or do not have specific authorization so there is no specific authorization

Further, a municipality must be insolvent or unable to meet its debts as they mature and must desire to effect a plan to adjust its debts, although the determination of insolvency is not as easy as it seems.[99] In addition, it must be demonstrated that one of the following has occurred:

1. The municipality has obtained the agreement of creditors holding at least a majority in the amount of claims of each class that such entity intends to impair under a plan in a case under Chapter 9;

2. The municipality has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in the amount of claims of each class that such entity intends to impair under a plan in a case under Chapter 9;

3. The municipality is unable to negotiate with creditors because such negotiations are impractical; or

---

98    The term "State" is defined in the Bankruptcy Code as including "the District of Columbia and Puerto Rico, except for the purpose of defining who may be a debtor" under Chapter 9. 11 U.S.C. § 101(52).

99    11 U.S.C. §§ 109(c)(3) and (4).

## **Appendix II**

# THE BOND BUYER

**Monday, October 6, 2014  |  as of 3:41 PM ET**

Regional News

# Puerto Rico's Possible Statehood Could Affect Triple Tax-Exempt Status

by Tonya Chin
NOV 2, 2012 4:12pm ET

With around $60 billion of outstanding debt, Puerto Rico has become one of the largest issuers in the tax-exempt bond market.

The U.S. territory's ability to amass such a massive debt load has been abetted by the exemption from local, state, and federal taxes on interest that Puerto Rico's bonds enjoy.

Depending on the outcome of Puerto Rico's statehood vote on Tuesday, the island's rare triple tax-exemption status may soon see its last days.

Tax law experts, analysts, and other market participants have said that if the territory becomes a state, its bonds would likely be exempt from only federal taxes, like every other state.

"Bonds issued only after a state is admitted will be treated under federal law, including under the Internal Revenue Code, the same way as all other state-issued bonds are treated under federal law," according to a New York lawyer who has served as bond counsel to Puerto Rico.

"You can't treat one state differently than others," he said.

He added that legislation regarding territories that become states is determined on a case-by-case basis, and that it is up to Congress to decide on various issues.

While it is generally expected that Puerto Rico's bonds would lose the added double tax-exempt benefit, the question remains of what might happen to the tax-exempt status of the island's previously issued debt.

"There is nothing in the federal laws of the United States that expressly says that pre-statehood exemption on bonds that are still outstanding post-statehood has to be preserved," said the New York lawyer.

"But fairness, and actions in connection with the admission of other states indicates that it would were Puerto Rico to become a state."

John Mousseau, managing director and portfolio manager at Cumberland Advisors, says he would expect that the bonds would keep the triple tax-exempt status they currently enjoy in all states, which would make them more valuable.

"If the bonds get grandfathered with the status of double exemption, it would make a lot of those bonds trade up quite a bit," Mousseau said.

Under that scenario, however, new Puerto Rico bonds without triple-tax-exemption would not be as desirable as outstanding Puerto Rico bonds.

"In a new world where there's no double exemption, the only compelling reason to buy would be diversification or a high yield," Mousseau said.

At Baa1, BBB, and BBB-plus by Moody's Investors Service, Standard & Poor's, and Fitch Ratings, respectively, Puerto Rico would be the lowest rated state, behind California and Illinois.

Alan Schankel, managing director at Janney Capital Markets, said that, all things being equal, Illinois bonds would probably be more attractive to investors than Puerto Rico, without the added tax benefit.

"You'd need a lot more yield to make the Puerto Rico credit, with its inherent credit risk, attractive enough to buy," he said.

Yields on the commonwealth's last $2.3 billion general obligation bond sale in March this year ranged from 4.00% with 4% and 5% coupons in 2020 to 5.32% with a 5% coupon in 2041.

Schankel said that if Puerto Rico were to become a state and lose its triple tax-exempt status, it would see its borrowing costs rise.

"The wealth metrics are such that there are not as many theoretical tax-free buyers in Puerto Rico as there are in other states that would need the in-state exemption," he said. "They would definitely pay more money than they pay today."

However, he added, it's possible that as a state, Puerto Rico might not have to borrow as much money because it would have more federal resources, but it's hard to predict.

"Economically, I think it would be a mixed bag," Schankel said. "They would get more money from Uncle Sam, they get more Medicaid, but they would also presumably have to pay federal tax, which they don't pay now."

