# United States Court of Appeals
## For the First Circuit

Nos. 15-1218
      15-1221
      15-1271
      15-1272

FRANKLIN CALIFORNIA TAX-FREE TRUST, et al.,

Plaintiffs, Appellees,

v.

COMMONWEALTH OF PUERTO RICO, et al.,

Defendants, Appellants,

PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Lynch, Circuit Judges.

Christopher Landau, with whom Margarita Mercado-Echegaray, Solicitor General for the Commonwealth of Puerto Rico, Beth A. Williams, Michael A. Glick, Claire M. Murray, and Kirkland & Ellis LLP were on brief, for the Commonwealth of Puerto Rico, Governor Alejandro García-Padilla, and César R. Miranda-Rodríguez, appellants.
    Martin J. Bienenstock, with whom John E. Roberts, Andrea G. Miller, Proskauer Rose LLP, Mark D. Harris, Sigal P. Mandelker, Philip M. Abelson, and Ehud Barak were on brief, for Melba Acosta-Febo and John Doe, appellants.
    Lewis J. Liman, with whom Jorge R. Roig, Joanne A. Tomasini-

Muñiz, González, Machado & Roig, LLC, Lawrence B. Friedman, Richard J. Cooper, Sean A. O'Neal, and Cleary Gottlieb Steen & Hamilton LLP were on brief, for the Puerto Rico Electric Power Authority (PREPA), amicus curiae.

Gabriel R. Avilés-Aponte and Tapia & Avilés on brief for Clayton P. Gillette and David A. Skeel, Jr., amici curiae.

Edilberto Berríos-Pérez and Berríos & Longo Law Office, P.S.C. on brief for Edilberto Berríos-Pérez, amicus curiae.

Matthew D. McGill, with whom David C. Indiano, Jeffrey M. Williams, Leticia Casalduc-Rabell, Indiano & Williams, PSC, Theodore B. Olson, Scott G. Stewart, Matthew J. Williams, and Gibson, Dunn & Crutcher LLP were on brief, for BlueMountain Capital Management, LLC, appellee.

Thomas Moers Mayer, with whom Kramer Levin Naftalis & Frankel LLP, Philip Bentley, David E. Blabey, Jr., Toro, Colón, Mullet, Rivera & Sifre, P.S.C., Manuel Fernández-Bared, and Linette Figueroa-Torres were on brief, for Franklin California Tax-Free Trust et al., appellees.

Marc E. Kasowitz, with whom Daniel R. Benson, Hon. Joseph I. Lieberman (ret.), Hon. Clarine Nardi Riddle (ret.), Andrew K. Glenn, and Kasowitz, Benson, Torres & Friedman LLP were on brief, for the Association of Financial Guaranty Insurers, amicus curiae.

Kate Comerford Todd, Steven P. Lehotsky, U.S. Chamber Litigation Center, Inc., William S. Consovoy, Thomas R. McCarthy, J. Michael Connolly, and Consovoy McCarthy PLLC on brief for the Chamber of Commerce of the United States of America, amicus curiae.

---

July 6, 2015

---

     **LYNCH, <u>Circuit Judge</u>**.  The defendants, the Commonwealth of Puerto Rico, its Governor, its Secretary of Justice, and the Government Development Bank ("GDB"), assert that Puerto Rico is facing the most serious fiscal crisis in its history, and that its public utilities risk becoming insolvent.  Puerto Rico, unlike states, may not authorize its municipalities, including these utilities, to seek federal bankruptcy relief under Chapter 9 of the U.S. Bankruptcy Code.  11 U.S.C. §§ 101(40), 101(52), 109(c).  In June 2014, the Commonwealth attempted to allow its utilities to restructure their debt by enacting its own municipal bankruptcy law, the Puerto Rico Public Corporation Debt Enforcement and Recovery Act ("Recovery Act"), which expressly provides different protections for creditors than does the federal Chapter 9.

     Plaintiffs are investors who collectively hold nearly two billion dollars of bonds issued by one of the distressed public utilities, the Puerto Rico Electric Power Authority ("PREPA"). Fearing that a PREPA filing under the Recovery Act was imminent, they brought suit in summer 2014 to challenge the Recovery Act's validity and enjoin its implementation.  The district court found in their favor and permanently enjoined the Recovery Act on the ground that it is preempted under 11 U.S.C. § 903(1).  <u>See</u> <u>Franklin Cal. Tax-Free Trust</u> v. <u>Puerto Rico</u>, ___ F. Supp. 3d ___, Nos. 14-1518, 14-1569, 2015 WL 522183, at *1, *12-18, *29 (D.P.R. Feb. 6, 2015); <u>Franklin Cal. Tax-Free Trust</u> v. <u>Puerto Rico</u>, No. 14-

1518, 2015 WL 574008, at *1 (D.P.R. Feb. 10, 2015).   That provision, § 903(1), ensures the uniformity of federal bankruptcy laws by prohibiting state municipal debt restructuring laws that bind creditors without their consent.   11 U.S.C. § 903(1); see S. Rep. No. 95-989, at 110 (1978).

The primary legal issue on appeal is whether § 903(1) preempts Puerto Rico's Recovery Act.   That question turns on whether the definition of "State" in the federal Bankruptcy Code -- as amended in 1984 -- renders § 903(1)'s preemptive effect inapplicable to Puerto Rico.   Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, sec. 421(j)(6), § 101(44), 98 Stat. 333, 368-39 (codified as amended at 11 U.S.C. § 101(52)).   The post-1984 definition of "State" includes Puerto Rico, "except" for the purpose of "defining" a municipal debtor under § 109(c).   11 U.S.C. §§ 101(52), 109(c) (emphasis added). All parties agree that Puerto Rico now lacks the power it once had been granted by Congress to authorize its municipalities to file for Chapter 9 relief.

We hold that § 903(1) preempts the Recovery Act.   The prohibition now codified at § 903(1) has applied to Puerto Rico since the predecessor of that section's enactment in 1946.   The statute does not currently read, nor does anything about the 1984 amendment suggest, that Puerto Rico is outside the reach of § 903(1)'s prohibitions.   See Cohen v. de la Cruz, 523 U.S. 213,

-4-

221 (1998) ("We . . . 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" (citation omitted)); cf. Kellogg Brown & Root Servs. Inc. v. United States ex rel. Carter, 135 S. Ct. 1970, 1977 (2015) ("Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move."). Indeed, the Recovery Act would frustrate the precise purpose underlying the enactment of § 903(1). Accordingly, we affirm.

Defendants argue that this leaves Puerto Rico without relief. Although § 101(52) denies to Puerto Rico the power to authorize its municipalities to pursue federal Chapter 9 relief, Puerto Rico may turn to Congress for recourse. Indeed, Congress preserved to itself that power to authorize Puerto Rican municipalities to seek Chapter 9 relief. Puerto Rico is presently seeking authorization or other relief directly from Congress. See Puerto Rico Chapter 9 Uniformity Act of 2015, H.R. 870, 114th Cong. (2015).

I.

Procedural History

Two groups of PREPA bondholders sued almost immediately following the Recovery Act's passage to prevent its enforcement. PREPA had issued their bonds pursuant to a trust agreement with the U.S. Bank National Association. The bondholders allege that the very enactment of the Recovery Act impaired these contractual

-5-

obligations by abrogating certain protections that were promised in the event of default.[1]  The first group, the Franklin plaintiffs,[2] filed on June 28, 2014, and cross-motioned for summary judgment on August 11, 2014.  The second group, BlueMountain Capital

---

[1]   Compare, e.g., Puerto Rico Electric Power Authority Act ("Authority Act"), P.R. Laws Ann. tit. 22, § 207 (providing for a court-appointed receiver in event of default); Trust Agreement between PREPA & U.S. Bank National Association as Successor Trustee dated Jan. 1, 1974, as amended and supplemented through Aug. 1, 2011 ("Trust Agreement"), § 804 (permitting U.S. Bank National Association to seek court-appointed receiver pursuant to the Authority Act), with Recovery Act, § 108(b) ("This Act supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including [Authority Act, P.R. Laws Ann. tit. 22, § 207] . . . .").

[2]   We use "Franklin plaintiffs" to denote the plaintiffs who brought the first suit.  The Franklin plaintiffs consist of two subsets of plaintiffs, referred to by the district court as the "Franklin plaintiffs" and the "Oppenheimer Rochester plaintiffs." The former are Delaware corporations or trusts that collectively hold about $692,855,000 of PREPA bonds.  The latter are Delaware statutory trusts holding about $866,165,000 of PREPA bonds.  For simplicity, we do not distinguish between these two subsets, but refer to both subsets collectively.

The individual parties who comprise the "Franklin plaintiffs" are: Franklin California Tax-Free Trust; Franklin New York Tax-Free Trust; Franklin Tax-Free Trust; Franklin Municipal Securities Trust; Franklin California Tax-Free Income Fund; Franklin New York Tax-Free Income Fund; Franklin Federal Tax-Free Income Fund; Oppenheimer Rochester Fund; Municipals Oppenheimer Municipal Fund; Oppenheimer Multi-State Municipal Trust; Oppenheimer Rochester Ohio Municipal Fund; Oppenheimer Rochester Arizona Municipal Fund; Oppenheimer Rochester Virginia Municipal Fund; Oppenheimer Rochester Maryland Municipal Fund; Oppenheimer Rochester Limited Term California Municipal Fund; Oppenheimer Rochester California Municipal Fund; Rochester Portfolio Series; Oppenheimer Rochester Amt-Free Municipal Fund; Oppenheimer Rochester Amt-Free New York Municipal Fund; Oppenheimer Rochester Michigan Municipal Fund; Oppenheimer Rochester Massachusetts Municipal Fund; Oppenheimer Rochester North Carolina Municipal Fund; and Oppenheimer Rochester Minnesota Municipal Fund.

Management, LLC ("BlueMountain"), for itself and on behalf of the funds it manages, filed on July 22, 2014.  Together, the Franklin plaintiffs and BlueMountain hold nearly two billion dollars in PREPA bonds.

Both the Franklin plaintiffs and BlueMountain sought declaratory relief under 28 U.S.C. §§ 2201-02 that the Recovery Act is preempted by the federal Bankruptcy Code, violates the Contracts Clause, violates the Bankruptcy Clause, and unconstitutionally authorizes a stay of federal court proceedings.  The Franklin plaintiffs (but not BlueMountain) also brought a Takings Claim under the Fifth and Fourteenth Amendments.  And BlueMountain (but not the Franklin plaintiffs) brought a claim under the contracts clause of the Puerto Rico constitution.  These claims were brought against the Commonwealth of Puerto Rico, Governor Alejandro García-Padilla, and various Commonwealth officials, including GDB agents.[3] The district court consolidated the cases and aligned the briefing on August 20, 2014, but did not merge the suits.

The district court issued an order and opinion in both cases on February 6, 2015, resolving the motions to dismiss and the

_____

[3]  The Franklin plaintiffs and BlueMountain named different Commonwealth defendants.  Both sued the Governor and agents of the GDB.  But only the Franklin plaintiffs (not BlueMountain) sued the Commonwealth itself, while BlueMountain (not the Franklin plaintiffs) named Puerto Rico's Secretary of Justice, César Miranda-Rodríguez, as a defendant.
    The Franklin plaintiffs (not BlueMountain) had also sued PREPA itself, but those claims were dismissed for lack of standing.

Franklin plaintiffs' outstanding cross-motion for summary judgment. <u>Franklin Cal. Tax-Free Trust</u>, __ F. Supp. 3d __, 2015 WL 522183, at *1. It entered judgment in the <u>Franklin</u> case on February 10, 2015. <u>Franklin Cal. Tax-Free Trust</u>, 2015 WL 574008, at *1.

As relevant here, the district court held that the Recovery Act was preempted by federal law and permanently enjoined its enforcement. It also denied the motion to dismiss the Contracts Clause claim and one of the Franklin plaintiffs' Takings claims.[4]

The Commonwealth defendants appeal from the permanent injunction, the grant of summary judgment to the Franklin plaintiffs, and further argue that the district court erred by reaching the Contracts Clause and Takings Claims in its February 6 order.

II.

Because the appeal presents a narrow legal issue, we summarize only those facts as are necessary. We do not address in any detail the extent of the fiscal crisis facing the Commonwealth, PREPA, or other Commonwealth entities. We begin with the considerations shaping the state-authorization requirement of § 109(c)(2), the provision that presently, in combination with

---

[4] The district court dismissed without prejudice the remaining claims for lack of ripeness, and all claims asserted against PREPA for lack of standing.

-8-

§ 101(52), bars Puerto Rico from authorizing its municipalities to bring claims for federal Chapter 9 relief.

A.      The History of Federal Municipal Bankruptcy Relief, and the State-Authorization Requirement

Modern municipal bankruptcy relief is shaped by two features: the difficulties inherent in enforcing payment of municipal debt, and the historic understanding of constitutional limits on fashioning relief.  M.W. McConnell & R.C. Picker, When Cities Go Broke: A Conceptual Introduction to Municipal Bankruptcy, 60 U. Chi. L. Rev. 425, 426-28 (1993).  The difficulties arise because municipalities are government entities, and so the methods for addressing their insolvency are limited in ways that the methods for addressing individual or corporate insolvency are not.[5] Id. at 426-50; see also 11 U.S.C. § 101(40) (defining "municipality" as "political subdivision[s]," "public agenc[ies],"

---

[5]      For example, remedies traditionally available in bankruptcy, like seizing assets, corporate reorganization, liquidation, or judicial oversight of the debtor's day-to-day affairs, are traditionally unavailable in enforcing the payment of municipal debt.  See McConnell & Picker, 60 U. Chi. L. Rev. at 426-50; see also City of East St. Louis v. United States ex rel. Zebley, 110 U.S. 321, 324 (1884) ("[W]hat expenditures are proper and necessary for the municipal administration, is not judicial; it is confided by law to the discretion of the municipal authorities. No court has the right to control that discretion, much less to usurp and supersede it.").  The relative unavailability of these "bitter medicine[s]" makes it more difficult for municipal bankruptcy regimes to navigate the gauntlet between addressing the "holdout" problem that bankruptcy is designed to resolve, and limiting the "moral hazard" problem that is exacerbated by the availability of bankruptcy relief.  McConnell & Picker, 60 U. Chi. L. Rev. at 426-27, 494-95.

and other "instrumentalit[ies] of a State").  Navigating these difficulties is further complicated, for state municipalities, by a two-prong dilemma created by the Contracts Clause and the Tenth Amendment.  <u>See</u> McConnell & Picker, 60 U. Chi. L. Rev. at 427-28.