While there are many moving parts to becoming a state, Schankel thinks that, overall, the effect on its financial situation would be mildly positive.

In the near term, however, a status change would likely be a credit negative.

"Although a status change could ultimately work in the best interest of debt holders if statehood was approved or be a serious challenge if independence was chosen (highly unlikely) the intervening uncertainty in all but a vote for status quo would be a near-term credit negative," Schankel wrote in a report on Thursday.

Credit rating agencies have said it is too soon to tell what effect statehood would have on Puerto Rico's low investment grade credit rating.

However, Karen Krop, senior director of public finance at Fitch Ratings, said that statehood in and of itself would not change Fitch's BBB-plus rating.

She said that analysts would have to look at any changes, like federal funding, to see if it would affect Puerto Rico's financial situation.

"We would not change criteria if Puerto Rico becomes a state, since we already use state criteria in rating Puerto Rico," Krop added.

All depends on the outcome of the status referendum on Nov. 6 when voters in Puerto Rico will decide whether or not they want statehood.

Voters will be asked to answer two questions: whether they want Puerto Rico to continue in its present form of territorial status, and, regardless of the answer to the first question, whether they would prefer statehood, independence, or to be a sovereign free associated state.

While the first two options are self-explanatory, the "sovereign free associated state" would mean a status outside of the territory clause of the U.S. Constitution that recognizes the sovereignty of the people of Puerto Rico.

On Tuesday's ballot, a description for each option will be provided.

Puerto Rico held similar referendums in 1998, 1993, 1991, and 1967. In 1967, 38.9% voted for statehood, and in 1993 and 1998, 46.4% voted for statehood.

While the vote presents the possibility of a change in the commonwealth's tax-exempt status, Schankel said that the vote itself would not likely have a significant impact on the municipal bond market.

"I think that the attitude on Puerto Rico bonds would probably be mixed, but I don't think it would move the market dramatically one way or the other because there are just so many unknowns," he said.

Actually, the gubernatorial election, scheduled on the same day, might have more impact on Puerto Rico's bonds than other events.

"I think one of the reasons the spreads have been widening so much lately is concern of the unknown," Schankel said.

At the beginning of September, yields on Puerto Rico's GO bonds were 210 basis points above triple-A benchmark yields in 30-year maturities and 235 basis points higher in 10-year maturities.

At the beginning of October, the yields had risen to 220 basis points and 245, respectively. On Oct. 31, they had gone up to 225 and 270 basis points.

Schankel said the spreads are likely tighter on the longer maturities because of concentration of mutual fund and other long duration investor demand.

Analysts and investors watching Puerto Rico have noted that the current administration, under Gov. Luis Fortuno, has been moving the commonwealth's finances in the right direction.

"In our opinion, the current administration has taken decisive measures to restore fiscal balance," Standard & Poor's analyst Horacio Aldrete-Sanchez said in a recent report, though he added that the government's ability to implement further cuts and revenue enhancements is limited.

 Schankel said that Gov. Fortuno has a good track record, noting financial reforms such as the significant reductions in the number of government employees and the narrowing of the government's persistent budget gap.

"An argument can be made that bond investors will react positively if he is re-elected, but will have a more uncertain view and investment approach if his primary opponent, Alejandro Garcia Padilla, wins the governorship," he said.

Richard Larkin, director of credit analysis at Herbert J. Sims & Co., wrote in a recent report that the current administration has stuck faithfully to its multi-year plan to attack and reduce deficits, adding that Tuesday's gubernatorial election will be important for the commonwealth's future.

"Regardless of which party wins the election, fiscal integrity will be necessary—failure to do so will deepen Puerto Rico's budgetary and economic challenges to the point where investors should then reconsider their position on investing in the commonwealth of Puerto Rico."

According to an Oct. 9 poll by El Nuevo Dia, a Spanish-language daily, Padilla led the current governor 41% to 39%.

Fortuño is president of the New Progressive Party, which is generally associated with a "pro-statehood" position. Padilla is president of the Popular Democratic Party, generally associated with a "pro-commonwealth" position.

In a separate poll on the political status this month by the ASISA Research Group, a Spanish-language information solution provider, statehood was in the lead with 47.9%, the sovereign free associated state was in second with 40.9%, and independence had 5.7% of the vote.

Regardless of the outcome of Tuesday's vote, any change in political status would still have to be approved by Congress and the president.



© 2014 SourceMedia. All rights reserved.