For these reasons, municipalities remained completely outside any bankruptcy regime for much of the nation's history.  <u>See</u> <u>id.</u> at 427-28.  Indeed, the prevailing assumption was that the constitutional limitations precluded either level of government, state or federal, from enacting a municipal bankruptcy regime.  <u>See</u> <u>id.</u>  States could not provide an effective solution to the "holdout problem" presented by insolvency because doing so "would [require] impair[ing] the obligation of contracts" in violation of the Contracts Clause.[6]  <u>See</u> <u>id.</u> at 426-28.  Federal intervention,

---

[6]  The holdout problem occurs in restructuring negotiations because creditors who refuse to capitulate early can often secure more favorable terms by "holding out."  <u>See, e.g.</u>, McConnell & Picker, 60 U. Chi. L. Rev. at 449-50.  Municipal bankruptcy relief can ameliorate this problem by binding the dissenters -- the holdouts -- provided a large enough class of creditors agrees.  <u>See</u> <u>generally</u> McConnell & Picker, 60 U. Chi. L. Rev. 425.  Indeed, some have suggested that even the shadow of the law in this area can assist negotiations, and that its absence can hinder it.  <u>See, e.g.</u>, D.A. Skeel, Jr., <u>States of Bankruptcy</u>, 79 U. Chi. L. Rev. 677, 689-90 (2012) (suggesting that "a bankruptcy law could prove beneficial <u>even if it is never used</u>").  <u>Compare</u> <u>id.</u> at 720 & nn. 191 & 192 (discussing a series of studies concerning the effect on debt price of a bankruptcy alternative to the holdout problem, so-called "collective-action clauses" (citing, <u>e.g.</u>, S.J. Choi, M. Gulati, & E.A. Posner, <u>Pricing Terms in Sovereign Debt Contracts: A Greek Case Study with Implications for the European Crisis Resolution Mechanism</u> *10-11 (U. Chi. John M. Olin L. & Econ. Working Paper No. 541, Feb. 1, 2011))), <u>with</u> <u>Municipal Bankruptcy -- Preemption -- Puerto Rico Passes New Municipal Reorganization Act</u>, 128 Harv. L. Rev. 1320, 1327 (2015) (suggesting that the

on the other hand, might interfere with states' rights under the Tenth Amendment in controlling their own municipalities. Id. at 427-28; see also Ashton v. Cameron Cnty. Water Improvement Dist. No. 1, 298 U.S. 513, 530-32 (1936) (striking down the first federal municipal bankruptcy law on federalism grounds).

The problems created by this absence of municipal bankruptcy relief became acute during the Great Depression. And so, in 1933, Congress enacted Chapter 9's predecessor to provide to states a mechanism for addressing municipal insolvency that they could not create themselves. See McConnell & Picker, 60 U. Chi. L. Rev. at 427-29, 450-54 (summarizing the history).

Although it had a rocky start, see, e.g., Ashton, 298 U.S. at 530-32 (invalidating the initial act), Congress eventually succeeded in avoiding a Tenth Amendment problem. It did so in part by requiring a state's consent in the federal municipal bankruptcy regime before permitting municipalities of that state to seek relief under it, and in part by emphasizing that the statute did not effect "'any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties.'" See, e.g., United States v. Bekins, 304 U.S. 27, 49-54 (1938) (quoting H.R. Rep. No. 75-517, at 2 (1937); S. Rep. No. 75-911, at 2 (1937)) (recognizing that this created a "cooperati[ve]" scheme); cf. McConnell & Picker, 60 U. Chi. L. Rev. at 452-53.

_____

Recovery Act forced creditors to the negotiation table).

This is the origin of the state-authorization requirement of § 109(c).[7]  That provision of the Code provides that a municipality may be a debtor under Chapter 9 only if it "is specifically authorized . . . to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to [so] authorize."  11 U.S.C. § 109(c)(2).

This requirement of state consent is based on reason: a state might instead decide to bail out an ailing municipality, if its own fiscal situation permits, to avoid the negative impact that a municipal bankruptcy would have on that state's economy and other municipalities.  See C.P. Gillette, Fiscal Federalism, Political Will, and Strategic Use of Municipal Bankruptcy, 79 U. Chi. L. Rev. 281, 302-08 (2012) (explaining the problem of "debt contagion").  But allowing state municipalities to bypass the state and seek federal Chapter 9 relief would undermine a state's ability to do so.  See id. at 285-86.  In this way, the state-authorization

---

[7]    This is the historical gloss given by courts and commentators alike because the Bekins Court declined to follow Ashton but without expressly overruling it.  See Bekins, 304 U.S. at 49-54; see, e.g., In re Jefferson Cnty., Ala., 469 B.R. 92, 99 (N.D. Ala. 2012); McConnell & Picker, 60 U. Chi. L. Rev. at 452-53.  A similar state-authorization requirement had been present in the original municipal bankruptcy act that the Court struck down in Ashton, but the Bekins Court recognized that state consent alleviates a potential "constitutional obstacle . . . in the right of the State to prevent a municipality from seeking bankruptcy protection," and makes the federal scheme a cooperative endeavor.  See McConnell & Picker, 60 U. Chi. L. Rev. at 452-53 (discussing the cases and changes to the Act made in the interim between them); see also Bekins, 304 U.S. at 49-54.

requirement not only addresses constitutional difficulties by making Chapter 9 a "cooperati[ve]" state-federal scheme, Bekins, 304 U.S. at 49-54, it also promotes state sovereignty by preventing municipalities from strategically seeking (or threatening to seek) federal municipal relief to "reduce the conditions that states place on a proposed bailout," Gillette, 79 U. Chi. L. Rev. at 285-86.

B.        Puerto Rico Municipalities Under the Code: 1938-1984

        Puerto Rico was granted the authority to issue bonds, and to authorize its municipalities to issue bonds, in 1917.[8]  See Act

_____

        [8]  The authorizing act also created Puerto Rico's "triple tax-exempt" status by prohibiting federal, state, and local taxation of Puerto Rico's municipal bonds.  See Act of Mar. 2, 1917, ch. 145, § 3, 39 Stat. at 953 (codified as amended at 48 U.S.C. § 745). This provision has not been amended since 1961, when limits on the amount of municipal debt that could be issued (as a percentage of the municipalities' property valuation) were removed, subject to approval by a vote in the Commonwealth.  See Joint Resolution of Aug. 3, 1961, Pub. L. No. 87-121, sec. 1, § 3, 75 Stat. 245.
        But Puerto Rico's status in this respect is not entirely remarkable.  State and local bonds have enjoyed federal tax-exempt status "since the modern income tax system was enacted in 1913." Nat'l Assoc. of Bond Lawyers, Tax-Exempt Bonds: Their Importance to the National Economy and to State and Local Governments 5 (Sept. 2012) ("Tax-Exempt Bonds"); see also 26 U.S.C. § 103.  The main difference is that states and local governments may not tax Puerto Rico municipal bonds, though they may tax their own or other states' municipal bonds.  See T. Chin, Puerto Rico's Possible Statehood Could Affect Triple Tax-Exempt Status, 121 The Bond Buyer No. 213 (Nov. 5, 2012); see also Tax-Exempt Bonds, supra, at 5 (explaining that, until 1988, "the tax-exempt status of interest on state and local government bonds also was believed to be constitutionally protected under the doctrine of intergovernmental immunities"); Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 583-86 (1895), modified, 158 U.S. 601 (1895), overruled in part by U.S. Const. amend. XVI, South Carolina v. Baker, 485 U.S. 505, 515-27 (1988).

of Mar. 2, 1917, ch. 145, § 3, 39 Stat. 951, 953 (codified as
amended at 48 U.S.C. § 741).   Like municipalities of a state, a
municipality in Puerto Rico is excluded from bankruptcy relief
under the Code's other chapters if it becomes unable to meet these
bond obligations.   See, e.g., 11 U.S.C. § 109; cf. McConnell &
Picker, 60 U. Chi. L. Rev. at 426-50 (explaining the obstacles to
treating municipal insolvency like corporate insolvency).   And, at
least from 1938 until the modern Bankruptcy Code was introduced in
1978, Puerto Rico, like the states, could authorize its
municipalities to obtain federal municipal bankruptcy relief.[9]
See 11 U.S.C. §§ 1(29), 403(e)(6) (1938); 48 U.S.C. § 734 (1934);
Bekins, 304 U.S. at 49; accord 11 U.S.C. §§ 1(29), 404 (1976); 48
U.S.C. § 734 (1976); see also S.J. Lubben, Puerto Rico and the
Bankruptcy Clause, 88 Am. Bankr. L.J. 553, 572 (2014).   And

--------

[9]   From 1938 until the modern Code's enactment, state
authorization was required for plan confirmation.   See Act of Aug.
16, 1937, Pub. L. No. 302, ch. 657, sec. 83(e)(6), 50 Stat. 653,
658 (codified at 11 U.S.C. § 403(e)(6) (1937) (conditioning
confirmation of a plan on, inter alia, petitioner being "authorized
by law to take all action necessary to be taken by it to carry out
the plan")); Bekins, 304 U.S. at 49 (holding that "law" in
§ 403(e)(6) refers to "state" law); accord 11 U.S.C. § 404 (1976).
Puerto Rico's power to provide this authorization to its
municipalities follows from two other statutory provisions: the
Bankruptcy Act's definition of "State," in effect from 1938 to
1978, which defined "State" to include "the Territories and
possessions to which this Act is or may hereafter be applicable,"
Act of June 22, 1938, Pub. L. No. 696, ch. 575, § 1(29), 52 Stat.
840, 842 (codified at 11 U.S.C. § 1(29) (1938)); accord 11 U.S.C.
§ 1(29) (1976); and the extension of United States laws to Puerto
Rico "except as . . . otherwise provided," in effect from 1917 to
the present, 48 U.S.C. § 734.   See also S.J. Lubben, Puerto Rico
and the Bankruptcy Clause, 88 Am. Bankr. L.J. 553, 572 (2014).

although the modern Code omitted a definition of the term "State" from its enactment in 1978 until it was re-introduced in 1984, most commentators agree that this did not affect Puerto Rico's ability during that time to provide its municipalities authorization.[10] See, e.g., Lubben, 88 Am. Bankr. L.J. at 572-73 & n.125; An Act to Establish a Uniform Law on the Subject of Bankruptcies ("Bankruptcy Reform Act of 1978"), Pub. L. No. 95-598, 92 Stat. 2549 (1978)

---

[10] The omission of a definition of "State" from the modern Bankruptcy Code was recognized as an error almost as soon as the modern Code was enacted. See Lubben, 88 Am. Bankr. L.J. at 573-75. Most assumed that the Code would still apply to Puerto Rico because, despite the significant substantive and procedural changes that the Code made to pre-Code law, those changes were tangential to the continued applicability of the federal bankruptcy law to Puerto Rico. See, e.g., id. at 572-73 & n.125; see also In re Segarra, 14 B.R. 870, 872-73 (D.P.R. 1981) (finding nothing that "would indicate that anyone in the vast bureaucracy of the federal government has had the slightest doubt that Congress did not intend the Bankruptcy Code to extend to Puerto Rico"); cf. Cohen, 523 U.S. at 221-22 (explaining that the Code is not to be construed "to erode past bankruptcy practice absent a clear indication that Congress intended such a departure"); Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1939 (2015) (describing the Code's expansion of power given to courts adjudicating bankruptcy cases).

Even so, this omission and others in the Code's early years led to at least some ambiguity about the Code's applicability to Puerto Rico. See Lubben, 88 Am. Bankr. L.J. at 572-73 & n.125 (explaining this was because both the definition of "State" and that of "United States" were absent in the original 1978 Code); see also In re Segarra, 14 B.R. at 872-73 (holding that the Code applied to Puerto Rico under 48 U.S.C. § 734). In addition to the general ambiguity about the applicability of the Code, in its entirety, to Puerto Rico, the applicability of Chapter 9 relief in particular was "further confused" by the inclusion of a definition for "governmental unit" that referenced both "State" and "Commonwealth" separately. Lubben, 88 Am. Bankr. L.J. at 572-73 n.125; An Act to Establish a Uniform Law on the Subject of Bankruptcies ("Bankruptcy Reform Act of 1978"), Pub. L. No. 95-598, § 101(21), 92 Stat. 2549, 2552 (1978) (codified as amended at 11 U.S.C. § 101(27)).

(codified as amended at 11 U.S.C. §§ 101 <u>et seq.</u>); <u>see also</u> <u>Cohen</u>,
523 U.S. at 221-22; <u>In re Segarra</u>, 14 B.R. 870, 872-73 (D.P.R.
1981).

This changed in 1984, when Congress re-introduced a
definition of "State" to the Code.[11]   Bankruptcy Amendments and
Federal Judgeship Act of 1984, sec. 421(j)(6), § 101(44), 98 Stat.
at 368-69 (codified as amended at 11 U.S.C. § 101(52)).   This 1984
amendment is key to this case.   Like previous definitions,
§ 101(52) defines "State" to "include[] . . . Puerto Rico."   But
importantly, and unlike previous versions of the definition, the
re-introduced definition of "State" includes Puerto Rico "<u>except</u>
for the purpose of defining who may be a debtor under chapter 9 of
[the Bankruptcy Code]."[12]   11 U.S.C. § 101(52) (emphasis added).

---

[11]   Correcting the Code's omission of this definition was one
of many changes made.   Indeed, the primary purpose of the Act was
entirely unrelated: Congress enacted the Bankruptcy Amendments and
Federal Judgeship Act of 1984 in large part to "respond[]" to the
Court's decision in <u>Northern Pipeline Construction Co.</u> v. <u>Marathon
Pipe Line Co.</u>, 458 U.S. 50 (1982), which had held parts of the
Code's new system of bankruptcy courts and expanded bankruptcy
jurisdiction to be unconstitutional.   <u>See</u> <u>Wellness Int'l Network,
Ltd.</u>, 135 S. Ct. at 1939.

[12]   The new version, unlike previous versions, also excludes
the District of Columbia from the definition of "State" for
purposes of defining Chapter 9 debtors.   <u>Compare</u> 11 U.S.C.
§ 101(52), <u>with</u> Act of June 22, 1938, Pub. L. No. 696, ch. 575,
§ 1(29), 52 Stat. 840, 842.
   And, unlike the previous version, the other territories are
not expressly included for any purpose. 11 U.S.C. § 101(52). Only
two definitions in § 101 refer to "territories": subsection (27),
defining "governmental unit," and subsection (55), defining the
geographical scope of the "United States." <u>See</u> 11 U.S.C. § 101(27)
("The term 'governmental unit' means United States; State;

Compare <u>id.</u>, <u>with</u> Act of June 22, 1938, Pub. L. No. 696, ch. 575, § 1(29), 52 Stat. 840, 842. As a result of this exception, Puerto Rico municipalities became expressly (though indirectly) forbidden from filing under Chapter 9 absent further congressional action: the change deprived Puerto Rico of the power to grant its municipalities the authorization required by § 109(c)(2) to file for Chapter 9 relief. <u>See</u> 11 U.S.C. § 109(c) (defining who may be a Chapter 9 debtor). The two sides to this controversy dispute whether this change was also meant to transform the preemption provision of § 903(1) without Congress expressly saying so.

C.      <u>The Recovery Act: Puerto Rico's Stated Attempt to "Fill the Gap"</u>

Facing a fiscal crisis and lacking the power to authorize its municipalities to seek Chapter 9 relief, the Commonwealth enacted the Recovery Act in June 2014, to take effect immediately. Somewhat modeled after Chapter 9, but with significant differences, the Recovery Act "establish[ed] a debt enforcement, recovery, and restructuring regime for the public corporations and other

---

Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."); 11 U.S.C. § 101(55) ("The term 'United States', when used in a geographical sense, includes all locations where the judicial jurisdiction of the United States extends, including territories and possessions of the United States."); <u>cf.</u> 11 U.S.C. § 109(a) ("Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title.").

instrumentalities of the Commonwealth of Puerto Rico during an economic emergency."  Recovery Act, Preamble (translation provided by the parties); id., Stmt. of Motives, § E.  In particular, the Act was intended to ameliorate the fiscal situations of several distressed Puerto Rican public corporations whose combined deficit in 2013 totaled $800 million, and whose combined debt reaches $20 billion: PREPA, the Aqueduct and Sewer Authority ("PRASA"), and the Highways and Transportation Authority ("PRHTA").  Id., Stmt. of Motives, § A.

The Recovery Act provides two methods for restructuring debt: Chapter 2 "Consensual Debt Relief," and Chapter 3 "Debt Enforcement."  Id., Preamble.  Although defendants say these serve as a substitute for Chapter 9, both Chapter 2 and Chapter 3 relief under the Recovery Act appear to provide less protection for creditors than the federal Chapter 9 counterpart.  See L.S. McGowen, Puerto Rico Adopts a Debt Recovery Act for Its Public Corporations, 10 Pratt's J. Bankr. L. 453, 460-62 (2014).  This is one form of harm that plaintiffs say the Recovery Act has caused them.

For example, Chapter 2 relief under the Recovery Act purports to offer a "consensual debt modification procedure" leading to a recovery plan that would only become binding "with the consent of a supermajority" of creditors.  Recovery Act, Stmt. of Motives, § E.  But this is belied by the provisions: Chapter 2

permits a binding modification, including debt reduction, to a class of debt instruments with the assent of creditors holding just over one-third of the affected debt.[13]  Id. § 202(d)(2); see also id., Stmt. of Motives, § E.   There is no analogous "consensual procedure" under federal law.

Chapter 3 relief, on the other hand, is a court-supervised process designed to mirror, in some ways, Chapter 9 and Chapter 11 of the federal Code.   Id., Stmt. of Motives, § E.  But while Chapter 3 debtors, like federal Chapter 9 debtors, may avoid certain contractual claims, protections for creditors are again reduced.  Compare, e.g., id. §§ 325, 326, with 11 U.S.C. §§ 365(e), 901(a); see also McGowen, 10 Pratt's J. Bankr. L. at 461.   For example, unlike in the federal Code, the Recovery Act does not provide a "safe harbor" for derivative contracts.  Compare Recovery Act, § 325(a), with 11 U.S.C. § 365(e); see also Recovery Act, § 205(c); McGowen, 10 Pratt's J. Bankr. L. at 461.

Municipalities that the Commonwealth may not authorize for federal Chapter 9 relief are nonetheless purportedly made eligible by the Recovery Act to seek both Chapter 2 and 3 relief, either simultaneously or sequentially, with approval from the GDB.

---

[13]   Specifically, a proposed modification becomes binding on all creditors within a class of affected debt instruments if (1) creditors of at least 50% of the amount of debt in that class participate in a vote or consent solicitation; and (2) creditors of at least 75% of the amount of debt that participates in the vote or consent solicitation approves the proposed modifications.  Recovery Act, § 202(d)(2).

Recovery Act, §§ 112, 201(b), 301(a).  Unlike the federal Code, the Recovery Act also expressly permits the Governor to institute an involuntary proceeding if the GDB determines that doing so is in the best interest of both the distressed entity and the Commonwealth.[14]  Recovery Act, §§ 201(b)(2), 301(a)(2).

Plaintiffs argue that the very enactment of these and other provisions cause them harm in several ways: by denying them the protection for which they bargained under the Trust Agreement, by denying them the protection to which they would be entitled under federal relief, and by injecting uncertainty into the bond market that reduces their bargaining position to address pending default.  See McGowen, 10 Pratt's J. Bankr. L. at 460-61 (discussing other examples, including the lack of protection for holders of liens on revenue should the municipality need to obtain credit to perform public functions).

---

[14]  The federal Code does not permit involuntary Chapter 9 proceedings brought by creditors, see 11 U.S.C. § 303(a) (limiting involuntary petitions to cases under Chapter 7 or 11), and does not expressly address whether states may institute these quasi-involuntary proceedings on behalf of their municipalities.  At least one commentator has suggested that states are prohibited from doing so by § 109(c)(4), which requires that a potential municipal debtor "desire[] to effect a plan to adjust such debts."  See Gillette, 79 U. Chi. L. Rev. at 297.

By contrast, the Recovery Act similarly precludes involuntary proceedings brought by creditors, Recovery Act, § 301(c), but expressly allows these quasi-involuntary proceedings to be initiated by the government, see id. § 301(a)(2).

III.

A.          Jurisdiction

We have appellate jurisdiction over the final judgment granting summary judgment and issuing a permanent injunction in favor of the Franklin plaintiffs under 28 U.S.C. § 1291. We have appellate jurisdiction over the injunction issued in favor of BlueMountain under 28 U.S.C. § 1292(a)(1).[15] Because we affirm the preemption ruling and attendant injunction, we decline to exercise jurisdiction over defendants' appeal of the district court's February 6, 2015 order denying the motions to dismiss the surviving Contracts Clause and Takings Claims. Cf. First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 50 (1st Cir. 2007) (discussing an exception to the general rule that denials of 12(b)(6) motions to dismiss are interlocutory rulings outside the scope of appellate jurisdiction).[16]

---

[15] This difference is an odd quirk of the procedure below: BlueMountain never moved for summary judgment, and so there is no final judgment from which to appeal, only the injunction from the order dated February 6, 2015.

[16] The defendants challenged the ripeness of the relevant claims before the district court, but not on appeal. "[A]lthough [they] do not press this issue on appeal, it concerns our jurisdiction under Article III, so we must consider the question on our own initiative." Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 265 n.13 (1991) (citing Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 740 (1976)).
We conclude that the defendants were correct in conceding ripeness: The plaintiffs allege that the Recovery Act itself impairs the terms of the agreements governing the PREPA bonds. Compare, e.g., Authority Act, P.R. Laws Ann. tit. 22, § 207

-21-

B.        Preemption under § 903(1)

        Puerto Rico may not enact its own municipal bankruptcy laws to cover the purported gap created by the 1984 amendment if such laws are preempted by the federal Bankruptcy Code.   U.S. Const. art. VI, cl. 2; CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663 (1993).   Thus, the issue on this appeal is whether 11 U.S.C. § 903(1) preempts Puerto Rico from enacting its own municipal bankruptcy law.  Our answer to that question is largely driven by examining whether the 1984 amendment adding § 101(52)

---

(providing for a court-appointed receiver in event of default); Trust Agreement, § 804 (permitting U.S. Bank National Association to seek court-appointed receiver pursuant to the Authority Act), with Recovery Act, § 108(b) ("This Act supersedes and annuls any insolvency or custodian provision included in the enabling or other act of any public corporation, including [Authority Act, P.R. Laws Ann. tit. 22, § 207] . . . .").   That is, plaintiffs allege that the very enactment of the Recovery Act, rather than the manner of enforcement, impairs their contractual rights -- allegations that present purely legal issues or factual issues controlled by past events.  Accordingly, the outcome of the case cannot be affected by subsequent events (except to be mooted), and so these issues satisfy the "fitness" prong of our ripeness inquiry.   See Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89-93 (1st Cir. 2013).   And because "the sought-after declaration" on the surviving Contracts Clause and preemption claims "would be of practical assistance in setting the underlying controversy to rest," a refusal to grant relief would result in hardship to the parties.   See Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994).   This claim is ripe for review.   See Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 16-17 (1st Cir. 2014) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)) (internal quotation marks omitted)).

altered § 903(1)'s effect.  See Dewsnup v. Timm, 502 U.S. 410, 419 (1992) ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" (quoting Emil v. Hanley (In re John M. Russell, Inc.), 318 U.S. 515, 521 (1943))); CSX Transp., 507 U.S. at 663-64 ("Where a state statute conflicts with, or frustrates, federal law, the former must give way.").  Our review is de novo. Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 17 (1st Cir. 2014) (citing DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 85 (1st Cir. 2011)).

Whether a federal law preempts a state law "is a question of congressional intent."  Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252 (1994).  We begin with the statutory language, which often "contains the best evidence of Congress' pre-emptive intent." Mass. Delivery Ass'n, 769 F.3d at 17 (quoting Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1778 (2013)) (internal quotation marks omitted).  We also consider "the clause's purpose, history, and the surrounding statutory scheme."  Id.

The relevant provision, § 903(1), states in full: "a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent

to such composition." 11 U.S.C. § 903(1).[17] This provision, by its plain language, bars a state law like the Recovery Act.

There is no disputing that the Recovery Act is a "law prescribing a method of composition of indebtedness" of eligible Puerto Rico municipalities that may "bind" said municipalities' creditors without those creditors' "consent." And, because "State" is defined to include Puerto Rico under § 101(52), the Recovery Act is a "State law" that does so. But this, under § 903(1), Puerto Rico "may not" do, and so we hold that the Recovery Act is preempted. Compare 11 U.S.C. § 903(1) ("[A] State law . . . may not bind any creditor that does not consent . . . ." (emphasis added)), with 49 U.S.C. § 14501(c)(1) ("[A] State . . . may not enact or enforce a law . . . related to a price, route, or service . . . ." (emphasis added)); Dan's City, 133 S. Ct. at 1778

_____

[17] This provision appears in § 903, which reads in full:

This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but--

(1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and

(2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

-24-

(noting that this language in § 14501(c)(1) "prohibits enforcement of state laws 'related to a price, route or service . . . .'").

The context and history of this provision confirm this construction -- that this provision was intended to have a preemptive effect. Cf. Dan's City, 133 S. Ct. at 1778; Cohen, 523 U.S. at 221. Context and history also confirm that our construction is consistent with the previous constructions of this provision, and so, absent clear congressional intention to modify the bankruptcy law, we "will not read the Bankruptcy Code to erode past bankruptcy practice." Cohen, 523 U.S. at 221 (citation and internal quotation marks omitted); see also Dewsnup, 502 U.S. at 419 ("When Congress amends the bankruptcy laws, it does not write 'on a clean slate.'" (quoting Emil, 318 U.S. at 521)).

The Code, at § 903(1), "is derived, with stylistic changes, from" its precursor, Section 83(i). S. Rep. No. 95-989 at 110. The legislative history reveals, and the parties do not dispute, that the purpose of Section 83(i) was to overrule an early Supreme Court decision which had upheld a state law permitting the adjustment of municipal debt if the city and 85% of creditors agreed. See Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 504, 513-16 (1942).[18] Before Faitoute, most had assumed

_____

[18] The GDB defendants, at oral argument, presented a strained reading of the manner in which Section 83(i) overruled Faitoute. They argued that the sole purpose of Congress in overruling Faitoute was to allow municipalities to convert to federal proceedings those state municipal bankruptcy proceedings that, like

that states could not themselves address the holdout problem that
municipal bankruptcy relief is designed to resolve because they
were barred from adjusting debt obligations (without all creditors'
consent) under the Contracts Clause.  See McConnell & Picker, 60 U.
Chi. L. Rev. at 452-54.

Congress enacted Section 83(i) to restore what had been
believed to be the pre-Faitoute status quo by expressly prohibiting
state municipal bankruptcy laws adjusting creditors' debts without
their consent.[19]   See, e.g., H.R. Rep. No. 79-2246, at 4 (1946)
("State adjustment acts have been held to be valid, but
. . . . [o]nly under a Federal law should a creditor be forced to
accept such an adjustment without his consent." (emphasis added)).
And Congress sought to preserve Section 83(i) when it re-codified

---

the one in Faitoute, had arisen in the absence of a federal
municipal bankruptcy regime from 1933-1937.  We do not share this
limited reading of Faitoute, which also does not comport with
either the legislative history or the scholarship on the subject.

[19]   The full text of Section 83(i) as enacted in 1946 reads:

Nothing contained in this chapter shall be construed to
limit or impair the power of any State to control, by
legislation or otherwise, any municipality or any
political subdivision of or in such State . . . Provided,
however, That no State law prescribing a method of
composition of indebtedness of such agencies shall be
binding upon any creditor who does not consent to such
composition, and no judgment shall be entered under such
State law which would bind a creditor to such composition
without his consent.

Act of July 1, 1946, Pub. L. No. 481, ch. 532, sec. 83(i), 60 Stat.
409, 415.

the section as § 903(1) in 1978.  See S. Rep. No. 95-989 at 110
(noting that this was necessary to maintain the uniformity of the
bankruptcy laws by preventing states from "'enact[ing] their own
versions of Chapter IX'" (quoting L.P. King, Municipal Insolvency:
Chapter IX, Old and New; Chapter IX Rules, 50 Am. Bankr. L.J. 55,
65 (1976))); cf. Kellogg, 135 S. Ct. at 1977 (explaining that
retention of language indicates absence of alteration).[20]

These provisions on their face barred Puerto Rico and the
Territories, just as they did the states, from enacting their own
versions of Chapter 9 creditor debt adjustment.  From the time of
its enactment in 1946, Section 83(i)'s prohibition on "State law[s]
prescribing a method of composition of indebtedness" expressly
applied to Puerto Rico law because "State" had been defined to
include the "Territories and possessions," like Puerto Rico, to
which the Bankruptcy Act was applicable.  See Act of June 22, 1938,

---

[20]  The Senate notes concerning the enactment of § 903 explain
in relevant part:

> Section 903 is derived, with stylistic changes, from
> section 83 of current Chapter IX.  It sets forth the
> primary authority of a State, through its constitution,
> laws, and other powers, over its municipalities.  The
> proviso in section 83, prohibiting State composition
> procedures for municipalities, is retained.  Deletion
> of the provision would "permit all States to enact their own
> versions of Chapter IX", Municipal Insolvency, 50 Am.
> Bankr. L.J. 55, 65, which would frustrate the
> constitutional mandate of uniform bankruptcy laws.
> Constitution of the United States.  Art. I, Sec. 8.

S. Rep. No. 95-989 at 110.

Pub. L. No. 696, ch. 575, § 1(29), 52 Stat. at 842 (defining "States"); Act of July 1, 1946, Pub. L. No. 481, ch. 532, sec. 83(i), 60 Stat. 409, 415 (prohibiting "State law[s] prescribing a method of composition of indebtedness"); Act of Mar. 2, 1917, ch. 145, § 9, 39 Stat. 951, 954 (codified as amended at 48 U.S.C. § 734) ("[T]he statutory laws of the United States not locally inapplicable, except as . . . otherwise provided, shall have the same force and effect in Porto Rico as in the United States . . . .").

The re-codification of this provision, § 903(1), must continue to apply to Puerto Rico because there is no evidence of express modification by Congress. See Dewsnup, 502 U.S. at 419-20. The mere absence of a definition of "state" in the Code from 1978 until the 1984 amendment does not provide such evidence, nor does the legislative history.[21] Cf. id. "Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move." Kellogg, 135 S. Ct. at 1977 (declining to find a significant change to a statute based on the removal of a small phrase while retaining the operative language).

---

[21] If anything, the legislative history suggests that the missing definition was a mistake, and so no alteration of § 903(1)'s or the rest of the Code's applicability to Puerto Rico was intended. See Lubben, 88 Am. Bankr. L.J. at 573 (explaining that adding a definition of "State" was among the proposed 1979 amendments "to 'clean up' errors in the original 1978 Code").

There is little doubt that § 903(1) would have pre-empted the Recovery Act, save for the questions occasioned by the 1984 amendment at issue. There is no disputing that the Recovery Act was a "State law" under Section 83(i), and so too under § 903(1) from 1978-1984. And there is no disputing that the Recovery Act binds creditors without their consent or that it is Puerto Rico's "own version[] of Chapter [9]," such that it directly conflicts with § 903(1)'s prohibition of such laws.[22] S. Rep. No. 95-989 at 110; Recovery Act, Stmt. of Motives, § E; see CSX Transp., Inc., 507 U.S. at 663 ("Where a state statute conflicts with . . . federal law, the former must give way.").

The question is whether the preemption provision of § 903(1) still applies in the face of the 1984 amendment. We hold that it does. The addition of the definition of "State" in 1984 does not, by its text or its history, change the applicability of § 903(1) to Puerto Rico.[23] 11 U.S.C. § 101(52). To the contrary,

_____

[22] For this reason, we need not address the exact scope of this preemption under either Section 83(i) or § 903(1). Cf. Dan's City, 133 S. Ct. at 1778 (noting that when "Congress has superseded state legislation by statute," the only task remaining is to "identify the domain expressly pre-empted" (quoting Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001)) (internal quotation marks omitted)).

[23] The parties agree that there is nothing in the legislative history directly indicating a change to § 903(1), only a change to § 109(c). Amici bankruptcy law experts, Clayton Gillette and David Skeel, Jr., inform us that "almost the only reference to the new definition in the legislative history came in testimony by Professor Frank Kennedy . . . who stated: 'I do not understand why the municipal corporations of Puerto Rico are denied by the

because § 903(1) does not define who may be a debtor under
Chapter 9, § 101(52) confirms that the "State law[s]" prohibited
include those of Puerto Rico, as has always been the case.
Cf. Dewsnup, 502 U.S. at 419 ("[T]his Court has been reluctant to
accept arguments that would interpret the Code . . . to effect a
major change in pre-Code practice that is not the subject of at
least some discussion in the legislative history."); Kellogg, 135
S. Ct. at 1977 ("The retention of the same term in the later laws
suggests that no fundamental alteration was intended.").   If
Congress had wanted to alter the applicability of § 903(1) to
Puerto Rico, it "easily could have written" § 101(52) to exclude
Puerto Rico laws from the prohibition of § 903(1), just as it had
excluded Puerto Rico from the definition of debtor under § 109(c).
See Burgess v. United States, 553 U.S. 124, 130 (2008).   But
Congress did not.

        The legislative history is silent as to the reason for
the exception set forth in the 1984 amendment.   One apparent
possibility concerns the different constitutional status of Puerto
Rico.   Because of this different status, the limitations on
Congress's ability to address municipal insolvency in the states

_____

proposed definition of 'State' of the right to seek relief under
Chapter 9, but the addition of the definition of 'State' is
useful.'"   Brief for C.P. Gillette & D.A. Skeel, Jr., as Amici
Curiae Supporting Defendants-Appellants, at *8; see also Lubben, 88
Am. Bankr. L.J. at 575 (noting that the exception in § 101(52) says
"nothing about how the word 'State' should be interpreted in
section 903").

discussed above are not directly applicable to Puerto Rico.  United States v. Rivera Torres, 826 F.2d 151, 154 (1st Cir. 1987); see also Harris v. Rosario, 446 U.S. 651, 651-52 (1980) (per curiam). Accordingly, Congress may wish to adopt other -- and possibly better -- options to address the insolvency of Puerto Rico municipalities that are not available to it when addressing similar problems in the states.  See Rivera Torres, 826 F.2d at 154; cf. McConnell & Picker, 60 U. Chi. L. Rev. at 494-95 (arguing that because Chapter 9 "leaves control in the hands of the state" and because "[t]he bankruptcy court lacks the powers typically given to state municipal receivers," "[t]he structure for making decisions that led to financial problems continues").

Our construction is consistent with a congressional choice to exercise such other options "pursuant to the plenary powers conferred by the Territorial Clause."  Rivera Torres, 826 F.2d at 154.  If Puerto Rico could determine the availability of Chapter 9 for Puerto Rico municipalities, that might undermine Congress's ability to do so.  Cf. Gillette, 79 U. Chi. L. Rev. at 285-86 (discussing the strategic use of municipal bankruptcy relief to avoid other solutions).  Similarly, Congress's ability to exercise such other options would also be undermined if Puerto Rico could fashion its own municipal bankruptcy relief.  Cf. id.  The

1984 amendment ensures that these options remain open to Congress

by denying Puerto Rico the power to do either.[24] Cf. id.

_____

[24]   Defendants argue that we should not construe § 903(1) to
continue to apply to Puerto Rico after the 1984 amendment because
to do so creates a "no-man's land" that Congress did not intend and
could not have created.  We disagree both as to Congress's intent
and as to whether a no-man's land is created.  Our construction
does not create one, because congressional retention of authority
is not the same as a no-man's land.  Further, defendants' argument
fails in any event.
    First, defendants' reliance on a congressional report stating
that it was "not prepared to admit that the situation presents a
legislative no-man's land" reveals nothing about Congress's intent
in enacting § 101(52).  Bekins, 304 U.S. at 51 (quoting H.R. Rep.
No. 75-517, at 3 (1937)).   Congress, in making the quoted
statement, was concerned not with a lack of laws, but a lack of
constitutional authority.  That statement, made in the wake of the
first municipal bankruptcy law's demise in Ashton, rejects the view
that creation of a federal municipal bankruptcy regime was
constitutionally impossible.  See Bekins, 304 U.S. at 51-54; cf.
Ashton, 298 U.S. at 530-32.   Accordingly, the statement is
inapposite; Congress's stated rejection of a legislative no-man's
land and assertion of authority is entirely consistent with
intending to retain that authority in deciding how to address
municipal insolvency in Puerto Rico.
    Second, any reliance on Guss v. Utah Labor Relations Board,
353 U.S. 1 (1957), is misplaced.  Far from creating a rule against
the creation of a no-man's land -- here, understood as the absence
of laws providing relief -- the Supreme Court held that where
"Congress' power in the area . . . is plenary, its judgment must be
respected whatever policy objections there may be to [the] creation
of a no-man's-land."  Id. at 11.
    The Court's reasoning in Guss is fully applicable here:
Congress, through the provisions of § 109(c)(2) and § 903,
"demonstrated that it knew how to cede jurisdiction to the states"
and "demonstrated its ability to spell out with particularity those
areas in which it desired state regulation to be operative."  Guss,
353 U.S. at 9-10 (citation and internal quotation marks omitted).
It prohibited states from enacting municipal insolvency laws that
would "bind any creditor that does not consent," but not from
devising other solutions or from controlling whether their
municipalities could access a federal alternative.   11 U.S.C.
§§ 109(c)(2), 903.   Guss therefore supports our conclusion that
"Congress has expressed its judgment" to retain its own authority
by denying to Puerto Rico both the power to choose Chapter 9 relief

C.        <u>The Defendants' Creative But Unsound And Unsuccessful</u>
          <u>Alternative Readings</u>

          Our construction follows straightforwardly from the plain

text and is confirmed by both statutory history and legislative

history.  Nonetheless, the defendants object to it on two grounds.

          First, they offer a novel argument in light of the

Bankruptcy Code's definition of "creditor" that the provision only

applies to creditors of entities who have or could have filed for

Chapter 9 relief: because Puerto Rico cannot authorize its

municipalities to become "debtors," those municipalities'

bondholders cannot be "creditors," and so the Recovery Act does not

bind "creditors" in violation of § 903(1).  That is, defendants

argue that Congress, without saying so, did indirectly what it

could have easily done directly but did not.

---

and to enact its own version thereof.  <u>Guss</u>, 353 U.S. at 10-11.
Because "Congress' power" over Puerto Rico "is plenary," the
Supreme Court dictates that Congress' "judgment [in this regard]
must be respected."  <u>Id.</u>; <u>Rivera Torres</u>, 826 F.2d at 154.
          In any event, these cases do not provide a reason to construe
the statute differently.  However remarkable a no-man's land might
be, assuming dubitante that there is one under our construction, it
would be even more remarkable to find that Congress decided to
abandon -- without comment and through a definition -- its forty-
year old prohibition on local insolvency laws that bind creditors
without their consent.  <u>See</u> <u>Cohen</u>, 523 U.S. at 221-22.  The former
can at least be reconciled with congressional purpose to retain its
authority, and, if the literature on incentives is correct, may
have been the only way for Congress to do so efficaciously.  <u>Cf.</u>
Gillette, 79 U. Chi. L. Rev. at 285-86.  Unlike defendants, we
cannot "ignore[] [this] more plausible explanation" of Congress's
decision.  <u>Kellogg</u>, 135 S. Ct. at 1977-78.

Second, they make a structural argument that § 903(1) cannot apply to Puerto Rico because Chapter 9, of which § 903(1) is a part, does not apply to Puerto Rico.

Neither attempt succeeds.  If Congress had wanted to exclude Puerto Rico from § 903(1), it would have done so directly without relying on the creativity of parties arguing before the courts.  <u>Cf.</u> <u>Kellogg</u>, 135 S. Ct. at 1977 ("If Congress had meant to make such a change, we would expect it to have used language that made this important modification clear to litigants and courts."). Instead, as discussed above, Congress did the opposite.

      1.    <u>Who May Be "Creditors" under § 903(1)</u>

Ignoring other language in the Code, the defendants' first argument begins by observing that the Bankruptcy Code defines "creditor" in relation to "debtor." 11 U.S.C. § 101(10)(A) (defining "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor").[25] But a "debtor" is defined as a "person or municipality concerning which a case under [the Bankruptcy Code] <u>has been commenced</u>." 11 U.S.C. § 101(13) (emphasis added). Because Puerto Rico cannot authorize its municipalities to commence "a case under [the Bankruptcy Code]," the argument goes, creditors of Puerto Rico municipalities are not "creditors" within the

_____

[25] Subsections (B) and (C) of § 101(10) provide additional definitions of "creditor" not relevant here.

meaning of § 101(10)(A), and so the Recovery Act does not bind "creditors" without their consent in violation of § 903(1).

This argument ignores congressional language choices, as well as context, and proves too much.[26]  Although "'[s]tatutory definitions control the meaning of statutory words . . . in the usual case,'" Burgess, 553 U.S. at 129-30 (second alteration in original) (quoting Lawson v. Suwannee Fruit & S.S. Co., 336 U.S. 198, 201 (1949)), we should not apply statutory definitions in a manner that directly undermines the legislation, Philko Aviation, Inc. v. Shacket, 462 U.S. 406, 411-12 (1983) (citing Lawson, 336 U.S. at 201).  But that is exactly what defendants ask us to do.[27]

---

[26]    The defendants are correct that their interpretation of "creditor" would not, as the Franklin plaintiffs contend, "reduce Section 903(1) to mere surplus."  As Professors Gillette and Skeel explain in their amici curiae brief, their construction of § 903(1), which limits "creditor" to the statutory definition, makes clear that even though Chapter 9 does not infringe on the power of states to manage their own municipalities,

> a State composition law could not be used to alter a creditor's claim against a municipality that has filed for Chapter 9[:] [a]ny prior or concurrent State law composition proceeding would be superseded pursuant to section 903(1) [upon filing], and any judgment previously obtained would be reopened under section 903(2).

The difficulty is that the Professors' construction cannot be squared with either the history of this provision, or the legislative intent in enacting it, of barring states from enacting their own municipal bankruptcy laws.  To the contrary, it would undermine the applicability of this provision to states.

[27]    Defendants attempt to escape this conclusion by arguing, in the alternative, that "debtor" is a person against whom a claim "has been [or could be] commenced," and so "creditors" are those who have a claim against an entity eligible for Chapter 9 relief.

-35-

Construing "creditor" in § 903(1) so narrowly would undermine the stated purpose of the provision in prohibiting states from "enact[ing] their own versions of Chapter [9]." <u>See</u> S. Rep. No. 95-989, at 110; H.R. Rep. No. 79-2246, at 4. Under defendants' construction, any state could avoid the prohibition by denying its municipalities authorization to file under § 109(c)(2). State laws governing the adjustment of these municipalities' debts could not then, on defendants' reading, "bind any creditor" because there would be none: no case would "ha[ve] been commenced" concerning the municipalities because no case could commence under § 109(c)(2).

Nor does a reference to the changes in 1978 or 1984 make this argument any more plausible. The 1978 version similarly defined "debtor" as a "person or municipality concerning which a case under this title <u>has been commenced</u>," and "creditor" in relation to a "debtor" against whom the creditor had a claim "that arose at the time of or before the order for relief." Bankruptcy Reform Act of 1978, §§ 101(9), 101(12), 92 Stat. at 2550-51 (codified at 11 U.S.C. §§ 101(9), 101(12) (1977-1980)) (emphasis added). Defendant's reading undermines the express purpose, stated in 1978, of enacting § 903(1): to "prohibit[] State composition procedures for municipalities." S. Rep. No. 95-989, at 110. If we follow defendants' suggestion, then either Congress was directly

---

There is no textual basis to do so. It is simply another gesture at their structural argument, which we address next.

self-defeating in enacting this legislation in 1978, or else in 1984 made a stark and drastic change -- without comment and in "an obscure way" -- to the law as previously enacted. Cf. Dewsnup, 502 U.S. at 419; Kellogg, 135 S. Ct. at 1977.  But "[a] statutory definition should not be applied in such a manner."  Philko Aviation, 462 U.S. at 412; see also Dewsnup, 502 U.S. at 419-20.

Where statutory definitions give rise to such problems, a term may be given its ordinary meaning.[28]  Philko Aviation, 462

---

[28]  The Code is replete with use of the term "creditor" in ways not limited by the statutory definition on which defendants rely. For example, § 502(a) uses creditor in a manner that is expressly inconsistent with the statutory definition because "a creditor of a general partner in a partnership that is a debtor" is not, itself, a holder of a "claim against the debtor" and so not a "creditor" under § 101(10)(A).  See 11 U.S.C. § 502(a) ("A claim of interest . . . is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under Chapter 7 . . . objects." (emphasis added)).

Similarly, § 101(12A)(C) also uses "creditor" in a manner that is expressly inconsistent with § 101(10)(A). That provision, which defines "debt relief agency" to be "any person who provides any bankruptcy assistance to an assisted person . . . ," excludes "a creditor of such an assisted person."  11 U.S.C. § 101(12A)(C). But because an "assisted person" might never file for bankruptcy (presumably one of the goals of the agency), an "assisted person" might never become a debtor.  "Creditor" here must have its plain meaning.

Following defendants' proffered strict construction would also create mischief for other portions of § 109 itself.  For example, an entity may only be a Chapter 9 debtor if it has, inter alia, "obtained the agreement of [certain] creditors," "negotiated in good faith with creditors," or been "unable to negotiate with creditors," or else "reasonably believes that a creditor may attempt to obtain a[n] [avoidable] transfer."  11 U.S.C. § 109(c)(5).  These requirements refer to the debtor's interactions with its "creditors" before filing.  But if we mechanically apply the definitions in the manner suggested, we obtain an absurd result: there would have been no creditors with whom to negotiate

U.S. at 411-12.  Doing so resolves the problem: a "creditor" is simply "[o]ne to whom a debt is owed."[29]  Black's Law Dictionary 424 (9th ed. 2009).  With this usage, states cannot escape the reach of § 903(1), in all or specific cases, merely by denying authorization.  And so Congress's stated purpose, of preventing "States [from] enact[ing] their own versions of Chapter IX," is fulfilled.  S. Rep. No. 95-989, at 110.

---

because "creditors" only exist once a suit "has been commenced," and so all potential debtors would automatically satisfy § 109(c)(5) under the "unable to negotiate with creditors" prong.
    The GDB defendants' argument that the district court erred by ignoring the "order for relief" language in the definition of creditor fails for similar reasons.  11 U.S.C. § 101(10)(A) (defining "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor" (emphasis added)).  GDB argues that PREPA's creditors do not have claims that arose at or before "the order for relief" because PREPA is ineligible to receive an "order for relief."  But there may never be an "order for relief" if a municipality fails to obtain agreement from, negotiate in good faith with, or show it is unable to negotiate with "creditors."  11 U.S.C. §§ 109(c)(5)(A)-(D).  Indeed, other provisions of the Bankruptcy Code that use the term "creditor" expressly contemplate that there are "creditors" though there may never be an "order for relief."  See, e.g., 11 U.S.C. § 303(c) ("After the filing of a petition . . . but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim . . . may join in the petition . . . ." (emphasis added)).

[29]  This definition of "creditor" is essentially the same as the prevailing definition when the prohibition was first enacted and when it was re-codified.  See, e.g., Webster's New International Dictionary of the English Language 621 (2d ed. 1941) (defining "creditor" as "one to whom money is due"); Black's Law Dictionary 476 (3d ed. 1933) (defining "creditor" as "[a] person to whom a debt is owing by another person"); Webster's Third New International Dictionary of the English Language 533 (3d ed. 1976) (defining "creditor" as "one to whom money is due"); Black's Law Dictionary 441 (rev. 4th ed. 1968) (essentially same as 1933 definition).

As a final effort, the defendants resort to the presumption against preemption. <u>See</u> <u>Antilles Cement Corp.</u> v. <u>Fortuño</u>, 670 F.3d 310, 323 (1st Cir. 2012). But "[p]reemption is not a matter of semantics." <u>Wos</u> v. <u>E.M.A. ex rel. Johnson</u>, 133 S. Ct. 1391, 1398 (2013). Puerto Rico "may not evade the preemptive force of federal law by resorting to a creative statutory interpretation or description at odds with the statute's intended operation and effect." <u>Id.</u> This is particularly true where, as here, the presumption is weak, if present at all. <u>See</u> <u>United States</u> v. <u>Locke</u>, 529 U.S. 89, 108 (2000) (citing <u>Jones</u> v. <u>Rath Packing Co.</u>, 430 U.S. 519, 525 (1977)) (holding that the presumption is weaker, if triggered at all, where there is not a tradition of state legislation); <u>Ry. Labor Execs.' Ass'n</u> v. <u>Gibbons</u>, 455 U.S. 457, 472-73 & n.14 (1982) (noting the nearly exclusive federal presence in the bankruptcy field because of Contracts Clause); <u>see also</u> McConnell & Picker, 60 U. Chi. L. Rev. at 427-28 (noting that for much of the nation's history it was thought that states were precluded from enacting municipal bankruptcy legislation). In any event, Congress was quite clear in the Bankruptcy Code that Puerto Rico was to be treated like a state, <u>except</u> for the power to authorize its municipalities to file under Chapter 9. 11 U.S.C. § 101(52). This is sufficient to overcome the presumption to the extent it applies. <u>See</u> <u>Locke</u>, 529 U.S. at 108 ("The question in each case is what the purpose of

-39-

Congress was." (quoting <u>Rice</u> v. <u>Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)) (internal quotation marks omitted)).

    2.    <u>"State law" under § 903(1)</u>

    Defendants' second argument is that Puerto Rico laws, like the Recovery Act, are not really "State law[s]" for purposes of § 903(1).[30]   The argument begins with the observation that § 903(1) appears within the larger provision of § 903, and so is an exception to it.

    The terms of § 903 clarify that the remedies of "[t]his chapter" (<u>i.e.</u>, Chapter 9) do not alter the ordinary powers that states have over their municipalities.  This provision, together with § 904, "carr[ies] forward doctrines of federal common law that had governed municipal insolvency before the first federal act, as well as the constitutional principle against federal interference in state and local governance."  McConnell & Picker, 60 U. Chi. L. Rev. at 462-63 (footnote omitted).  "The effect is to preserve the power of political authorities to set their own domestic spending priorities, without restraint from the bankruptcy court."  <u>Id.</u>; <u>cf.</u>

───────────────

    [30]    The argument that we should read "State" in § 903(1) differently from its statutory definition, as we do "creditor," is a nonstarter: unlike with "creditor," reading the definition mechanically into the provision does not create strange results or ones that are inconsistent with the historic purpose of § 903(1). To the contrary, it confirms that Congress did not intend to alter the historic applicability of § 903(1) to Puerto Rico.  <u>Cf.</u> <u>Cohen</u>, 523 U.S. at 221; <u>see also</u> <u>Kellogg</u>, 135 S. Ct. at 1977 (noting that "[t]he retention of the same term in later laws suggests that no fundamental alteration was intended").

<u>City of East St. Louis</u> v. <u>United States</u>, 110 U.S. 321, 324 (1884) (holding that "[n]o court has the right to control [the] discretion [of municipal authorities]" as to "what expenditures are proper and necessary for the municipal administration").

Relying on the context of § 903, the defendants argue that § 903(1), rather than <u>itself</u> preempting state municipal bankruptcy laws (or similar), clarifies that the power to enact municipal bankruptcy laws is not one of the powers preserved once Chapter 9 is, or can be, invoked.  Because Puerto Rico is <u>already</u> excluded from Chapter 9, the argument goes, § 903 -- including § 903(1) -- does not apply because there is no need to stipulate that the remedies of Chapter 9 do not undermine Puerto Rico's control over its own municipalities.

The defendants further argue that the presumption against preemption bolsters this reasoning and provides a reason to adopt this argument.  <u>See</u> <u>Antilles Cement</u>, 670 F.3d at 323.  Indeed, they argue that the presumption applies to this case with particular force because "Title 11 suspends the operation of state insolvency laws except as to those classes of persons specifically excluded from being debtors under the Code."  <u>In re Cash Currency Exch., Inc.</u>, 762 F.2d 542, 552 (7th Cir. 1985) (holding that currency exchanges were not excluded from being debtors under the Code, such that their filing under Chapter 11 was permitted, and rejecting the argument that a state insolvency law might preclude such exchanges

-41-

from filing). "[T]o permit the blocking of [a] state reorganization herein," defendants argue, "would be tantamount to imposing a federal reorganization which is clearly forbidden by the Act's exemption" of Puerto Rico municipalities, and is "inconsistent with the congressional scheme of the Bankruptcy Act" which sought to provide to states a mechanism that was unavailable under the Contracts Clause. <u>In re Bankers Trust Co.</u>, 566 F.2d 1281, 1288 (5th Cir. 1978) (discussing the Bankruptcy Act's "exemption of savings and loan associations"); <u>see generally</u> McConnell & Picker, 60 U. Chi. L. Rev. 425 (explaining how the federal law attempts to provide states with a mechanism to solve the holdout problem of municipal bankruptcy).

To accept the defendants' reading, we must accept one of the two following propositions: Either states that do not authorize their municipalities to file for Chapter 9 relief are similarly "exempted," and so not barred by § 903(1) from enacting their own bankruptcy laws. Or the availability of Chapter 9 relief for state municipalities, regardless of whether a particular state chooses to exercise the option, occupies the field of nonconsensual municipal debt restructuring, and § 903(1) merely aims to clarify that the operative clause of § 903 does not undermine that background assumption. Thus, ironically, it is the defendants' argument which relies on the notion of field preemption.

We have already rejected the first proposition, for the reasons stated above.  The second is undermined by the very presumption against preemption that defendants seek to employ: field preemption is generally disfavored absent clear intent, and is, in any event, unnecessary in light of § 903(1).  See Arizona v. United States, 132 S. Ct. 2492, 2501 (2012); Mass. Ass'n of Health Maint. Orgs. v. Ruthardt, 194 F.3d 176, 178-79 & n.1 (1st Cir. 1999); cf. C. Nelson, Preemption, 86 Va. L. Rev. 225, 227-28 & n.12 (2000) ("The Court has grown increasingly hesitant to read implicit field-preemption clauses into federal statutes.").

Defendants' second argument fails for another, related reason.  For if field preemption of municipal bankruptcy exists by virtue of the availability of Chapter 9, the defendants must show that it does not apply to Puerto Rico.  This they cannot do.

Unlike state bankruptcy laws governing banks and insurance companies, which are not preempted by the federal Code in light of congressional language which directly and expressly excludes them from the Code, 11 U.S.C. § 109(b); see In re Cash Currency, 762 F.2d at 552, the exclusion of Puerto Rico municipalities is not direct and is of a different sort.  Rather, Puerto Rico is precluded from granting its municipalities the required authorization, and so its municipalities fail to qualify for the municipal bankruptcy protection that is available. 11 U.S.C. §§ 101(52), 109(c)(2).  But failure to qualify is not the

same as direct and express exclusion.  On defendants' reasoning, states could offer bankruptcy relief to municipalities that fail to qualify for municipal bankruptcy protection for other reasons -- including, for example, municipalities that are not "insolvent" as required by § 109(c)(3), or that refuse to "negotiate[] in good faith" with creditors as required by § 109(c)(5).  To exclude such municipalities from the preemptive scope of § 903(1) would be an absurd result.  The terms of § 101(52) do not <u>exclude</u> Puerto Rico municipalities from federal relief; rather, they <u>deny</u> to Puerto Rico the authority to decide when they might access it.  On this reading, absent further congressional action, § 903(1) still applies.

### 3.    Conflict Preemption

Before moving on, we pause to note that defendants' arguments fail in any event, for they assume that a law containing the provisions of the Recovery Act, so long as it is passed by either Puerto Rico or the District of Columbia, is not otherwise preempted.  But even where an express preemption provision does not apply, federal law preempts state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  <u>See</u> <u>Pac. Gas & Elec. Co.</u> v. <u>State Energy Res. Conservation & Dev. Comm'n</u>, 461 U.S. 190, 204 (1983) (quoting <u>Hines</u> v. <u>Davidowitz</u>, 312 U.S. 52, 67 (1941)) (internal quotation marks omitted).  Where this occurs, conflict preemption also

-44-

applies.   See In re Celexa & Lexapro Mktg. & Sales Practices Litig., 779 F.3d 34, 40 (1st Cir. 2015) (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

  Conflict preemption applies here because the Recovery Act frustrates Congress's undeniable purpose in enacting § 903(1).  As discussed above, all of the relevant authority shows that Congress quite plainly wanted a single federal law to be the sole source of authority if municipal bondholders were to have their rights altered without their consent.   See, e.g., H.R. Rep. No. 79-2246, at 4 ("Only under a Federal law should a creditor be forced to accept such an adjustment without his consent.").  But the Recovery Act does just that: both Chapter 2 and Chapter 3 relief, the only forms of relief under the Recovery Act, bind creditors without their consent.[31]   Thus, there is an independent basis to affirm, namely that the Recovery Act is also preempted under conflict preemption principles.

  That conflict preemption applies confirms our conclusion that Congress did not remove Puerto Rico and the District of Columbia from the express reach of § 903 or § 903(1).   See Pac.

---

  [31]   For this reason, we also reject the GDB defendants' contention that at least part of the Act is severable from any portion of the law so preempted.  The GDB defendants point to two different areas of the Recovery Act, §§ 307-09, and § 135.  On their face, these provisions are dependent on the sustainability of the remainder of the law, and so cannot survive independently of the Act.  Nor, we note, have we found any other section which might stand alone.

Gas, 461 U.S. at 204.  Defendants would have us hold that Congress somehow inadvertently introduced a provision into the Code that would fly in the face of its long-professed intent to ensure that all municipalities seeking reorganization must do so under federal law.  See, e.g., H.R. Rep. No. 79-2246, at 4; S. Rep. 95-989, at 110.  But we should not accept defendants' invitation to impute mistakes to Congress to reach defendants' desired result.  Cf. Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 114 (1st Cir. 1988) ("Our task in construing the statutory language is 'to interpret the words of the[] statute[] in light of the purposes Congress sought to serve.'" (alterations in original) (quoting Chapman v. Hous. Welfare Rights Org., 441 U.S. 600, 608 (1979))); Philko Aviation, 462 U.S. at 411 ("Any other construction would defeat the primary congressional purpose for the [provision's] enactment . . . ."); Demko v. United States, 216 F.3d 1049, 1053 (Fed. Cir. 2000) ("When a statute is as clear as a glass slipper and fits without strain, courts should not approve an interpretation that requires a shoehorn.").

D.      Tenth Amendment Concerns

        Finally, defendants argue that the canon of constitutional avoidance weighs against our view of congressional intent as to preemption.  They argue that if § 903(1) bars the Recovery Act because it expressly preempts local municipal bankruptcy law, then it directly raises a constitutional question

-46-

under the Tenth Amendment of whether § 903(1) (and (2)) "constitute[s] an impermissible interference with a state's control over its municipalities."  6 <u>Collier on Bankruptcy</u> ¶ 903.03[2] (A.N. Resnick & H.J. Sommer, eds., 16th ed. 2015).  The concern is that:

> If a state composition procedure does not run afoul of the [C]ontracts [C]lause, then municipal financial adjustment under a state procedure should be a permissible exercise of state power, and a congressional enactment prohibiting that exercise would be congressional overreaching in violation of the Tenth Amendment.

<u>Id.</u>; <u>cf.</u> <u>City of Pontiac Retired Emps. Ass'n</u> v. <u>Schimmel</u>, 751 F.3d 427, 430-31 (6th Cir. 2014) (en banc) (per curiam) (declining to reach the issue on appeal).

Our construction leaves this question open and we need not resolve it in this case.[32] The limits of the Tenth Amendment do not apply to Puerto Rico, which is "<u>constitutionally</u> a territory," <u>United States</u> v. <u>Lopez Andino</u>, 831 F.2d 1164, 1172 (1st Cir. 1987) (Torruella, J., concurring), because Puerto Rico's powers are not "[those] reserved to the States" but those specifically granted to it by Congress under its constitution.  <u>See</u>

---

[32] For example, there may be a saving construction of § 903(1) that narrows its preemptive scope, an issue we did not reach because we were not called upon to define the limits of § 903(1)'s preemptive effect.  <u>Cf.</u> <u>City of Pontiac</u>, 751 F.3d at 430-31.  Or it may be the case that the Bankruptcy Clause permits this imposition on state sovereignty and that <u>Ashton</u> is no longer good law. <u>Cf.</u> McConnell & Picker, 60 U. Chi. L. Rev. at 451-52 (citing <u>Ashton</u>, 298 U.S. at 530-31); Lubben, 88 Am. Bankr. L.J. at 566.

U.S. Const. art. IV, § 3, cl. 2; <u>id.</u>, amend. X; <u>Davila-Perez</u> v. <u>Lockheed Martin Corp.</u>, 202 F.3d 464, 468 (1st Cir. 2000) (citing <u>Harris</u>, 446 U.S. 651).   Accordingly, that § 903(1) expressly preempts a Puerto Rico law does not implicate these Tenth Amendment concerns.

IV.

We observe, in closing, that municipal bankruptcy regimes run a particularly difficult gauntlet between remedying the "holdout problem" among creditors that bankruptcy is designed to resolve, and avoiding the "moral hazard" problem presented by the availability of bankruptcy relief -- namely, "the tendency of debtors to prefer to devote their resources to their own interests instead of repaying their debts." <u>See</u> McConnell & Picker, 60 U. Chi. L. Rev. at 426.

In creating federal Chapter 9 relief for states, Congress's ability to effectively run this gauntlet was constrained by our federalist structure and the limitations posed by the Tenth Amendment. <u>See</u> <u>id.</u> at 428, 494.   But Congress is not so constrained in addressing Puerto Rican municipal insolvency owing to Puerto Rico's different constitutional status. <u>Cf.</u> <u>id.</u>; <u>Harris</u>, 446 U.S. at 651-52.  That is, other solutions may be available.

In denying Puerto Rico the power to choose federal Chapter 9 relief, Congress has retained for itself the authority to decide which solution best navigates the gauntlet in Puerto Rico's

case.  The 1984 amendment ensures Congress's ability to do so by preventing Puerto Rico from strategically employing federal Chapter 9 relief under § 109(c), and from strategically enacting its own version under § 903(1), to avoid such options as Congress may choose.  <u>See</u> Gillette, 79 U. Chi. L. Rev. at 285-86.  We must respect Congress's decision to retain this authority.

We <u>affirm</u>.  No costs are awarded.

**- Concurring Opinion Follows -**

TORRUELLA, <u>Circuit Judge</u> (Concurring in the judgment).

Since at least 1938, the definition of the term "States" in § 1(29) of the Bankruptcy Act included the Territories and possessions of the United States, making Puerto Rico's municipalities eligible for federal bankruptcy protection.[33]  All parties to this case agree that this is so.  As provided in § 109(c)(2) of the Bankruptcy Reform Act of 1978, a municipality could be an eligible debtor under Chapter 9 if it was "generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to [so] authorize."[34]  This situation remained unchanged until 1984[35] when Congress enacted § 421(j)(6) of the Bankruptcy Amendments and Federal Judgeship Act of 1984[36] (the "1984 Amendments"), which -- for the first time -- eliminated Puerto Rico's decades-long power to seek federal bankruptcy protection for its municipalities by amending § 101(52) to exclude Puerto Rico's ability under § 109(c)(2) to authorize a "debtor" for purposes of Chapter 9.

---

[33]  <u>See</u> Act of June 22, 1938, Pub. L. No. 75-696, ch. 575, § 1(29), 52 Stat. 840, 842.

[34]  Pub. L. No. 95-598, § 109(c)(2), 92 Stat. 2549, 2557.  The current text requires "specific" authorization by State law rather than "general" authorization.  11 U.S.C. § 109(c)(2).

[35]  The majority accurately recounts the legislative path of the predecessors to the bankruptcy section presently in controversy.  <u>See</u> Maj. Op. at 13-16.

[36]  Pub. L. No. 98-353, sec. 421(j)(6), § 101 (44), 98 Stat. 333, 368-69 (codified as amended at 11 U.S.C. § 101(52)).

Because there is no dispute that under the pre-1984 federal bankruptcy laws, Puerto Rico had -- as did all the states -- the power to authorize its municipalities to file for the protection of Chapter 9, I agree with the majority's conclusion that the 1984 Amendments are the "key to this case."

Although I also agree that Puerto Rico's Recovery Act contravenes § 903(1) -- which applies uniformly to Puerto Rico, together with the rest of Chapter 9 -- and thus is invalid, I am compelled to write separately in order to note that the 1984 Amendments are equally invalid. Not only do they attempt to establish bankruptcy legislation that is not uniform with regards to the rest of the United States, thus violating the uniformity requirement of the Bankruptcy Clause of the Constitution,[37] but they also contravene both the Supreme Court's and this circuit's jurisprudence in that there exists no rational basis or clear policy reasons for their enactment. See Harris v. Rosario, 446 U.S. 651, 651-52 (1980) ("Congress, which is empowered under the Territory Clause of the Constitution . . . to 'make all needful Rules and Regulations respecting the Territory . . . belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its actions." (emphasis added)) (per curiam); Califano v. Torres, 435 U.S. 1, 5 (1978) (per curiam); Córdova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan

---

[37]    U.S. Const. art. I, § 8, cl. 4.

Bank N.A., 649 F.2d 36, 41-42 (1st Cir. 1981) ("We believe that there would have to be specific evidence or clear policy reasons embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." (emphasis added)).

Furthermore, to assume that the 1984 Amendments are a valid exercise of Congress's powers to manage the local financial affairs of Puerto Rico's municipalities is inconsistent with this court's long-lasting Commonwealth-endorsing case law.  Finally, I also take issue with the majority's proposal that Puerto Rico simply ask Congress for relief; such a suggestion is preposterous given Puerto Rico's exclusion from the federal political process.

## I.   Congress's Uniform Power under the Bankruptcy Clause

In enacting the 1984 Amendments, Congress acted pursuant to the power enumerated in the Bankruptcy Clause, which states that "Congress shall have the power . . . [t]o establish . . . uniform laws on the subject of bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.  The term "uniform" is unequivocal and unambiguous language, which is defined as "always the same, as in character or degree; unvarying,"[38] and as "[c]haracterized by a

---

[38]   The American Heritage Dictionary of the English Language 1881 (4th ed. 2000).

lack of variation; identical or consistent."[39]  Prohibiting Puerto
Rico from authorizing its municipalities to request Chapter 9
relief, while allowing all the states to benefit from such power,
is hardly in keeping with these definitions.[40]  It would be absurd
to argue that the exclusion of Puerto Rico from the protection of
the Bankruptcy Code by the enactment of the 1984 Amendments is not
prohibited by the unequivocal language of the Bankruptcy Clause of
the Constitution.  This should end the analysis of Congress's
powers under the Constitution, as "reliance on legislative history
is unnecessary in light of the statute's unambiguous language."
Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1709 (2012) (quoting
Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229,
236 n.3 (2010)); see also Circuit City Stores, Inc. v. Adams, 532
U.S. 105, 119 (2001) ("[W]e do not resort to legislative history to
cloud a statutory text that is clear." (alteration in original)
(quoting Ratzlaf v. United States, 510 U.S. 135, 147–148 (1994))).

---

[39]  Black's Law Dictionary, 1761 (10th ed. 2014).

[40]  Any effort to understand rather than rewrite the Bankruptcy
Clause must accept and apply the presumption that the lawmakers
used words in "their natural and ordinary signification."
Pensacola Tel. Co. v. W. Union Tel. Co., 96 U.S. 1, 12 (1878).
Furthermore, it has long been established as a fundamental rule of
statutory construction that lawmakers do not use terms in
enactments that "have no operation at all."  Marbury v. Madison, 1
Cranch 137, 174 (1803) ("[O]ur task is to apply the text, not to
improve upon it."); see also Pavelic & LeFlore v. Marvel Entm't
Grp. Div. of Cadence Indus. Corp., 493 U.S. 120, 126 (1989).

Even if we did turn to legislative history, there is little in the Federalist Papers, or elsewhere in our canonical sources, to aid us in finding any hidden meaning to the clear language of the Bankruptcy Clause.[41]  This gives added weight to the conclusion that the language in the Clause means what it unequivocally states: bankruptcy laws must be <u>uniform</u> throughout the United States or else are invalid.  <u>See</u> Daniel A. Austin, <u>Bankruptcy and the Myth of "Uniform Laws"</u>, 42 Seton Hall L. Rev. 1081, 1141-47 (2012); Judith Schenck Koffler, <u>The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity</u>, 58 N.Y.U. L. Rev. 22, 99 (1983).

---

[41]  <u>See</u> The Federalist No. 42, at 237 (James Madison) (Robert A. Ferguson, ed., 2006) ("The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent many frauds where the parties or property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.").  No further comment is found before the Bankruptcy Clause was incorporated into the Constitution as it presently appears.  It also bears noting that the Congressional powers to regulate commerce uniformly under the Commerce Clause -- which contains language identical to the Bankruptcy Clause -- apply in full force to Puerto Rico.  <u>See</u> <u>Trailer Marine Transp. Corp.</u> v. <u>Rivera Vázquez</u>, 977 F.2d 1, 8 (1st Cir. 1992) ("The central rationale of [the] dormant Commerce Clause doctrine . . . is . . . to foster economic integration and prevent local interference with the flow of the nation's commerce.  This rationale applies with equal force to official actions of Puerto Rico.  Full economic integration is as important to Puerto Rico as to any state in the Union." (citation omitted)).

Although Congress's powers under the Bankruptcy Clause are broad,[42] they are nonetheless limited by the Clause's uniformity requirement, which is geographical in nature.  <u>Ry. Labor Execs, Ass'n</u> v. <u>Gibbons</u>, 455 U.S. 457, 471 (1982) ("A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over the debtor." (citing <u>In Re Sink</u>, 27 F.2d 361, 363 (W.D. Va. 1928), <u>appeal dismissed per stipulation</u>, 30 F.2d 1019 (4th Cir. 1929))).  "The uniformity requirement . . . prohibits Congress from enacting a bankruptcy law that . . . applies only to one regional debtor.  To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors."  <u>Id.</u> at 473; <u>cf.</u> <u>Blanchette</u> v. <u>Conn. Gen. Ins. Corps.</u>, 419 U.S. 102, 159 (1974).

## II.   <u>The 1984 Amendments Fail the Rational Basis Requirement</u>

The non-uniform treatment of Puerto Rico under the bankruptcy laws not only violates the Bankruptcy Clause, but also fails the rational basis requirement.  As explained above, <u>Harris</u>, 446 U.S. at 651-52, and <u>Califano</u>, 435 U.S. at 5, held that Congress may legislate differently for Puerto Rico, as long as it has a rational basis for such disparate treatment.  These were equal protection and substantive due process cases brought by U.S.

---

[42]   <u>See</u> <u>Cont'l Ill. Nat'l Bank</u> v. <u>Chicago, R.I. & Pac. Ry. Co.</u>, 294 U.S. 648, 668 (1935).

citizens of Puerto Rico who challenged Congress's discriminatory treatment in certain welfare programs.  The plaintiffs in these cases claimed to have been discriminated against based on their classification as Puerto Ricans, an insular minority purportedly subject to heightened scrutiny.  However, the Supreme Court rejected their argument, holding that, pursuant to Congress's powers under the Territorial Clause, only rational basis review is warranted when considering the validity of a statute that treats Puerto Rico differently.  Harris, 446 U.S. at 651-52; Califano, 435 U.S. at 5.[43]

It is black letter law that this tier of scrutiny "is a paradigm of judicial restraint," FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993), and courts should not question "[r]emedial choices made by . . . legislative . . . bod[ies] [unless] 'there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals.'" Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005) (quoting Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 54 (1st Cir. 2005)).

---

[43]   The same rational basis requirement that regulates disparate treatment of Puerto Ricans applies to the Commonwealth itself.  See Jusino-Mercado v. Puerto Rico, 214 F.3d 34, 44 (1st Cir. 2000) (citing Harris, 446 U.S. at 651-52) (recognizing that Congress could have legislated differently for the Commonwealth).

This implies that Congress's justification for its legislative actions need not be expressly articulated, and thus the action of removing Puerto Rico's power to authorize its municipalities to file under Chapter 9 must be allowed if there is any set of conceivable reasons rationally related to a legitimate interest of Congress. See Beach Commc'ns, 508 U.S. at 313 ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenges if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). Furthermore, in order to pass rational basis review, legislation cannot be arbitrary or irrational. See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). Here, there is no conceivable set of facts rationally related to a legitimate purpose of Congress in these amendments, and thus these amendments are invalid.

This legislation unreasonably and arbitrarily removed a power delegated to Puerto Rico by the previous legislation. Had there been any justification for not granting Puerto Rico the managerial power to authorize its municipalities to seek bankruptcy protection before 1984, Congress certainly did not express or even

imply it at any time up to and including the present.  How could such a justification arbitrarily materialize without explanation?

### A.  The 1984 Amendments Lack any Record or Justification

As previously stated, there is no legislative record on which to rely for determining Congress's reasons behind the 1984 Amendments.  A tracing of its travels through the halls of Congress sheds less light than a piece of coal on a moonless night regarding the reason for its enactment.  Thus, the majority's statement that "Congress [sought to] preserve to itself th[e] power to authorize Puerto Rican municipalities to seek Chapter 9 relief,"[44] is pure fiction.  There is absolutely nothing in the record of the 1984 Amendments to justify this statement or Congress's legitimate purpose in adopting them.

The Puerto Rico exception actually predates the 1984 Act. It appeared out of thin air during the 96th Congress in 1980 in a House Report, accompanying S. 658.  See H.R. Rep. No. 96-1195, at 38 (1980).  That proposal was a failed bill similar in substance to Pub. L. No. 98-353, which later became the Bankruptcy Amendments and Federal Judgeship Act of 1984, 98 Stat. 333.  See 98 Stat. 368-69 (containing the Puerto Rico language under "Subtitle H - Miscellaneous Amendments to Title 11").  When S. 658 arrived in the House from the Senate, on September 11, 1979, it did not contain the Puerto Rico-excluding language.  The Puerto Rico provision was,

---

[44]   Maj. Op. at 5.

however, included in the version that emerged from the House Committee on the Judiciary on July 25, 1980. There is no legislative history on the Puerto Rico clause, as hearings from the House Committee on the Judiciary from 1979-1980 reveal nothing about the amendment's purpose or justification.

The story was not very different with regard to the 1984 Amendments. On March 21, 1984, the House passed H.R. 5174 without the Chapter 9 debtor eligibility exclusion for Puerto Rico. On that same day, Senator Strom Thurmond (R-SC) introduced S. Amdt. 3083. Subtitle I, section 421(j)(6) of the amendment proposed altering Section 101 of Title 11 to provide that "(44) 'State' includes the District of Columbia and Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title." 130 Cong. Rec. S6118 (daily ed. May 21, 1984) (statements of Sen. Thurmond). And that is how we got the current text of 11 U.S.C. § 101(52). On the day that he introduced the amendment, Senator Thurmond addressed the Senate to explain several of its numerous stipulations, yet said little about the newly added Puerto Rico exemption. He noted, "Subtitles C through I contain the remaining substantive provisions passed by the Senate in S. 1013. These provisions were not in the House bill. They do, however, have broad support in the Senate and were therefor included in the substitute amendment." 130 Cong. Rec. S6083 (daily ed. May 21, 1984) (statement of Sen. Thurmond).

The original S. 1013 also did not contain the Puerto Rico exclusion when it was reported in the Senate on April 7, 1983. Senators Dole, Thurmond, and Hefflin introduced Amendment 1208 on April 27, 1983, which contained the Puerto Rico Chapter 9 debtor eligibility exclusion.  129 Cong. Rec. S5441 (daily ed. Apr. 27, 1983).   The Senators gave no explanation for the Puerto Rico exclusion in S. 1013.   Thurmond described Subtitle I of Amendment 3083 as "Technical Amendments to Title 11," which is consistent with the rest of the statute and gave no further reasons for its inclusion.   130 Cong. Rec. S6083 (daily ed. May 21, 1984) (Statement of Sen. Strom Thurmond).  The Senate Amendments to H.R. 5174, including 3083, passed on June 20, 1984.   The Congressional Record from the House on that day announced that "the Senate insists upon its amendments" and therefore it would have to conference with the House which was not in agreement with them. 130 Cong. Rec. H6085 (daily ed. June 20, 1984).

The House adopted the Conference Report, including the Puerto Rico exclusion, without specific mention or comment on June 28, 1984, with a vote of 394 yeas, 0 nays, and 39 abstentions.  The Senate also voted for the Conference Report, thereby making H.R. 5174 into Public Law No. 98-353.   Congress never articulated a reason for the Puerto Rico-excluding language.

To ignore this silence is striking given that the central task for courts when interpreting changes to the bankruptcy

statutes is to carefully examine Congress's statutory text and justifications. See Cohen v. de la Cruz, 523 U.S. 213, 221 (1998) ("We . . . 'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" (citation omitted)); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 380 (1980) ("Such a major change in the existing rules would not likely have been made without specific provision in the text of the statute; it is most improbable that it would have been made without even any mention in the legislative history." (citation omitted)); cf. Kellogg Brown & Root Servs. Inc. v. United States ex rel. Carter, 135 S. Ct. 1970, 1977 (2015) ("Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move.").

Tellingly, the parties do not dispute this absolute lack of Congressional justification for the Puerto Rico language in the 1984 Amendments. See also Frank R. Kennedy, The Commencement of a Case under the New Bankruptcy Code, 36 Wash. & Lee L. Rev. 977, 991 n.75 (1979) ("While there may be special reasons why Washington, D.C., should not be eligible for relief under Chapter 9, it is not self-evident why all political subdivisions, public agencies, and instrumentalities in Puerto Rico, Guam, and other territories and possessions of the United States should be precluded from relief under the chapter.").

-61-

And yet, there is one undisputed fact that is self-evident in all this: no one proposed a need for the 1984 change, or protested the efficacy of the Code as it existed without this amendment.  There is hermetic silence regarding all of the issues or questions that would normally arise and be discussed when a provision that was on the Bankruptcy Code for close to half a century, and whose elimination would affect millions of U.S. citizens, is deleted.

**B.  Congress's Power over Puerto Rico's Internal Affairs**

The 1984 Amendments deprived Puerto Rico of a fundamental and inherently managerial function over its municipalities that has no connection to any articulated or discernible Congressional interest.  See Bennet v. City of Holyoke, 362 F.3d 1, 12 (1st Cir. 2004) (explaining that "municipalities are creatures of the state" subject to control of the state's legislature).  All the states and territories -- including Puerto Rico before 1984 -- had the power to control, manage, and regulate the local financial affairs of their municipalities.  See Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 513-15 (1942); Armstrong v. Goyco, 29 F.2d 900, 902 (1st Cir. 1928) ("In the matter of local regulations and the exercise of police power Porto Rico possesses all the sovereign powers of a state, and any exercise of this power which is reasonable and is exercised for the health, safety, morals, or welfare of the public is not in contravention of the Organic Act

nor of any provision of the Federal Constitution."). As the Court

explained in Faitoute Iron & Steel Co.,

> Can it be that a power that . . . was
> carefully circumscribed to reserve full
> freedom to the states, has now been completely
> absorbed by the federal government -- that a
> state which . . . has . . . elaborate[d]
> machinery for the autonomous regulation of
> problems as peculiarly local as the fiscal
> management of its own household, is powerless
> in this field? We think not.

316 U.S. at 508-09; see also New York v. United States, 505 U.S.

144, 156-57 (1992) (explaining that the structure of the

Constitution protects the rights of the states to control their

internal affairs). Puerto Rico has the same level of authority

over its municipalities. See United States v. Laboy-Torres, 553

F.3d 715, 722-23 (3d Cir. 2009) (O'Connor, J., sitting by

designation) ("[C]ongress has accorded the Commonwealth of Puerto

Rico 'the degree of autonomy and independence normally associated

with States of the Union.'") (quoting United States v. Cirino, 419

F.3d 1001, 1003-04 (9th Cir. 2005) (per curiam)).

When the Supreme Court held in 1976 that Puerto Rico has

"[t]he degree of autonomy and independence normally associated with

States of the Union,"[45] it reaffirmed this proposition, which had

longstanding vitality even before the 1984 Amendments or the

---

[45] Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 594 (1976).

enactment of the Federal Relations Act[46] and the creation of the so-called "Commonwealth status."  See Puerto Rico v. Shell Co., 302 U.S. 253, 261-62 (1937) ("The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination with an autonomy similar to that of the states and incorporated territories.").

        Even this court has questioned the basis for Congress's power to legislate over Puerto Rico local affairs.  In one of its Commonwealth-endorsing decisions dealing with the question of whether Congress had the intention to limit Puerto Rico's powers to regulate internal antitrust violations through the Sherman Act's control of purely local affairs of the territories, the court held that "[t]he states are clearly able to adopt such variations as to purely local matters.  And, there is no reason of policy discernible in the Sherman Act for treating Puerto Rico differently."  Córdova, 649 F.2d at 42 (emphasis added).[47]  The court went on to explain how Congress's power to legislate purely local affairs of Puerto Rico is constrained: "We believe that there

_____

        [46]  Act of July 3, 1950, Pub. L. No. 81-600, ch. 446, 64 Stat. 319 (codified at 48 U.S.C. § 731b et seq.); 48 U.S.C. § 821.

        [47]  As in Córdova, there is no discernible policy justification in the Bankruptcy Code to support the conclusion that Congress intended to control the purely local affairs of Puerto Rico.  In fact, if anything, the policy reasons embodied in the constitutional requirement that bankruptcy legislation be uniform throughout the United States would support the opposite conclusion. The 1984 Amendments clearly violate the constitutional policy mandate.

would have to be specific evidence <u>or clear policy reasons</u> embedded in a particular statute to demonstrate a statutory intent to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." <u>Id.</u> at 42 (emphasis added); <u>see also</u> <u>Antilles Cement Corp.</u> v. <u>Fortuño</u>, 670 F.3d 310, 322 (1st Cir. 2012).

In the instant case, there are no articulated or conceivable "clear policy reasons." And while the "specific evidence" requirement could be met by the clear statutory text of the 1984 Amendments, this court has stated that Congress's powers to legislate differently for Puerto Rico under the Territorial Clause are also subject to some "outer limits," in addition to the rational-basis constraints of <u>Harris</u> and <u>Califano</u>. <u>See</u> <u>Jusino-Mercado</u>, 214 F.3d at 44. At a minimum, there should be some explanation as to why Congress's enactment of the 1984 Amendments fits within those "outer limits" given the complete absence of clear policy reasons.

Congress has expressly delegated to Puerto Rico the power to manage its municipalities. Section 37 of the Federal Relations Act provides:

> That the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable, including power to create, consolidate, and reorganize the municipalities so far as may be necessary, and to provide and repeal laws and ordinances therefor; also the power to alter, amend, modify, or repeal any or all laws and

-65-

> ordinances of every character now in force in
> Puerto Rico or municipality or district
> thereof, insofar as such alteration,
> amendment, modification, or repeal may be
> consistent with the provisions of this Act.

P.R. Laws Ann. tit. 1, Federal Relations Act § 37; Federal

Relations Act, Pub. L. No. 64-368, § 37, 39 Stat. 951, 954 (1917),

as amended by Act of July 3, 1950, Pub. L. No. 81-600, 64 Stat. 319

(codified at 48 U.S.C. § 821).[48]

      This court has further reiterated the norm that Puerto

Rico has authority to control its internal affairs in several other

Commonwealth-endorsing decisions.   See, e.g., United States v.

Quiñones, 758 F.2d 40, 42 (1st Cir. 1985) ("Puerto Rico ceased

being a territory of the United States subject to the plenary

powers of Congress as provided in the Federal Constitution. . . .

[T]he government of Puerto Rico is no longer a federal government

agency exercising delegated power."); Córdova, 649 F.2d at 41.

Because Congress was precluded from enacting the 1984 Amendments,

they cannot serve a legitimate purpose and are therefore

irrational.

---

      [48]  For a more detailed description of Puerto Rico's powers to
control its internal affairs, even before the "Commonwealth
status," see, e.g., People of Porto Rico v. E. Sugar Assocs., 156
F.2d 316, 321 (1st Cir. 1946) ("[T]his grant of legislative power
with respect to local matters . . . is as broad and comprehensive
as language could make it. . . . [T]he legislative powers conferred
upon the Insular Legislature by Congress are nearly, if not quite,
as extensive as those exercised by the state legislatures."
(citations and internal quotation marks omitted)); González v.
People of Porto Rico, 51 F.2d 61, 62 (1st Cir. 1932) (quoting
Armstrong, 29 F.2d at 902).

The degree of authority granted to Puerto Rico to regulate its local affairs is very different from Congress's exclusive powers over the District of Columbia, the other territory excluded by § 101(52) from authorizing its municipalities under § 109(c)(2) of the Bankruptcy Code. See Trailer Marine Transp. Corp., 977 F.2d at 8 ("If the government of Puerto Rico were nothing other than the alter ego or immediate servant of the federal government, then the dormant Commerce Clause doctrine would have no pertinence, for a doctrine designed to safeguard federal authority against usurpation has no role when the federal government itself is effectively the actor."); cf. Palmore v. United States, 411 U.S. 389, 397 (1973) ("Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes."); Berman v. Parker, 348 U.S. 26, 31 (1954) ("The power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.").

Any comparison of Puerto Rico to the District of Columbia, therefore, including the proposition made by the majority that Congress may have intended to retain plenary powers to regulate the local affairs of Puerto Rico as it does for the seat of the Federal Government, fundamentally changes the current nature

-67-

of Puerto Rico-federal relations.  To argue that Congress's
rationale for the disparate treatment enacted in the 1984
Amendments is that it may have wanted to adopt "other -- and
possibly better -- options to address the insolvency of Puerto Rico
municipalities"[49] overturns over half a century of binding case law
that purported to recognize that Congress delegated to Puerto Rico
the power to control its municipalities and legislate for its local
affairs.  Congress's solution to the budgetary and fiscal crisis
faced by the District of Columbia during the mid-1990s, through the
enactment of the District of Columbia Financial Responsibility and
Management Assistance Act of 1995, Pub. L. No. 104-8, 109 Stat. 97,
could have been taken for granted considering that the Federal
Government and Congress itself would be directly affected by the
District's financial crisis.  But, the circumstances here are very
different, since no such sense of urgency is evident in Congress,
nor is the requisite political clout available to Puerto Ricans.
And, even if it were, instituting direct Congressional control of
Puerto Rico's finances through a financial control board would
require fundamentally redefining Puerto Rico's relationship to the
United States.  See Flores de Otero, 426 U.S. at 594.

        Without an adequate explanation, the majority chooses to
ignore our own binding case law and suggests that Congress chose to
unreasonably interfere with a managerial decision affecting Puerto

---

[49]   Maj. Op. at 31.

Rico's local municipal affairs.  Although Congress may, in special circumstances, legislate to amend or repeal uniform bankruptcy legislation, such an act, on a totally silent record, cannot be rational considering the long and substantiated jurisprudence that militates to the contrary.

### C.  Rational Basis Review After <u>Harris</u> and <u>Califano</u>

This is an extraordinary case involving extraordinary circumstances, in which the economic life of Puerto Rico's three-and-a-half million U.S. citizens hangs in the balance; this court should not turn a blind eye to this critical situation by ignoring Congress's constraints to legislate differently for Puerto Rico.[50]  Besides being irrational and arbitrary, the exclusion of Puerto Rico's power to authorize its municipalities to request federal bankruptcy relief, should be re-examined in light of more recent rational-basis review case law.  In certain cases, where laws have been found to be arbitrary and unreasonable, and where minorities have been specifically targeted for discriminatory treatment, judicial deference -- even under such a deferential rational-basis standard -- must yield.  <u>See</u> <u>United States</u> v. <u>Windsor</u>, 133 S. Ct. 2675, 2693 (2013) ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group.") (quoting <u>Dep't of</u>

---

[50]  <u>See</u> Maj. Op. 8.

Agric. v. Moreno, 413 U.S. 528, 534-35 (1973)).  Moreover, this Court has recognized that "Supreme Court equal protection decisions have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited permissible justification."  Massachusetts v. Dep't of Health & Human Servs., 682 F.3d 1, 10 (1st Cir. 2012).  "[T]he usually deferential 'rational basis' test has been applied with greater rigor in some contexts, particularly those in which courts have had reason to be concerned about possible discrimination."  Id. at 11 (citing United States v. Then, 56 F.3d 464, 468 (2d Cir. 1995) (Calabresi, J., concurring)).  Rightly so, because, when facing "historic patterns of disadvantage suffered by the group adversely affected by the statute . . . [t]he Court . . . undertake[s] a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review."  Id.  The 1984 Amendments are just another example of a historic pattern of disadvantage suffered by Puerto Rico, but no such careful assessment is performed.  See Igartúa-De La Rosa v. United States, 626 F.3d 592, 612 (1st Cir. 2010) (Torruella, J., concurring in part, dissenting in part) ("This is a most unfortunate and denigrating predicament for citizens who for more than one hundred years have been branded with a stigma of inferiority, and all that follows therefrom.").

A less-deferential rational basis review should also be performed in light of the aforementioned considerations regarding the well-settled law of Puerto Rico's authority over its internal matters.  See Dep't of Health & Human Servs., 682 F.3d at 11-12 ("Supreme Court precedent relating to federalism-based challenges to federal laws reinforce the need for closer than usual scrutiny . . . and diminish somewhat the deference ordinarily accorded.").

### III.  __This Court Now Sends Puerto Ricans to Congress__

The justification for the degree of judicial deference afforded by our constitutional jurisprudence under the typical rational basis review is founded on the basic democratic tenet that, "absent some reason to infer antipathy," courts should not intervene with legislative choices because "even improvident decisions will eventually be rectified by the democratic process . . . ."  Beach Commc'ns, 508 U.S. at 314 (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)).  And, while the democratic process was equally foreclosed to Puerto Ricans at the time Harris and Califano were resolved, here the situation is different because, contrary to the Supreme Court's statements in those two cases, we have not been presented with a single plausible explanation of why Congress opted for the disparate treatment of Puerto Rico.

The majority offers Puerto Rico the alternative to seek a political solution in Congress and cites proposed changes in the

relevant legislation pending before Congress to show that Puerto

Rico is advancing in that direction.  While I acknowledge that, in

some contexts, the fact that Congress has taken steps to remedy a

purportedly unfair statutory distinction may be relevant to

avoiding judicial intervention under rational basis review, see

Vance, 440 U.S. at n.12, when Puerto Rico is effectively excluded

from the political process in Congress, this is asking it to play

with a deck of cards stacked against it,[51] something this same panel

of this court has previously recommended, but to no avail.[52]

---

[51] Pursuant to the majority's construction of the statutory text, obtaining Congress's authorization to file for Chapter 9 protection would imply a procedure that need not require the enactment of a statute.  Regardless of this, Puerto Rico has no political representation in Washington, other than a non-voting member of Congress.  See, e.g., Igartúa-De La Rosa v. United States, 417 F.3d 145, 159 (1st Cir. 2005) (Torruella, J., dissenting); Juan R. Torruella, Hacia Dónde Vas Puerto Rico? Puerto Rico, 107 Yale L.J. 1503, 1519-20 (1998) (reviewing José Trías Monge, The Trials of the Oldest Colony in the World (Yale University Press, 1997)) ("[T]hat Puerto Rico has a 'representative' in Congress without a vote is not only a pathetic parody of democracy within the halls of that most democratic of institutions, but also a poignant reminder that Puerto Rico is even more of a colony now than it was under Spain.").

[52] See Sánchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 103 (1st Cir. 2012) (stating in dismissing a claim against the United States for injuries caused by the Navy's pollution of Vieques, that "the plaintiffs' pleadings, taken as true, raise serious health concerns. [. . .] The Clerk of Court is instructed to send a copy of this opinion to the leadership of both the House and Senate."); see also id. at 120 (Torruella, J., dissenting) ("Access to the political forum available to most other citizens of the United States has already been blocked by this same Court." (citations omitted)).

## IV.   The "Business-as-Usual" Colonial Treatment Continues

The majority's disregard for the arbitrary and unreasonable nature of the legislation enacted in the 1984 Amendments showcases again this court's approval of a relationship under which Puerto Rico lacks any national political representation in both Houses of Congress and is wanting of electoral rights for the offices of President and Vice-President.  That discriminatory relationship allows legislation -- such as the 1984 Amendments -- to be enacted and applied to the millions of U.S. citizens residing in Puerto Rico without their participation in the democratic process.  This is clearly a colonial relationship, one which violates our Constitution and the Law of the Land as established in ratified treaties.[53]  Given the vulnerability of these citizens before the political branches of government, it is a special duty of the courts of the United States to be watchful in their defense. As the Supreme Court pronounced in United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938), "prejudice against . . . insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."  I am

---

[53]   See Igartúa-De La Rosa, 417 F.3d at 185-86 (Howard, J., dissenting) (questioning the U.S. Senate's declaration that the International Covenant on Civil and Political Rights, ratified by Congress in 1992, is not self-executing).

sorry to say this special duty to perform a "more searching inquiry" has been woefully and consistently shirked by this court when it comes to Puerto Rico, with the majority opinion just being the latest in a series of such examples.[54]

When the economic crisis arose, after considering Congress's cryptic revocation of Puerto Rico's powers to manage its own internal affairs through the 1984 Amendments, Puerto Rico looked elsewhere for a solution. It developed the Recovery Act enacted pursuant to the police powers this very court had sustained, to fill the black hole left by the 1984 Amendments introducing of the definition now codified in § 101(52). And while I agree with the majority that Puerto Rico could not take this step because Chapter 9 applies to Puerto Rico in its entirety, I commend the Commonwealth for seeking ways to resolve its predicament.

Even if one ignores the uncertain outcome of any proposed legislation, questions still remain: why would Congress intentionally take away a remedy from Puerto Rico that it had before 1984 and leave it at the sole mercy of its creditors? What legitimate purpose can such an action serve, other than putting

---

[54] See, e.g., Igartúa-De La Rosa, 626 F.3d at 612; Igartúa-De La Rosa, 417 F.3d at 159; Igartúa-De La Rosa v. United States, 229 F.3d 80, 85 (1st Cir. 2000) (Torruella, J., concurring); López v. Arán, 844 F.2d 898, 910 (1st Cir. 1988) (Torruella, J., concurring in part and dissenting in part); see also Juan R. Torruella, The Insular Cases: A Declaration of Their Bankruptcy and My Harvard Pronouncement 61 (Gerald L. Neuman and Tomiko Brown-Nagin eds., 2015).

Puerto Rico's creditors in a position that no other creditors enjoy in the United States?  While favoring particular economic interests -- _i.e._, Puerto Rico creditors -- to the detriment of three-and-a-half million U.S. citizens, is perhaps "business as usual" in some political circles, one would think it hardly qualifies as a rational constitutional basis for such discriminatory legislation.

## V.  Conclusion

The 1984 Amendments are unconstitutional.  Puerto Rico should be free to authorize its municipalities to file for bankruptcy protection under the existing Chapter 9 of the Bankruptcy Code if that is the judgment of its Legislature.

I concur in the Judgment.